```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
2                              ATLANTA DIVISION

3

4
   UNITED STATES OF AMERICA,         )
5                                    )
                     Plaintiff,      )   CRIMINAL ACTION FILE
6              v.                    )   NO. 1:17-CR-00229-AT-CMS
                                     )
7   JARED WHEAT,                     )
    JOHN BRANDON SCHOPP, and         )   MOTION HEARING
8   HI-TECH PHARMACEUTICALS, INC.    )
                                     )
9                    Defendant.      )
   _____  )
10

11

12  -------------------------------------------------------------

13                      BEFORE THE HONORABLE

14            MAGISTRATE JUDGE ALAN J. BAVERMAN

15               TRANSCRIPT OF PROCEEDINGS

16                      DECEMBER 7, 2017

17  -------------------------------------------------------------

18

19         Proceedings recorded by mechanical stenography
             and computer-aided transcript produced by
20

21             WYNETTE C. BLATHERS, RMR, CRR
                    Official Court Reporter
22                   2314 U.S. Courthouse
                   75 Ted Turner Drive, SW
23                  Atlanta, Georgia  30303
                       (404) 215-1547
24

25
```

```
1   APPEARANCES:

2   For the Plaintiff:          STEVEN D. GRIMBERG
                                KELLY K. CONNORS
3                               NATHAN P. KITCHENS
                                Assistant United States Attorneys
4                               600 U.S. Courthouse
                                75 Ted Turner Drive SW
5                               Atlanta, Georgia  30303

6   For the Defendant          BRUCE S. HARVEY, ESQ.
    Jared Wheat:               Law Office of Bruce Harvey
7                              146 Nassau Street NW
                               Atlanta, Georgia  30303
8
    For the Defendant          ARTHUR W. LEACH, ESQ.
9   Hi-Tech and Jared Wheat:   Law Office of Arthur W. Leach
                               5780 Windward Pkwy, Suite 225
10                             Alpharetta, Georgia  30005

11                             JACK WENIK, ESQ.
                               Epstein Becker & Green, PC
12                             One Gateway Center
                               Newark, New Jersey  07102
13
    For the Defendant          WARREN C. LIETZ, III, ESQ.
14  John Brandon Schopp:       Kish & Lietz, PC
                               1700 South Tower
15                             225 Peachtree Street NE
                               Atlanta, Georgia  30303

16

17

18

19

20

21

22

23

24

25
```

1                    Thursday Afternoon Session

2                        December 7, 2017

3                          3:30 p.m.

4                          -  -  -

5                  P R O C E E D I N G S

6          COURTROOM DEPUTY:  All rise.  United States District

7   Court for the Northern District of Georgia is now in session,

8   Judge Baverman presiding.

9          THE COURT:  Good afternoon, everyone.  Please be

10  seated.  All right.  This is the case of United States of

11  America v. Jared Wheat, John Brandon Schopp, and Hi-Tech

12  Pharmaceuticals, and it's 1:17-CR-229.  It's assigned to Judge

13  Totenberg and to Judge Salinas.

14          Let's see here, representing the United States I have

15  Mr. Grimberg, Mr. Kitchens, Ms. Connors.  Representing

16  Mr. Wheat I have Mr. Harvey, Mr. Wenik, Mr. Leach.  Mr. Leach

17  is representing the corporation; is that correct?

18          MR. LEACH:  Yes, sir.

19          MR. WENIK:  Yes, your Honor.

20          THE COURT:  And Mr. Lietz is here representing

21  Mr. Schopp.

22          So I set this down for a hearing.  Unfortunately,

23  when I initially set it down for a hearing, I wasn't expecting

24  to have complications from surgery, so I had to postpone it.

25  So I'm sorry about that.  But we're here to hear Mr. Wheat's

1   and Hi-Tech Pharmaceutical's motion, which is Document No. 45,

2   to amend the conditions of release.  And Mr. Lietz, on behalf

3   of Mr. Schopp, has filed No. 56, which is to adopt the motion.

4   I don't see any reason not to allow Mr. Schopp to adopt this

5   motion --

6           MR. GRIMBERG:  No, your Honor.

7           THE COURT:  -- do you want to be heard on that?

8   Okay.  So I'll grant the motion to adopt.  So is everybody

9   ready?

10          MR. WENIK:  I believe so, your Honor.

11          THE COURT:  Okay.  All right.  Mr. Wenik, certainly.

12          MR. WENIK:  Good afternoon, your Honor.  And let me

13  begin by thanking the Court for allowing me to appear pro hac

14  vice.  I was an AUSA in New York and Philadelphia, and I feel

15  surrounded by southern charm here but I'll do my best.

16          Judge, we're here about a very narrow issue, and that

17  is the condition banning the sale and manufacture of DMAA,

18  whether that should remain as part of the conditions on behalf

19  of Hi-Tech.  And I want to speak on behalf of Hi-Tech as to

20  the DMAA.  I believe Mr. Leach would like to address the

21  coercion aspect, and Mr. Harvey will speak on behalf of

22  Mr. Wheat.

23          But it's a very simple issue.  The statutes are such

24  that one can impose conditions of release for two basic

25  reasons.  One is it's a flight risk and the second to protect

1   the safety of the public.  And when we're talking, especially

2   about that second prong, the safety of the public, the burden

3   is on the government to prove by clear and convincing evidence

4   that the conditions put in place are the, quote unquote, least

5   restrictive needed to ensure the safety of the public.

6           And in this matter and in this case the condition

7   forbidding the sale of DMAA is not the least restrictive

8   condition to ensure the safety of the public.  Indeed, as I

9   will argue to you, your Honor, it is an overreaching by the

10  government to attempt to use this improper vehicle to achieve

11  what it could not achieve in four years of civil litigation.

12          THE COURT:  Well, let me ask you this question

13  because you're right, this is a very narrow issue.  And

14  it's -- you would agree that it's a violation of the law to

15  introduce adulterated substances into the marketplace?

16          MR. WENIK:  Sure.

17          THE COURT:  Okay.  And some of the charges related --

18  some of the charges included in the superseding indictment,

19  they don't concern that one substance but involve introducing

20  adulterated substances into the marketplace; right?  So

21  typically when somebody gets released here, the first and

22  foremost restriction is don't violate the law.  So what I'm

23  faced with is an order of a much superior and wiser judge than

24  I am, Judge Hunt, who says that in the 13-CV-3675 case that

25  substances, DMAA, is -- that products for human consumption

1  containing DMAA are adulterated foods under the Food And Drug

2  Cosmetics Act, and that's on appeal.

3       And I know that Hi-Tech and Mr. Wheat -- I don't

4  think Mr. Schopp was part of that proceeding technically.  But

5  they were the movants or the respondents in that other action,

6  have that on appeal.  So if there is a case out there that

7  says that DMAA in food is an adulterated food, if it's in

8  there, and the defendants can't traffic in adulterated food,

9  then let's just assume for the moment that I say, well, DMAA

10 is -- I'm not going to have it expressed on there, but there's

11 a decision out here which says that the same identical

12 material seized from these defendants is adulterated or not

13 allowed to be marketed.

14       MR. WENIK:  I don't think it quite says -- my

15 interpretation of what Judge Hunt wrote is quite on all fours

16 of what your Honor is saying.

17       THE COURT:  Well, I know.  He didn't say --

18       MR. WENIK:  He didn't come out and say this is an

19 illegal substance or illegal product.

20       THE COURT:  He didn't say -- two things.  Well, the

21 most important thing is this was not an injunction -- that was

22 not an injunction action which said defendants can't market

23 DMAA products.  Basically all he found was that the DMAA

24 substances that were seized were subject to being forfeited.

25 But he made a finding which -- you know, I know we don't

1   really deal with this in the criminal area, but in the civil

2   area right now it's res judicata.  It's collateral estoppel,

3   even though it's on appeal.  And that's what I'm struggling

4   with, Mr. Wenik.

5           MR. WENIK:  And I think, to address your Honor's

6   concern, one of the things we mention in our papers, which I

7   think is very significant, is that subsequent to that decision

8   that your Honor is referencing the government applied to Judge

9   Hunt for an order to expressly ban the sale and manufacture of

10  DMAA and he did not grant that relief and --

11          THE COURT:  He did not grant -- he didn't deny it.

12  He just didn't rule on it.

13          MR. WENIK:  He ignored it completely, and that's what

14  I think your Honor should find troubling, is that from

15  November of 2013 when the government first detained DMAA

16  containing products at Mr. Wheat's establishment, until

17  October of 2017 when they came into your Honor's courtroom for

18  this order, they never moved for an injunction.  They never

19  moved for any sort of ban pursuant to the regulatory process.

20  They never even objected to the continued sale of DMAA, which

21  was both open and notorious for more than four years.  And

22  even in addition to that, not only was it open and notorious,

23  but throughout the civil litigation they took the position

24  that they weren't going to seize any additional DMAA

25  containing products until that matter had been fully litigated

1  and decided in that civil litigation.  So I find it --

2          THE COURT:  Well, isn't it -- hasn't it now been

3  fully litigated and decided?

4          MR. WENIK:  Well, it's on appeal.  And, again, that

5  decision is limited to the res, if you will, of what was

6  seized.  They are now trying to use a bail condition to

7  achieve what they could not achieve elsewhere.  In other

8  words, I don't think the law is such that you can impose any

9  bail condition whatsoever if it has no relation to safety or

10 preventing someone's flight.

11         THE COURT:  I agree.  I agree.

12         MR. WENIK:  And what's troubling, I think should

13 trouble your Honor, is what has all of a sudden, what light

14 switch has been flicked on and off that now makes DMAA a

15 danger to the community that it has to be banned, and we can't

16 sell it when for the last four years that wasn't a problem.

17         And I would proffer to you, your Honor, that if we

18 did have a hearing here on the, quote unquote, dangers of

19 DMAA, the evidence will be overwhelming to the contrary.  I

20 would submit -- and I could just pull the affidavits that were

21 submitted in the civil litigation -- I have a Ph.D.

22 toxicologist, three board certified physicians, an entire

23 panel of experts, all of whom would say that DMAA is

24 completely safe for human consumption at the levels that are

25 included or were included in the Hi-Tech products.

1          THE COURT:  Well, I mean, I understand that.  I mean,

2   I have not read the whole record of the civil action in front

3   of Judge Hunt, but I read a lot of it.  And although it's not

4   exactly binding because I'm not bound by an order of a

5   district judge, I do know where my bread is buttered.  And

6   Judge Hunt did have an evidentiary hearing and it doesn't

7   seem --

8          MR. WENIK:  There was no evidentiary hearing.  It was

9   just summary judgment.

10          THE COURT:  Well, he had summary judgment where he

11   considered the evidence, he considered the burdens, and he

12   ruled.  Now, he might be right or he might be wrong, so I'm

13   concerned.

14          MR. WENIK:  He did not rule that DMAA was unsafe or

15   dangerous.

16          THE COURT:  I know, but he held that products

17   containing DMAA were adulterated foods under the FDCA Act, and

18   that's the problem that the Court has because the defendants

19   are not allowed to market adulterated food products while on

20   bond.  That's a specific condition.  And so if there is a --

21   in the absence of some judicial finding that DMAA contained in

22   food is an adulterate -- is adulterated food or contained in a

23   product is an adulterated food, we would be having a lot

24   different conversation here.

25          But, you know, we have these defendants with the

1  exception of Mr. Schopp -- Mr. Schopp is part of Hi-Tech --

2  and these, at least Mr. Wheat and Hi-Tech, are bound by the

3  findings in 13-CV-3675 unless Judge Hunt either issues a Rule

4  62.1 order or the circuit reverses him.  And so for me to

5  ignore a binding final order by a district judge involving the

6  same defendants is -- well, first of all, it's not an action

7  that I'm willing to take.

8          MR. WENIK:  But if we're talking about deferring to

9  Judge Hunt, shouldn't we defer to Judge Hunt who refused to

10  impose the very relief that apparently the government coerced

11  from Mr. Wheat here?

12          THE COURT:  Well, let's see this through.  Wait a

13  minute.  Okay.  Let's see this through.  So let's say I agree

14  with you, okay, and I take the position that the government,

15  although, you know, it's the civil side of the government, but

16  it's one government, the government asked Judge Hunt to bar

17  the defendants from marketing DMAA goods.  For whatever reason

18  Judge Hunt didn't issue an order doing that.  He did make a

19  key finding that DMAA is, you know, is not kosher, so to

20  speak, but he didn't ban them.

21          So let's just say that I agree with you and I say,

22  all right, the defendants can market DMAA.  All right.  I have

23  an order out here that is binding on these guys, on at least

24  two of the three defendants, which says this is adulterated

25  food and that products containing DMAA are adulterated.  And

1  that would, I think at a minimum, would prompt the government

2  to go to Judge Hunt and seek contempt for violation of his

3  order.  And I would be sitting -- you know, I would then be

4  looking at Judge hunt saying I said this stuff can't be, you

5  know, is adulterated.  Why are you giving them permission to

6  do it?

7       MR. WENIK:  Well, I don't think it's that I'm asking

8  you, your Honor, to give us permission.  I'm asking you to

9  have -- if the order just read, as you surmised, that we just

10  can't sell adulterated products, I wouldn't be here.  I'd be

11  back in New Jersey asking for Eli Manning to start again.  I

12  wouldn't be here arguing before you.  And --

13       THE COURT:  I was just in Philadelphia.  My God.

14  That's all they talk about up there.  They weren't going to

15  talk about the Eagles, but they were talking on Eli Manning.

16       MR. WENIK:  It's a big deal for us.  But my point is

17  if they're so confident that Judge Hunt's ruling has that

18  expansive effect -- and I would argue that it didn't, that

19  what he ruled is technically in his view based on something he

20  created out of the legislative history that didn't exist.

21  It's a, quote, food additive.  But putting that aside for a

22  minute, they should come in here and meet their evidentiary

23  burden to show.  Let me just hand up one other thing to your

24  Honor which I think is significant.

25       So to try to address some of the things we're talking

1  about, one of my colleagues wrote to the government and said
2  we want to know -- here's a list of our products that we're
3  selling, and we want to know which of these products that
4  you're going to have a problem with, that you're going to
5  claim is adulterated.  And the letter basically comes back to
6  us, this one paragraph letter, saying we're not going to opine
7  on anything.  Whatever you do you do at your own risk.  And I
8  think the core point that we're trying to make here,
9  particularly if you get into the underlying conduct that
10 happened in that litigation that led to Hunt's decision, and I
11 don't want to get too down in the weeds.  But from our
12 perspective there was some fraud that went on that was both
13 funded and directed by the government in the course of that
14 litigation and candidly some conduct that was questionable
15 ethics in putting forward research by reachers who I would
16 assert were lying.

17         And if the government is so convinced that DMAA is a
18 danger and adulterated, let's have an objective order and let
19 them come in here and prove it as opposed to coercing it for
20 Mr. Wheat one minute before your Honor is to come out to hear
21 argument on what the appropriate bail condition is.  That's
22 what really is the crux of the matter here.

23         You know, the following afternoon the government --
24 and I don't want to get too into this because there are other
25 motions dealing with the search warrants.  But the government

1   went and seized five tractor trailer loads of DMAA containing

2   products and ironically leaving at the premises products that

3   were actually containing things that are in the indictment.

4   And the whole course of conduct here just really smacks of

5   overreaching and a subterfuge to circumvent the civil

6   litigation process, what was going on and what has been going

7   on for the last four years.

8           You know, the government is relying on Mr. Wheat's

9   coerced consent to this.  If we had a hearing, an evidentiary

10  hearing, there's no doubt in my mind that they could not

11  present to this Court a single death or serious injury caused

12  by DMAA, not one.  Not only has Hi-Tech not had any deaths or

13  serious injuries, but in the one case that's been litigated,

14  the *Farland* case, the Court threw out all the expert

15  testimony.  So there is no link between DMAA and adverse

16  medical outcomes.

17          So we stand before you saying sure we have no problem

18  with a condition saying obey the law, don't sell adulterated

19  products.  But don't insert DMAA into that order when I ask

20  you to put your money where your mouth is and you say we're

21  not going to tell you anything.  But what we are going to do

22  is because we couldn't get the relief that we would seek for

23  years is bootstrap with this proceeding to get that order,

24  which, again, the standard is clear and convincing evidence

25  that this is necessary to protect the public.

1           Where is their evidence?  Where is their evidence

2    that DMAA is a danger to anybody?  Where is their evidence

3    that anyone has been harmed by it?  Obviously, Judge Hunt

4    didn't feel so or he would have given them that injunction.

5    Obviously they didn't feel so, they meaning the government

6    generally, not these particular individuals here, because

7    throughout four years of litigation, I mean, Mr. Wheat was

8    issuing press releases about the sales of DMAA and the

9    products.  There was no secret here, what was going on, and

10   they allowed it to go on because they know that there is

11   nothing dangerous about DMAA.  And that is the real crux of

12   the problem here, Judge.  I think that to impose a bail

13   condition that dealing with safety it has to have some logical

14   nexus in the facts, not in their interpretation of Judge

15   Hunt's decision, which is of limited applicability.  And they

16   did not get the specific release they got from you from Judge

17   Hunt, and they didn't even get it from you by proffering

18   evidence or having a hearing.  They got it --

19           THE COURT:  It was contested.

20           MR. WENIK:  I would say inappropriately by coercing

21   Mr. Wheat, who hadn't had his medications, who had his

22   daughter, 15-year-old daughter who wasn't being supervised,

23   who had no idea candidly what was going on in a whirlwind of a

24   minute or two in a courtroom to decide something off candidly

25   the top of his head.

1           THE COURT:  Let me ask you this question, Mr. Wenik,

2     because I know that in the civil action there was a motion for

3     reconsideration, and I didn't get deep into the weeds of the

4     motion.  I just read the order denying it.  And I know that in

5     y'all's motion trying to get me to revise the release

6     conditions, you make additional concern.  When I say you, the

7     defense, makes additional concerns about the integrity of the

8     evidence that goes towards the DMAA issue.  Is there

9     additional material that you have presented in your motion in

10    front of me that is additional and/or different than the

11    material that was submitted to Judge Hunt?

12          MR. WENIK:  I would think -- I think that obviously

13    you don't have the entire record that obviously Judge Hunt had

14    so there would be us -- what we submitted to you was a subset

15    of what was submitted to Judge Hunt.

16          THE COURT:  Okay.  So here's the question then, and

17    my previous question was poorly worded.  The information that

18    you're presenting to me hoping that I agree with you that

19    Judge Hunt's conclusions were suspect because of the

20    information that was presented to him, that information was

21    already presented to Judge Hunt?

22          MR. WENIK:  I believe that in our summary judgment

23    briefs the allegations that we had made about some of the

24    fraudulent conduct by government researchers, yes, that was

25    before Judge Hunt.

1         THE COURT:  Right.  And you're not telling me

2  anything new that you didn't present to Judge Hunt?

3         MR. WENIK:  Not in that regard, no, no.

4         THE COURT:  Okay.

5         MR. WENIK:  I would agree with your Honor on that

6  point, but, you know, I think the other point is you can't

7  consider what's going on here, you know, in isolation.  And,

8  again, I know we're here on a narrow issue, but the fact of

9  the matter is that the whole process of how the search

10  warrants were applied for, what was sent or disclosed to you

11  in that context and how this all came about, I candidly

12  question the integrity of what was taking place here.

13         Again, what makes this different -- you know,

14  sometimes you come into a bond hearing -- I've had cases, you

15  know, child pornography cases -- and you'll say the defendant

16  can't use his computer, which isn't a crime in and of itself,

17  but the notion is, well, we want to make sure to prevent this

18  person from maybe looking at other inappropriate images.  And

19  so you get that.

20         Even though you're not telling us all not to do

21  something illegal, it's part of the protecting the public.

22  Here this doesn't protect anybody.  This product has been sold

23  openly, notoriously for the entire four years that this

24  litigation has been going on.  This product which was, quote,

25  in plain view which led to a subsequent search, of course it

1  was in plain view.  We advertised it for sale.

2          THE COURT:  Well, let me ask you this:  Suppose --

3  and I know it won't happen, but suppose tomorrow the Eleventh

4  Circuit affirms Judge Hunt and in all respects rejects the

5  arguments on appeal and says that products containing DMAA

6  constitutes an adulterated food under the Food Drug and

7  Cosmetic Act, so therefore they can't be sold.  All right.

8  Does that change your argument or is your argument solely

9  because Judge Hunt -- because your argument is Judge Hunt's

10  order is wrong because of the information that he was

11  presented with?

12          MR. WENIK:  There is nothing illegal about DMAA.

13  It's not a Schedule III drug, unlike say the example of

14  ephedra when it was a specific regulatory proceeding to ban

15  the product.  Nothing of that sort has happened here.  So if

16  the Eleventh Circuit says that DMAA should have been the

17  subject to either an NDI, a new drug identification -- a new

18  dietary ingredient identification proceeding or should have

19  been subject to a more formal grasp generally recognized as

20  safe proceeding and paneled.  So we would then have to go back

21  and go through those logistical and regulatory hoops, for lack

22  of a better expression, to dot all our I's and cross all our

23  T's for DMAA to be sold.  But the ruling from Judge Hunt, just

24  so we all understand, wasn't because adulterated in the sense

25  that there's something wrong with it, unwholesome or illegal.

```
 1   His ruling basically was -- and I think it's wrong -- that his
 2   reading of the statutory and regulatory requirements for what
 3   one has to show for something to be a dietary ingredient
 4   versus a food additive is different from our interpretation --
 5           THE COURT:  I understand.
 6           MR. WENIK:  -- and so if the Eleventh Circuit affirms
 7   that, what we would do is go through the process of if the
 8   Court rules it is a, quote, new dietary ingredient and you
 9   then go through all the procedures for selling and marketing a
10   new dietary ingredient, I presume Hi-Tech would do the new
11   dietary ingredient notification and all those requirements or
12   if the Court says, no, I think that Judge Hunt is right, it is
13   a food additive and not a dietary ingredient at all, then we
14   would go through the grass process and jump through those
15   regulatory and logistical hoops to get it approved in that
16   manner.
17           And the reason we haven't done that to date was
18   because this case in our view has important implications for
19   the dietary supplement industry that the government shouldn't
20   be allowed to just unilaterally declare something a new
21   dietary ingredient or food additive to force companies like
22   Hi-Tech to go through these additional regulatory hoops.  But
23   it's not that the Eleventh Circuit's decision is going to put
24   an end to the sale of DMAA in the United States, far from it.
25           THE COURT:  No, I understand that, and just help me
```

1   out here.  So a product is an adulterated food regardless of

2   whether or not it's harmful.  You can have an adulterated food

3   that just hasn't gone through all of the regulatory steps.

4           MR. WENIK:  That's correct.

5           THE COURT:  And if you market an adulterated food,

6   even though it's completely safe, you can be subject to

7   criminal prosecution?

8           MR. WENIK:  Well, we get into issues of scienter and

9   all the --

10          THE COURT:  Right, all that sort of stuff.

11          MR. WENIK:  I think that if you're knowingly

12  marketing something that's a, quote, unapproved new food

13  additive that's therefore adulterated, I suppose there might

14  be some theory of government action based on that.  But the

15  problem, I think, for the government here is that we've been

16  in active litigation over that very issue for four years.

17          You know, this letter basically says to me that, you

18  know, everything else you're going to sell we don't care

19  because we want to get what we couldn't get in the civil

20  litigation in this context here.  That, I believe, Judge, is

21  what's truly inappropriate.  Let them come and put on evidence

22  that DMAA is a danger to the public.  That's what the bail

23  statute requires.  Obviously we have to obey the law.  That

24  would be true whether we had any order at all or not.

25          THE COURT:  So what I don't have is a copy of

1  Mr. Morris's October 26th letter that Mr. Grimberg responded

2  to.

3          MR. WENIK:  I'll get that for you, Judge.  I don't

4  have it with me today, but based on my understanding, it was a

5  list of the various products that we sell and what they

6  contain.

7          THE COURT:  Okay.

8          MR. WENIK:  With that, Judge, I think I'll hand it

9  over to Mr. Leach, who would like to make few comments about

10 the coercive aspect of this.

11         MR. LEACH:  Judge, the one point I want to touch on

12 has to do with the reason why at the point that we were before

13 your Honor we did not understand the full import part of it

14 has to do with the fact that Mr. Wheat has got certain medical

15 issues, which we've talked about in our papers and I won't

16 detail here, which, you know, the government would have been

17 aware of, that these are things that have been out in the

18 press because of interactions with the Court in the past.

19         But setting that aside for a moment and setting

20 apart, you know, the issues with his daughter and lack of

21 medication and so forth, one of the very important things for

22 the Court to think about -- because this Court was involved in

23 it, and I don't mean that in any sort of negative sense, it's

24 just the way things shook out -- is that we came in this

25 courtroom, and we had that hearing.

1           And there was a warrant that was presented to you

2    shortly thereafter, and I'm confident, based upon my review of

3    that warrant, that the Court had no earthly idea that the

4    seizure of evidence was going to involve $19 million worth of

5    product, over five truckloads.  It's at least five truckloads,

6    by our estimate, because it was 109 pallets of material.  So

7    we're in a slightly different and unusual circumstance here

8    because that sort of seizure for evidence, which is what that

9    has been represented to us by AUSA Grimberg, you know, that

10   that was seized for evidence.  There is no forfeiture

11   proceeding going on with regard to all of that material that

12   was taken.

13          By your Honor's warrants they also seized our

14   operating accounts, and granted that is subject to motion

15   practice and that's not before the Court.  But I raise that

16   just so the Court will know that it's approximately

17   $22 million when you take all the product that they took out

18   of the Hi-Tech facilities.  Now, you have to contrast that

19   with the fact that in this indictment all of that material

20   that was seized, DMAA is not in this indictment.

21          What we do is we have red yeast rice, and we have

22   DHEA, which they left in the building.  Additionally, your

23   Honor, the res, that is, the property that was subject to the

24   case before Judge Hunt was kept throughout the four years at

25   Hi-Tech, and they did not disturb that either with good

1    reason, because when the marshal goes into the facility and

2    seizes the res in place, if they were to remove it, they would

3    destroy Judge Hunt's jurisdiction over that property.

4           So we can have that property sitting in our

5    facilities for four years untouched.  There's never been an

6    allegation that we ever did anything with regard to that

7    property that was subject to the civil forfeiture, yet they're

8    going to come in and remove from the business $19 million

9    worth of raw materials and finished goods because they have

10   DMAA in them.

11          THE COURT:  Wasn't there a distinction because now

12   there is a final order of the United States district judge

13   saying that DMAA is adulterated food or it's a shorthand way

14   of saying products containing DMAA are adulterated food under

15   the act?  Isn't that a distinction?

16          MR. LEACH:  In terms of a search is what you're

17   talking about?

18          THE COURT:  Correct.

19          MR. LEACH:  Yeah.  In terms of a search, but in this

20   Court's experience -- and I know this Court has had long

21   experience before you came to the bench.  I mean, when have

22   you ever seen a seizure of five truckloads of material under

23   circumstances where other indicted material is left in place?

24   I mean, the motive in what's going on here is just clear as a

25   bell.

1          And, you know, Judge, if the government had turned

2     around, superseded the indictment, and DMAA is in there, we're

3     done, you know.  But that is not what's happened here.  If the

4     government had turned around and filed a civil forfeiture

5     action against that 109 pallets of material, you know, you can

6     envision what the caption of that case would be, United States

7     v. 109 pallets of DMAA, you know, if they had done that.  We

8     have none of that under these circumstances.  We are sitting

9     here where we've been told, oh, it's seized for evidence, as

10    though when we try a case, 109 pallets are going to be

11    presented somehow to a Court and a jury.  It's just not going

12    to happen.  And the reason why I point all of this out is

13    simply to say to you, Judge, that there's no remedy here.

14          Under CAFRA, as you will remember, the Civil Asset

15    Forfeiture Reform Act -- 2000 is when it's passed -- FDA has a

16    carve-out.  So where the government gets forfeiture wrong,

17    under CAFRA litigants have a course of action that they can

18    go.  And the asset forfeiture fund is there in place not only

19    to pass money out to government entities that participate in

20    the fund but also when the government gets it wrong, to

21    compensate those people who have been wronged.

22          We have no such remedy as that.  We are under the old

23    system where we're going to have to make a presentation to the

24    Court and object to a certificate of good cause.  And when

25    that happens, our remedies, in terms of what we can get even

1    when the Court says, you know what, you did not have good

2    cause for this seizure, are very limited.  So I just think

3    that this is an unusual circumstance combined with everything

4    else, combined with the fact that we had no knowledge that

5    that warrant was coming, that they were going to go in there

6    and have five trucks ready to go to take all that material

7    out.

8              It's not normally something that you see.  Normally

9    you have a bank robber appear.  Don't violate the law.  It's

10   not costing 19-, 20-, $22 million for that person to invoke

11   that standard by the Court, and I just think that because it's

12   an unusual circumstance, the Court should just consider that

13   as part of the factor.

14             So if the government stands up today and says, you

15   know what, we're going to supersede today after tomorrow and

16   we're including DMAA, I don't think that's going to happen,

17   though, because the exposure here is that when it goes up on

18   the Eleventh Circuit and it gets reversed, as Mr. Wenik and I

19   believe is going to be the result, then what happens with

20   their case?  It's lost.  So I just don't think that is the

21   route that we're going.

22             Thank you, Judge.

23             THE COURT:  Thank you, Mr. Leach.  Mr. Harvey.

24             MR. HARVEY:  Can I remain here?  Can you hear me?

25             THE COURT:  You can certainly remain there.

1          MR. HARVEY:  You okay?  I just wanted to add

2  something very briefly.  It's been well argued by these

3  gentlemen, the substance.  But, you know, these decisions have

4  real world consequences.  They have real world consequences to

5  all of these people sitting here.  The representations made to

6  the Court are that people are losing their job.  The business

7  itself may become extinct by the time the Eleventh Circuit

8  rules.  And every one of these people is going to be impacted,

9  and hundreds of people are going to lose their jobs and have a

10 tremendous difficulty.

11         Here's the problem:  You know, you said, well, what

12 if the Eleventh Circuit affirms it tomorrow?

13         THE COURT:  No, they won't.  We're under a one-inch

14 blizzard tomorrow.

15         MR. HARVEY:  But let's flip that coin.  What if they

16 say tomorrow or six months from now that Judge Hunt was, in

17 fact, wrong and it's not an adulterated product.  In the

18 meantime, every one of these people have lost their jobs.  He,

19 Mr. Wheat, has lost millions of dollars, and he's out of

20 business.  And what does the government say?  Tough?  Tough?

21         Don't you in your infinite wisdom have the ability to

22 craft something so that Mr. Wheat and everybody that depends

23 upon him can have the assurance that if the Eleventh Circuit

24 reverses Judge Hunt, that Mr. Wheat can stay in business,

25 people can continue to eat?  And the government ought to be

1  able to allow Mr. Wheat to continue to operate because what if

2  the Eleventh Circuit reverses?

3          THE COURT:  Well, how do I do that?

4          MR. HARVEY:  Good question.

5          THE COURT:  Let me just -- let's assume for the

6  moment I agree with you; right?

7          MR. HARVEY:  And you should because I'm right.

8          THE COURT:  But how would I do that?  How am I,

9  clearly not Willis Hunt, right, able to ignore that order

10  which says DMAA is adulterated food and say all right,

11  Mr. Wheat, and all right, Mr. Schopp, and all right, Hi-Tech,

12  go ahead, knock yourselves out, sell as much DMAA material as

13  you can in order to employ these people but there's an order

14  out here which says DMAA is adulterated, which means you have

15  to go through whatever hoops you have to go through in order

16  not to be in violation of the law and I've told these folks

17  they can't violate the law while they're out?

18          So I'm going to say go ahead and do it.  I would

19  expect pretrial services to bring me a warrant the next day

20  and say they're violating the law.  What do I do about that?

21          MR. HARVEY:  But, you know, there are things that

22  civil courts do that I think can jump the bridge between civil

23  litigation and criminal litigation.  On the one hand, if you

24  don't do it and we win on appeal, the government has put

25  Mr. Wheat out of business and put a bunch of people out of

1   business.  They've seized $19 million worth of product and

2   $3 million of cash from a bank account.  So, you know,

3   ordinarily we've got to put up a bond.  We have to do

4   something in order to ensure that if the order gets reversed,

5   that we're made whole.

6         What is the government going to do?  They should put

7   up 20 million.  They should pay proceeds.  They should pay

8   payroll in the meantime because they've seized that product,

9   and if they lose, if they lose, he's still in business.

10         THE COURT:  But in --

11         MR. HARVEY:  Yeah, I know.

12         THE COURT:  -- many, many criminal cases involving

13   white collar defendants, you know, securities fraud, mortgage

14   fraud -- we have a gazillion prescription cases now -- there

15   are seizures by the government of bank accounts that

16   presumably are subject to forfeiture if the case goes south

17   for the defendant.  If the case doesn't go south, then the

18   defendant gets his money back.  That's just the nature of the

19   criminal process.

20         MR. HARVEY:  Okay.  So the nature of the criminal

21   process is the government gets to decide based upon an

22   appeal --

23         THE COURT:  Probable cause.  Based upon probable

24   cause, they get to seize --

25         MR. HARVEY:  This isn't even probable cause.  This is

1  a civil order that's under appeal that says that the product

2  is not dangerous.  And I'm not deciding whether the product is

3  dangerous.  The product is not illegal.  It is not illegal.

4  It hasn't been determined to be dangerous, and the United

5  States of America is going to take it, put everybody out of

6  business, and say it's just -- it is just the way the system

7  works, tough luck all you people, tough luck.

8          THE COURT:  But, I mean, I don't want to, you know,

9  slough this off on my colleagues.  I don't want to slough this

10 off on my colleagues, but there are motions to suppress saying

11 that I was wrong in issuing warrants.

12          MR. HARVEY:  So if you concede right now --

13          THE COURT:  No, I'm saying what their warrants say.

14          MR. HARVEY:  If you concede, then we can get on --

15          THE COURT:  Wouldn't be the first time --

16          MR. HARVEY:  And get people these back to work.  And

17 we'll take your concession, you know, in an hour.  The court

18 reporter is here and --

19          THE COURT:  Don't even need to write it.  But

20 that's --

21          MR. HARVEY:  I agree with you.  The question is, how

22 do you bridge that gap?  What do you do in case the appeal is

23 successful and in the meantime --

24          THE COURT:  What do we do about the guy who sits in

25 custody for 24 months and then is acquitted?

1              MR. HARVEY:  I agree.  It's outrageous.

2              THE COURT:  So, I mean, the issue in the case is, to

3    me, is as it was, what I said when I came in, is it, you know,

4    is Judge Hunt's finding an order which makes DMAA an

5    adulterated food stuff and makes it unlawful to sell it

6    something that is proper in the bond order?  And read, you

7    know, my order, getting away from the issue of consent, the

8    order says the defendants are not to sell adulterated food,

9    adulterated products, happened to say including MDAA.  So it's

10   clear they're not allowed to sell adulterated.  That's a

11   violation of the law.

12             MR. HARVEY:  It ain't MDMA.  I know you're thinking

13   contraband because, you know, that's the way your mind --

14             THE COURT:  Right, right.  DMAA.  Well, every time I

15   had to say it I would have to look down at the piece of paper.

16   Right, right, DMAA.  And so that's what the order is, and so

17   that's really the issue.

18             MR. HARVEY:  It's your order, isn't it?

19             THE COURT:  It's my order.

20             MR. HARVEY:  Boom.  You can, you can, after a

21   hearing, after argument, revise your own order.  And, you

22   know, you're right.  There are instances in which people are

23   kept in jail and then acquitted.  There are instances in which

24   people -- money is forfeited.  But, you know, we're here with

25   specific grounds asking you to change that, and that's

1  different.  I don't know what the facts are in any of those

2  cases.  I don't know what's justified and what's not

3  justified, but you know.  You know your rule on the case in

4  front of you.  And what we've got here is an unusual and

5  pretty unique circumstance that -- that's why you're wearing

6  the robe.

7        THE COURT:  No, it's why I granted y'all a hearing,

8  because it's an unusual case.

9        MR. HARVEY:  And you're exactly correct, and I don't

10  know.  We're repeating ourselves going back and forth, so I've

11  said all I'm going to say.

12        THE COURT:  Thank you.  Mr. Lietz.

13        MR. LIETZ:  I don't have much else to add on behalf

14  of Mr. Schopp, Judge.  I really want to echo the comments that

15  have already been made, particularly as it relates to the

16  comments that Mr. Harvey made.  And the reason I say that is

17  Mr. Schopp has been at Hi-Tech for about ten years.  And just

18  like every other case where somebody gets a bond, one of the

19  conditions of bond is to maintain employment, and that's what

20  he's doing.  And I'm not here representing to you that his

21  employment is currently at risk because of that.  I'm not

22  saying that.  But I think Mr. Harvey made some good points

23  about the implications that this could have.  Mr. Schopp likes

24  Hi-Tech.  Mr. Schopp loves his job.  So that's really why we,

25  you know, adopted the motion.

1          Sitting here thinking about these issues when

2     everybody else is talking about it, it seems like to me that

3     if the order said you shall not sell adulterated products and

4     it didn't specifically say DMAA and then Hi-Tech went out and

5     sold DMAA, then there would have been some hearing here

6     instituted by the government to convince you that they

7     violated your order and that DMAA was, in fact, an adulterated

8     product.  I think in that setting, I think you certainly would

9     not have ignored Judge Hunt's order.  I don't think it's

10    something you would have ignored.  But I also don't think it's

11    something that you would have -- that that's the only thing

12    you would have considered.

13          I think you would have considered other information

14    recognizing that what was presented to Judge Hunt, there may

15    be more for you to hear.  And I know you would have conducted

16    a fair hearing where you let these gentlemen and any witnesses

17    that they wanted to call try to convince you that it wasn't a

18    violation of that hypothetical bond condition that we're

19    talking about.  And I have a feeling what would have happened

20    is you would rule one way or the other, and then ultimately,

21    just sort of judging the nature of the litigation that we have

22    here, it would probably go up to Judge Totenberg at some level

23    no matter what.

24          And so really what you would have done would be to do

25    a lot of the work that she's ultimately going to consider

1   anyway, so I would never suggest to you that you ignore an

2   order from a district court, particularly one that's issued in

3   this building.  But under the circumstances, particularly as

4   described by Mr. Wenik, when the government has not acted for

5   years and there is a procedure that the FDA can utilize to

6   officially ban it, which has not been utilized, that I know

7   you would have considered more than what Judge Hunt said.

8         But thank you for your time, Judge.

9         THE COURT:  Thank you, Mr. Lietz.  Mr. Grimberg,

10  Ms. Connors, let's continue.

11        MR. GRIMBERG:  Well, Judge, I don't have a whole lot

12  more to add other than to remind the Court that the issue is

13  even narrower than it's been defined here.  The motion that

14  was filed was a motion for reconsideration, and so the

15  question before the Court is what has changed, what has

16  changed since your Honor issued this bond condition?  And the

17  answer is nothing, literally nothing has changed.

18        At the time that your Honor issued the order, we had

19  Judge Hunt's order in place.  We had an appeal pending before

20  the Eleventh Circuit.  Mr. Leach, when asked during the

21  hearing about the bond condition with regard to the DMAA, he

22  said, Judge, with regard to one term that has to do with DMAA,

23  there has been civil litigation with FDA on the DMAA issue

24  that is presently before the Eleventh Circuit, and we are

25  agreeable to what is, in essence, an injunction here, period.

1  That was his statement.

2          And now they have tried to concoct this narrative of

3  somehow that they were coerced into that stipulation, and that

4  is absolutely false.  And you can review the transcript, your

5  Honor.  I have a copy here if you'd like to see it.

6          THE COURT:  It's on the docket.

7          MR. GRIMBERG:  I was asked at the hearing whether we

8  were seeking detention.  We said unqualifiedly no and then

9  proceeded with a discussion about the conditions.  It was

10 never premised on detention.  So it seems to me that they have

11 concocted this narrative of a coerced confession simply to get

12 in front of your Honor again so that they can now raise the

13 appeal with Judge Totenberg.  That is what really is going on

14 here.

15          The issue is what is the basis for reconsideration.

16 That's the issue before you.  That's the issue that will be

17 before Judge Totenberg if and when they appeal this.  And that

18 narrow issue, it is undisputed nothing has changed.

19          The standard conditions of this court prohibit the

20 violation of any federal law.  It is a violation of federal

21 law to manufacture or distribute an adulterated food.  The

22 government's position is that products that are manufactured

23 or distributed for human consumption that contain DMAA is an

24 adulterated food, period.  Whether or not Judge Hunt issued

25 that order, that is the government's position.

1          THE COURT:  Now, let me ask you this, Mr. Grimberg,

2    and I know this was not you.  I don't think you were involved

3    in that case.  But why didn't the government demand Judge Hunt

4    to address the motion enjoining the defendants in the civil

5    action from selling or marketing DMAA products?

6          MR. GRIMBERG:  Your Honor, I'll confess I am not

7    involved in that case, and I'm not intimately familiar with

8    the proceedings.  My understanding -- and I could be wrong on

9    this.  My understanding, coming into this hearing, was that an

10   injunction had never been requested.  So Mr. Wenik's comment

11   that there was a motion filed for an injunction is news to me.

12   I don't know -- do you have a copy of that?

13         MR. WENIK:  I don't have all --

14         MR. GRIMBERG:  I've never heard of that.  In fact, I

15   was told the opposite, that we have never requested an

16   injunction.

17         THE COURT:  Okay.  I'll look at the record.

18         MR. GRIMBERG:  But regardless, that's beside the

19   point.  Products that contain DMAA for human consumption is

20   considered an adulterated food, period.  Whether Judge Hunt

21   issued that order or not, that is the law.  That is the

22   government's position.  That is the FDA's position.  Were it

23   not for Judge Hunt's order, perhaps the merits of that could

24   be litigated, but it doesn't need to be because it has already

25   been litigated by these very parties in this very court by a

1   district court judge.  And that's pending before the Eleventh

2   Circuit.

3          Now, I am sympathetic.  It's, frankly, one of the

4   hardest parts of our job as prosecutors when criminal offenses

5   impact third parties, and I am sympathetic to the folks in

6   this courtroom whose jobs have been impacted by Mr. Wheat's

7   and Hi-Tech's behavior.  It is unfortunate that he was seeking

8   to sell over $19 million of unlawful products.

9          As you know, your Honor, he is a convicted felon who

10  has been through this rodeo before, and despite his previous

11  conviction, he is continuing to sell or was continuing to

12  sell, manufacture, and distribute unlawful products.  Whether

13  or not we seized them doesn't change the fact that they were

14  not allowed to sell them or manufacture them.  So even if the

15  search warrants had never been authorized by your Honor, even

16  if those items had never been seized, they would still not

17  have been authorized or allowed to sell those products because

18  it is illegal to do so.

19         THE COURT:  Well, let me say this:  So Mr. Morris

20  wrote you on October 26th and presumably sent out a list of

21  Hi-Tech's products.  I presume that the letter asked which of

22  these products can we sell.  Why is the government not in a

23  position to say or at least begin the process of saying, you

24  know, we've looked at, you know, A, B, D, and F; you can sell

25  this, you can't sell, you know, C, E, and G?

1        MR. GRIMBERG:  Well, because, first of all, he

2   attached an Excel spreadsheet of dozens and dozens of products

3   by name.  For us to opine -- first of all, it is not our --

4   we're not in a position to opine about the legality of

5   products based on the brand name.  What would be required for

6   that would be for us to be intimately familiar with the

7   process in which they are being manufactured to assure that

8   they are GMP compliant.  We would have to know exactly the --

9   not only what ingredients are on the label but also have a lab

10  test the product to see what is, in fact, in those products.

11       It would require an examination and an audit that I

12  don't believe Hi-Tech is agreeing for the government to engage

13  in.  If they wish for us to do that, I can speak to the FDA

14  about it.  But for us to be in a position of opining about the

15  legality of products without knowing the conditions in which

16  they are being manufactured, whether they comply with federal

17  and state law, on that end, to take on face value what is on

18  the label when we know, in fact, that Hi-Tech and Mr. Wheat

19  have a history of selling products with ingredients that are

20  not on the label, is not something that we're going to engage

21  in nor is it our responsibility.

22       They're the defendants.  They're responsible for

23  complying with the Court's bond conditions, and that requires

24  them to comply with federal law.  They know, just as well as

25  anyone else, what is in compliance with the law and what is

1   not.  And if they want to engage in a full audit of not only

2   the products and what ingredients are in those products but

3   also their manufacturing practices, I can speak to the agency

4   about that.  But for us to respond to that request based on an

5   Excel spreadsheet, is fairly ridiculous.

6            THE COURT:  All right.  Thank you.

7            MR. LEACH:  Just one point in response to what

8   Mr. Grimberg has presented.  We're not talking about cocaine,

9   heroin, schedule drugs, anything along that line, and there's

10  a whole regimen of inspections that are done by FDA of these

11  facilities.

12           Mr. Grimberg mentioned GMP, and it's really difficult

13  to go out and find any manufacturing facility that has never

14  been cited by the FDA through a process known as a 483.

15  Hi-Tech has been inspected 16 times and has never been issued

16  a 483.  So while counsel wants to paint Hi-Tech as a convicted

17  felon, the reality is in terms of the manufacturing process

18  and the goods that this company sells, it is as good a record

19  as you can find anywhere.

20           And, Judge, if you look at other items that are out

21  there on the market, like Tylenol, the highest number of

22  emergency room visits are because of Tylenol.  Vitamin C has

23  more than DMAA has ever had.  If you look at aspirin, the

24  amount --

25           THE COURT:  Here's the problem.  Here's the problem

1    that I have:  If you and I were in business together and we
2    were selling what we marketed as dietary supplements and the
3    government said that we violated the Food and Drug Act and
4    indicted us and then hauled us in front of a magistrate judge
5    and said and, by the way, Leach and Baverman, you can't sell
6    DMAA, you know, we would have at least a better argument
7    because me and you have never litigated DMAA.  The problem
8    that I'm having -- and this is sort of the blending of a civil
9    and criminal case -- is that the defendants in front of me,
10   excluding Mr. Schopp because he was not a party but he's
11   associated with the corporation, litigated this issue in front
12   of Judge Hunt.  So we can talk about being bound by a district
13   judge's order and things of that nature, but these defendants
14   are.  I mean, it's res judicata as to them but whether or not
15   it's -- you know, until the Eleventh Circuit says it's
16   reversed, it's a final judgment in favor of the government.
17   That's the problem that I'm having.
18           And that's why I can't have what Mr. Leach suggests
19   is -- would ordinarily be a great idea, for me to have a full
20   blown hearing as to whether or not DMAA constitutes a product
21   that in food makes the food adulterated because it's already
22   been litigated as to these guys, at least for the same
23   purposes for civil litigation as it is for a bond condition.
24   That's the real problem that I have.
25           If you and I were charged and you came in and said,

1    you know, I don't know anything about these Wheat and Hi-Tech

2    folks, but, you know, Judge Hunt was wrong there, Judge.  You

3    have to, you know, new judge, you have to figure this out.

4    But here there's a binding order as to these defendants or

5    their interests.  That's the problem that I have.

6            MR. LEACH:  And that order, Judge, is in a civil

7    asset forfeiture case --

8            THE COURT:  I understand.

9            MR. LEACH:  -- relating to a particular res, as

10   opposed to the entire world under circumstances as Mr. Wenik

11   pointed out to you where the government applied to the Court

12   to have a broader implication to bar Hi-Tech from being able

13   to sell the product going forward.

14           And think about what you did not hear from

15   Mr. Grimberg.  You know, if the product was indicted, if it

16   was DMAA, we wouldn't even be here, Judge.

17           THE COURT:  No, I understand that.

18           MR. LEACH:  There's no mention of the fact that DMAA

19   is going to be indicted or is under investigation in this

20   case.  There's no mention of their intention to file a civil

21   asset forfeiture with regard to that $19 million worth of

22   product.  So, I mean, I heard --

23           THE COURT:  I'm thinking that they're going to be

24   waiting for final order from the Eleventh Circuit, and then of

25   course prior to the -- prior to that, there has been no on

1  notice we've done something wrong here.  So those are all
2  separate issues.  What I'm dealing with now is a binding order
3  as to these defendants, as to a finding of law that DMAA
4  contained in the product makes it adulterated.  It's against
5  the law to sell an adulterated food, and that's the real
6  problem that I have.

7         I'm sympathetic completely to the impact on the folks
8  sitting out here in the audience.  I mean, I've represented
9  scores of people whose families and businesses were destroyed
10 by an indictment and a seizure and an accusation.  I
11 understand that completely.  But the question is, you know,
12 how, as to these individuals in front of me who are subject to
13 an order that they fought, how can I possibly say go ahead and
14 market DMAA goods when a case which they actively fought says
15 DMAA is an adulterated food article, food stuff.

16         MR. LEACH:  I hear you, Judge.  I just want -- I
17 would like to make one more point before I sit down, if I
18 may.

19         THE COURT:  Sure.

20         MR. LEACH:  Judge, when Mr. Wenik was here before
21 you, he was talking about the *Sparling* case.  The reason why
22 *Sparling* is important to us is that Judge Hunt cites it, and
23 he's relying on the magistrate judge out in Texas.  He's
24 referring to, yeah, Berton, who did a beautiful job.  But
25 you'll see that there's a footnote in Judge Hunt's order

1   saying he's not relying in any way, shape or form on Dr. Khan

2   who was the subject of our litigation.  He was the one who

3   made certain representations about DMAA and so forth.

4          The problem is that Dr. ElSohly was the one who

5   testified out there, and he is the partner of Dr. Khan.  So

6   that testimony, the only testimony that the judge permitted in

7   that case, was Dr. ElSohly, and it was predicated upon the

8   same tweet maneuvered, in our view fraudulent, not involving

9   any of these lawyers in this courtroom.

10          Don't want to cast any negative light on anybody that

11  is present here.  But, you know, as you said, Judge, this is

12  an unusual case, and it's got a lot of kind of crazy ripples

13  and implications.  And, yes, it affects real people.  Yes, it

14  affects a real company and a real defendant, which is

15  Mr. Wheat and the people that work with him.  But there's a

16  lot of really strange, we do not believe coincidental things,

17  that are going on here, to include the fact that when the

18  warrant was presented to you, you had no earthly idea that

19  they were going to take that kind of quantity of things out of

20  the business.  Thank you.

21          MR. WENIK:  May I just make one more comment,

22  Judge?

23          THE COURT:  Sure.

24          MR. WENIK:  You mentioned, you know, the issue of res

25  judicata.  And, you know, as I'm sitting here thinking about

1  this, Judge Hunt's order was issued in April of 2017.  So if

2  the government really believes that this order is res

3  judicata, which I suggest it isn't because it's limited to the

4  res, and gave the ex --

5         THE COURT:  It's more like collateral estoppel, but

6  it's okay.

7         MR. WENIK:  Why did they move for six months to hold

8  us in contempt for selling DMAA if that's what this order

9  means?  The point we're trying to make, I think at base here,

10  is that by using this tool, the bail condition tool, they've

11  altered the status quo that was in place until the Eleventh

12  Circuit finally renders the ultimate decision on here.

13  And it just -- like the question before, a light switch, why

14  is it now all of a sudden that Mr. Leach and Mr. Wheat are

15  confronted two minutes in this courtroom to agree to this?

16         If Mr. Grimberg is correct that DMAA is adulterated

17  regardless of Hunt's decision, then surely then with this

18  decision you're going to have a basis to move for contempt.

19  They never did.  They never sought an injunction where they've

20  moved before Hunt in response to reconsideration and about

21  appeal bonds.  When they asked for the order, they didn't get

22  it.  They're extracting from this Court something that they

23  don't have a legal basis to get.  That is our point.

24         THE COURT:  Anybody on the government's side want to

25  say anything?

1          MR. GRIMBERG:  Just to clear up in the hearing, one

2     thing I just want to add is Mr. Leach made the point about

3     Hi-Tech being GMP compliant.  The Court will note that they

4     have actually been indicted in this case for submitting false

5     GMP certificates, so let's not forget what they've been

6     charged with criminally here.

7          THE COURT:  All right.  Well, I'll get out an order

8     in the next couple of days on the motion, and I appreciate

9     y'all coming in today.  I know it's important for everybody.

10    I'm going to look more closely at the record in 13-CV-3675,

11    but I'll get something out as quickly as I can so that one

12    disappointed side or the other can go complain to the district

13    court about that.

14         MR. GRIMBERG:  And, your Honor, I would ask that this

15    order be limited to the motion for reconsideration.

16         MR. HARVEY:  Well, I'm sorry.  It's not a motion for

17    reconsideration.  It's a motion to amend.  What you can do is

18    amend.  It's different from a motion for reconsideration.

19    And, second, you can amend the conditions of bond by making

20    them put up a $22 million bond.

21         THE COURT:  Well, I think that the standard for

22    whether this is a motion for reconsideration of a bond order

23    or motion to amend a bond order would probably be about the

24    same.  I've always treated them the same.  Even in cases where

25    somebody is detained, I always give the defendant the

1  opportunity to reapply in changed circumstances.  Maybe these

2  aren't changed circumstances, but it's certainly a different

3  opportunity to raise different arguments.  And so I'll get

4  something out fairly quickly.

5          MR. WENIK:  Thank you, your Honor.

6          COURTROOM DEPUTY:  All rise.

7          (Whereupon, the proceedings were adjourned at 4:45

8  p.m.)

9                          -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTERS CERTIFICATE

2

3

4          I, Wynette C. Blathers, Official Court Reporter for

5   the United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8   proceedings held in open court on December 7, 2017, in the

9   matter of UNITED STATES OF AMERICA v. JARED WHEAT, JOHN

10  BRANDON SCHOPP, and HI-TECH PHARMACEUTICALS, INC., Case No.

11  1:17-CR-00229; that said proceedings in connection with the

12  hearing were reduced to typewritten form by me; and that the

13  foregoing transcript (Pages 1 through 44) is a true and

14  accurate record of the proceedings.

15         This the 3rd day of January, 2017.

16

17

18                              _____

                           /s/ Wynette C. Blathers, RMR, CRR
19                              Official Court Reporter

20

21

22

23

24

25