IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JARED WHEAT, JOHN BRANDON
SCHOPP, and HI-TECH
PHARMACEUTICALS, INC.,

Defendants.

CIVIL ACTION FILE NO.
1:17-cr-0229-AT-CMS

## REPORT AND RECOMMENDATION

This matter is before the Court on the Government's Motion to Disqualify Bruce

S. Harvey as co-counsel for Defendant Jared Wheat.  [Doc. 88].

## I.  BACKGROUND

On September 28, 2017, a federal grand jury in the Northern District of Georgia

returned a first superseding indictment (hereinafter "indictment") against Jared Wheat,

John Brandon Schopp, and Hi-Tech Pharmaceuticals, Inc. ("Hi-Tech") (collectively,

"Defendants").  [Doc. 7].  Defendant Hi-Tech is a manufacturer, distributor, wholesaler,

and retailer of dietary supplement products.  Defendant Jared Wheat is the

owner/operator of Hi-Tech, and serves as its president and chief executive officer.  [Doc.

44 at 3; Doc. 66 at 2].  The 18-count indictment includes charges of conspiracy, wire

fraud, money laundering, introduction of misbranded drugs into interstate commerce, and the manufacture and distribution of a controlled substance. [Id.]. The indictment was unsealed on October 4, 2017. [Doc. 15].

Count One of the indictment charges Defendants with conspiracy to commit wire fraud arising from their distribution of false and misleading certificates and audit reports to prospective and current clients. [Doc. 7]. The indictment alleges that prior to purchasing FDA-regulated products, some foreign customers require a "Certificate of Free Sale" issued by the FDA certifying that the food product is eligible for export. [Id. ¶¶ 6-7]. In addition, certain foreign countries will not allow the importation of dietary supplements from the United States without audit reports or certificates from third-party independent companies that the dietary supplements meet current good manufacturing practices ("GMP"). [Id. ¶ 8].

The indictment charges that Defendants sought to enrich themselves by deceiving prospective and current customers with fraudulent FDA Certificates of Free Sale and GMP audit reports and certificates. [Id. ¶ 9]. According to the indictment, Defendants sent prospective and current Hi-Tech customers fake FDA Certificates of Free Sale with unauthorized signatures of government officials and unauthorized government agency seals, which had been graphically superimposed onto the fake certificates; Defendants

2

also sent customers fraudulent GMP certificates bearing a forged and unauthorized signature from an individual falsely identified as the "General Manager" for PharmaTech, which was actually a company operated by Defendant Wheat.  [Id. ¶ 11]. Counts Two and Three of the indictment are substantive wire fraud counts against the Defendants for sending a forged GMP certificate and audit report to a customer.  [Id. ¶¶ 10, 13-14].

In connection with the Government's investigation of the alleged fraudulent certificates and audit reports at issue in Counts One through Three, the Government began investigating the role of C.S., who served (and continues to serve) as Hi-Tech's creative director and graphic designer.  [Doc. 44-3 at 5 ¶ 7].  In 2013 and 2014, two search warrants were authorized by United States Magistrate Judges.  The first warrant authorized a search of Wheat's AOL email account (htpharmac@aol.com) for evidence of mail and wire fraud, false statements, and conspiracy.  The second warrant authorized a search of a Yahoo email account used by C.S. for personal and business purposes in connection with his employment with Hi-Tech.  Emails that the Government obtained showed that on at least one occasion, C.S. sent Wheat an email attaching an unsigned GMP certificate purportedly on behalf of PharmaTech that was backdated.  [Doc. 7 ¶ 8]. In March 2011, Wheat sent an email to C.S. attaching a third-party audit report that did

not certify Hi-Tech as GMP-compliant.  [Id. ¶ 9].  The Government later discovered PharmaTech audit reports that looked very similar in content and design to the audit report sent to C.S., except the third-party findings of "Not Acceptable" had been changed to "Acceptable" in what the Government contends were fraudulent PharmaTech reports.  [Id. ¶¶ 11-12].  The Government investigation identified C.S. as a Hi-Tech employee with the technical background and expertise to manipulate documents in the manner alleged in the indictment.  [Id. ¶¶ 13-14].

In April 2014, C.S. received a subpoena to testify before a federal grand jury in the subject investigation.  Attorney Bruce Harvey represented C.S. in the subpoena response and arranged for C.S. to be interviewed by the Government pursuant to a "use immunity" agreement in lieu of testifying before the grand jury.  [Doc. 46 at 1].

In June 2014, the Government interviewed C.S. about his Hi-Tech employment, and Mr. Harvey represented C.S. during the interview.  Although C.S. denied preparing any GMP certifications or GMP audit reports, he stated that he believed he was the only Hi-Tech employee who performed graphics design work.  [Doc. 44-3 at 8 ¶ 14; Doc. 120 at 59].

On October 4, 2017, Defendant Wheat was arraigned in federal court on the indictment, and attorney Bruce Morris appeared on Wheat's behalf.  [Doc. 20].  Attorney

Harvey entered a notice of appearance on behalf of Wheat on October 23, 2017.  [Doc. 35].

On November 13, 2017, the Government filed a notice of potential attorney conflicts.  [Doc. 46].  One of the potential conflicts identified was that Mr. Harvey is representing Jared Wheat in this case, but Mr. Harvey represented C.S. in the 2014 Government interview.  [Id. at 1].  On November 29, 2017, the Government filed a supplemental brief in which it identified C.S. as a Government witness and a "subject" of the investigation, which the Government defined as meaning that C.S.'s conduct was within the scope of the grand jury's investigation and "circumstances could arise where he would be charged."  [Doc. 57 at 2-4].

On January 16, 2018, the Court held a Rule 44 hearing to address all of the conflicts or potential conflicts raised in the Government's notice.  [Doc. 90].  Present at the hearing were counsel for the Government; the three Defendants; the Defendants' attorneys of record, including Mr. Harvey; independent counsel for each of the Defendants; the cooperating witnesses identified in the Government's notice regarding potential conflicts, including C.S.; and the cooperating witnesses' independent counsel. At the time of the hearing, the Government had not yet filed a formal motion to disqualify Attorney Harvey (or any of the other defense attorneys).  However, as noted

above, the Government subsequently did file a formal motion to disqualify Attorney Harvey as co-counsel for Defendant Wheat, which motion is currently before the Court. Because the motion concerns only Attorney Harvey, I will restrict my recap of the Rule 44(c) hearing to the colloquy that took place with regard to Attorney Harvey, Defendant Wheat, C.S., and C.S.'s counsel at the hearing, Robert Citronberg.[1]

While those parties were present, the Court explained the numerous ways a conflict of interest may arise, instructed that financial considerations should not affect any defendant's or witness's decision, and made clear that the Court would appoint an independent lawyer at no cost to them, if requested, to discuss with them the wisdom of proceeding without independent counsel and whether they should waive a conflict of interest and keep their current lawyer or have new counsel. [Doc. 145 at 3-12].

After direct and exhaustive questioning by the Court and consultations with both Attorney Harvey and, separately, Bruce Morris, both before and during the hearing, Defendant Wheat orally indicated that he knew there was at least the possibility of a conflict, he knew how this conflict could harm his interests, and he knew he had the right to an attorney at no cost to himself, if applicable. [Id.; Doc. 113 at 3, 9-15].  I received a narrative response from Defendant Wheat that he had been advised of his right to

---

[1]  Other potential conflicts raised by the Government at the hearing concerned other defense counsel.

effective representation, that he understood the details of Mr. Harvey's possible conflict of interest and the potential perils of such a conflict, that he had discussed the matter with his attorneys and with independent counsel, and that he voluntarily waived his Sixth Amendment protections.   [Doc. 113 at 9-15].   Defendant Wheat indicated that he knowingly, intelligently, freely, and voluntarily waived objection to Mr. Harvey's conflict or potential conflict of interest with regard to Mr. Harvey's prior representation of C.S.   [Id. at 13].   Defendant Wheat also executed and submitted a written waiver, under penalty of perjury, waiving any and all conflicts of interest, or potential conflicts of interest, that were the subject of the hearing [Doc. 91], including specifically Mr. Harvey's prior representation of C.S.   The waiver included the affirmative acknowledgment that Wheat was waiving, or giving up, his ability to contend in the future that his lawyer had a conflict of interest, and that if Wheat pled guilty or was found guilty in this case, that he would not be able to argue to the trial court, on appeal, or in any collateral proceeding that he did not receive effective assistance of counsel because his lawyer had a conflict of interest.   [Id. at 4-5].   Defendant Wheat indicated in writing that he wanted to keep being represented by Bruce Harvey and that he voluntarily and knowingly gave up his right to have a different lawyer represent him in this case.   [Id. at 5].

The Court made similar, independent inquiries of C.S. and his attorney at the hearing, Mr. Citronberg. [Doc. 145 at 3-12; Doc. 113 at 10, 15-22; Doc. 120 at 48-52]. C.S. acknowledged that he was Mr. Harvey's former client, that he had had the opportunity to discuss fully with Mr. Citronberg the conflict situation presented by Mr. Harvey's representation of Defendant Wheat in this matter and potential ramifications for C.S., and indicated that he had no objection to Mr. Harvey continuing to represent Defendant Wheat in this case. [Doc. 120 at 49, 51; Doc. 113 at 16-22]. C.S. indicated to the Court that no one had threatened him to take that position, no one had offered him any benefit for taking that position as to Mr. Harvey, and his decision not to object to Mr. Harvey's representation of Defendant Wheat was made knowingly, intelligently, voluntarily, and of his own free will. [Doc. 120 at 52]. Attorney Harvey has attached to his brief in opposition to the Government's motion to disqualify him a sworn affidavit that C.S. subsequently executed indicating in writing that he has no objection to Attorney Harvey representing Jared Wheat in this matter, that all conflicts or potential conflicts have been explained to him, and that he waives any possible conflict that may arise from Mr. Harvey representing or continuing to represent Defendant Wheat in this matter. [Doc. 120 at 62, "C.S. Aff."].

After the hearing, I deferred my ruling on whether to accept Wheat's and/or C.S.'s written waivers with respect to Attorney Harvey until briefing was completed on the Government's motion to disqualify, which is now complete and before the Court for consideration.

## II.  DISCUSSION

In its motion to disqualify, the Government contends that Eleventh Circuit precedent precludes Mr. Harvey from representing Defendant Wheat due to an actual conflict of interest arising from Mr. Harvey's prior representation of C.S., who has been repeatedly identified as a likely Government witness, a subject of the Government's investigation, and an unindicted co-conspirator related to the wire fraud charge against the Defendants.  [Doc. 88 at 10; Doc. 128 at 1].

In response, Mr. Harvey argues that the Government has failed to meet its burden of showing a significant risk that any duty to Mr. Harvey's former client C.S. would materially and adversely affect his representation of Defendant Wheat or that any such conflict cannot be knowingly and voluntarily waived.  [Doc. 120 at 1-2].

9

**A.      Applicable Law**

The U.S. Constitution gives every defendant the right to effective assistance of counsel, including separate representation.  Fed. R. Crim. P. 44(c)(2).  The Supreme Court has recognized that an essential part of that right is the accused's ability to select the counsel of his choice.  See Powell v. Alabama, 287 U.S. 45, 53 (1932).  Thus, a criminal defendant has a presumptive right to counsel of his choice.  Wheat v. United States, 486 U.S. 153, 164 (1988); United States v. Ross, 33 F.3d 1507, 1522-23 (11th Cir. 1994).

Despite this framework, a defendant's counsel of choice may be disqualified based upon an actual conflict of interest, or a serious potential for conflict of interest.  Ross, 33 F.3d at 1523 ("[E]ven a potential conflict suffices for disqualification").  The Supreme Court has recognized that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  Wheat, 486 U.S. at 159.  A conflict of interest may occur in a variety of settings, including where a lawyer represents two defendants, where a single law firm represents two defendants in a case, where a lawyer represents a defendant and a potential witness, or where the case involves a current and former representation, which is the situation presented here.

10

A defendant, however, may waive a conflict of interest and elect to have his attorney continue to represent him, so long as that waiver is knowing, intelligent, and voluntary.  United States v. Garcia, 447 F.3d 1327, 1337 (11th Cir. 2006) (citing Ross, 33 F.3d at 1523).   In order for a waiver of the right to conflict-free counsel to be knowing and intelligent, the defendant (1) must have been made aware that a conflict or potential conflict existed; (2) realized the consequences to his defense that continuing with counsel under the conflict could have; and (3) been made aware of his right to obtain other counsel.  See id. (citing Zuck v. Alabama, 588 F.2d 436, 440 (5th Cir. 1979)); see also United States v. Rodriguez, 982 F.2d 474, 477 (11th Cir. 1993). A defendant's waiver must be established by "'clear, unequivocal, and unambiguous language.'"  Rodriguez, 982 F.2d at 477 (quoting United States v. Garcia, 517 F.2d 272, 278 (5th Cir. 1975)).  Although the court is not required to accept a defendant's waiver, Wheat, 486 U.S. at 164, "a criminal defendant has a presumptive right to counsel of choice and courts should hesitate to disqualify defense counsel." Ross, 33 F.3d at 1522-23.

In determining whether an actual or potential conflict warrants disqualification, courts look to whether: (1) counsel's earlier representation is "substantially and particularly related" to counsel's later representation; or (2) counsel actually learned

particular confidential information during the prior representation that is relevant to the later representation. Freund v. Butterworth, 164 F.3d 839, 859 (11th Cir. 1999) (citing Smith v. White, 815 F.2d 1401, 1405 (11th Cir. 1987)); Ross, 33 F.3d at 1523 (noting that these circumstances could adversely affect counsel's ability to cross examine a witness who had been a client). This inquiry is fact-specific, and may require "other proof of inconsistent interests," especially in a successive representation case like this one. See Freund, 165 F.3d at 859. The determination of whether an actual or potential conflict of interest exists is "left primarily to the informed judgment of the trial court." Wheat, 486 U.S. at 164.

The Supreme Court has recognized the inherent difficulty of this determination that must take place "in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." Id. at 162-63. A defense counsel's ability to recognize the risk of a conflict is complicated by the fact that it is "rare" for a defense counsel "to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand." Id. A client's waiver of conflict-free representation may also be suspect because the "imponderables" that may arise in trial "are difficult enough for a lawyer to assess, and even more difficult to

12

convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics." Id. at 163.

In light of the difficulty in assessing conflicts, the district court has "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Id. And "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver." Id. at 162.

Courts have the authority to decline such waivers because they have a duty to "protect [the court's] independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards." Ross, 33 F.3d at 1523; Wheat, 486 U.S. at 160 ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."). This independent interest arises in part from the "legitimate wish of district courts that their judgments remain intact on appeal." Wheat, 486 U.S. at 161-62 (citing cases entertaining ineffective assistance claims from defendants who waived the right to conflict-free counsel); Ross, 33 F.3d at 1524 (affirming disqualification when conflict "would have

rendered the court's verdict suspect and [defendant's] assistance of counsel unethical and ineffective."). Accordingly, the Eleventh Circuit recognizes that "[t]he need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial." Ross, 33 F.3d at 1523; Wheat, 486 U.S. at 160 ("Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.").

In Georgia, conflicts of interest are also governed by the Georgia Rule of Professional Conduct 1.9, which provides that a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing. See Ga. R. of Prof'l Conduct 1.9. The Rule instructs that a lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter use information relating to that representation to the disadvantage of the former client, with certain exceptions, or reveal information relating to that representation except as the rules permit or require. Id.

14

Courts must inquire as to whether the previous matter is "substantially related" to the instant matter.  If it is, the court must then determine if the interests of the current client are "materially adverse to the interests of the former client."  Id.

**B.    Analysis**

In this case, the Government contends, and Mr. Harvey acknowledges, that his representation of C.S. was "obviously substantially related" to the current prosecution of Wheat and that Mr. Harvey "received relevant confidential information" through his prior representation of C.S.  [Doc. 120 at 19].  Mr. Harvey further concedes that emails sent to and from C.S. "may be relevant to some of [the Government's] claims" against Wheat.  [Id. at 15].  Nevertheless, Mr. Harvey maintains that there is no threat of divided loyalties and no actual conflict in representing Wheat because Mr. Harvey's representation of C.S. was "limited and fleeting," he has not shared any of C.S.'s confidences with Wheat or his co-counsel, Bruce Morris, and should C.S. be called by the Government to testify, Mr. Morris can cross-examine C.S. to ensure the fair and efficient administration of justice.

Even if there is an actual conflict, Mr. Harvey argues that the Government has failed to show that his previous representation of C.S. would materially and adversely affect his current representation of Wheat or why any purported conflict cannot be

AO 72A
(Rev.8/82)

resolved by this Court accepting the oral and written waivers of conflict-free counsel that were knowingly and voluntarily made by both Wheat and C.S.

In support of his position, Mr. Harvey has attached to his brief a copy of the Government's summary of the interview that it conducted with C.S. on June 24, 2014 ("Report of Investigation" or "ROI"). [Doc. 120 at 57]. The ROI memorializes that C.S. stated during the interview that he never designed, prepared, or modified a GMP audit report, GMP certificate, or Certificate of Free Sale. [Doc. 88 at 4; Doc. 120 at 59]. Given this testimony, Mr. Harvey asserts that even if C.S. were called as a witness, he would expect C.S.'s testimony to be favorable to Wheat, rather than inculpatory. Thus, he contends there is nothing in the record to show that there is a risk, let alone a serious risk, that his prior representation of C.S. will materially and adversely affect his representation of Defendant Wheat. [Doc. 120 at 15]. Moreover, he asserts that because his limited representation of C.S. ended after the June 2014 Government interview, and no further confidences have been shared since that time, there is no information – confidential or otherwise – that he possesses that could even potentially harm – let alone adversely affect – Defendant Wheat's interests. Accordingly, he asks this Court to accept the waivers and deny the Government's motion to disqualify him.

16

In response, the Government argues that in circumstances such as these, the holdings in <u>Wheat</u>, <u>Ross</u>, <u>Henry</u>, and <u>Campbell</u> dictate that Mr. Harvey has an actual conflict adversely affecting his representation of Wheat that cannot be waived or otherwise mitigated.  The Government has repeatedly identified C.S. as a likely government witness, a subject of the investigation, and an unindicted co-conspirator. There is no question that the subject matter of Mr. Harvey's first representation of C.S. involved "substantially related" if not identical matters for which he is now representing Defendant Wheat.  The Government's interview of C.S. concerned facts directly related to the wire fraud counts currently pending against Wheat and Hi-Tech: the alleged creation of fake or fraudulent certificates and audit reports.  [Doc. 7 ¶¶ 7-14].  The Government points out that despite C.S.'s denials in the interview that he prepared GMP certifications or audit reports, the email records referenced in the Government' s motion tell a different story, namely, that Wheat emailed C.S. links to sample GMP certificates in early 2011, and C.S. later sent Wheat at least one unsigned GMP certificate, which falsely identified G.G. as the general manager of PharmaTech, as alleged in Paragraph 11 of the indictment.  [Doc. 128 at 8; Doc. 88 at 3-4].  Another email sent by Wheat to C.S. attached a sample GMP audit report with the message "I will be back there in a minute."  [Doc. 44-3 at 6 ¶ 9].  The Government argues that if C.S.'s testimony at trial

differs from the statements he made in his proffer or shared in confidence with Mr. Harvey, that Mr. Harvey faces the very peril of divided loyalties that the Eleventh Circuit has found disqualifying: he cannot cross-examine C.S. regarding confidences gleaned from his prior representation; but failing to cross-examine C.S. regarding this information would violate his duty of loyalty to Wheat. [Doc. 128 at 9, citing United States v. Campbell, 491 F.3d 1306, 1311 (11th Cir. 2007); Ross, 33 F.3d at 1523].

In United States v. Henry, 307 F. App'x 331, 334-35 (11th Cir. 2009), the Eleventh Circuit held that "[w]hen a witness at trial was defended by an attorney representing the defendant against charges related to an identical crime, the attorney has an 'actual' conflict of interest." Similarly, in Ross, the Eleventh Circuit recognized that "[t]he need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial." Ross, 33 F.3d at 1523 (underlining added). These are the circumstances here. Where a prior client's testimony directly concerns a current client's conduct, there is a serious risk that such testimony as a government witness will not be fully aligned with the current client's (Wheat's) interests, but instead would be materially adverse. The Eleventh Circuit has stated that when, like here, "an actual

18

conflict of interest exists, the client is denied effective assistance of counsel, and the attorney may be disqualified."  Ross, 33 F.3d at 1523; see also Wheat, 486 U.S. at 164 ("A showing of a serious potential for conflict" overcomes the presumption in favor of the defendant's counsel of choice).

Considering all of the factors discussed above, I conclude that disqualification is appropriate under the circumstances presented here.  The subject matters of the present and prior representations are "substantially related."  In the Eleventh Circuit, courts "irrebuttably presume that relevant confidential information was disclosed during the former period of representation."  Henry, 307 F. App'x at 335 (citing Freund v. Butterworth, 165 F.3d 839, 859 (11th Cir. 1999)).  Mr. Harvey confirms that he received relevant confidential information from C.S. during his representation (although he denies that such confidences would adversely affect Wheat or C.S.).  [Doc. 120 at 19].  And even though a client may knowingly, intelligently, and voluntarily waive his right to conflict-free representation, the court may refuse to accept the waiver where, like here, it is necessary to "ensure the adequacy of the defendant's representation, to protect the integrity of the court, and to preserve the trial judge's interest to be free from future attacks over adequacy of waiver and fairness of trial."  Ross, 33 F.3d at 1524 (citing Wheat, 486 U.S. at 162).

19

Wheat has other extremely capable defense counsel, Messrs. Bruce Morris and Jack Wenik, whose continued representation will counterbalance any impact of this disqualification on Wheat's Sixth Amendment rights.  Wheat chose Mr. Morris as his counsel at the arraignment more than two weeks before Mr. Harvey entered an appearance, and there is no indication that Mr. Morris cannot capably continue to represent Wheat as his counsel of choice.  In <u>Henry</u>, the Eleventh Circuit affirmed the disqualification of co-counsel due to potential conflicts of interest and noted that the defendant "was able to receive his choice of representation with respect to one of his attorneys."  <u>Henry</u>, 307 F. App'x at 335; <u>see also</u> <u>United States v. Stuckey</u>, 917 F.2d 1537, 1543 (11th Cir. 1990) (holding that disqualification of co-counsel did not deny defendant her Sixth Amendment rights when original counsel represented defendant at trial).  The same applies here.

## III.  <u>CONCLUSION</u>

For all the reasons stated above, I **RECOMMEND** that the district court **GRANT** the Government's Motion to Disqualify Bruce Harvey [Doc. 88] and decline to accept the waivers from Wheat and C.S.

20

**IT IS SO RECOMMENDED**, this 17th day of May, 2018.

_____
**CATHERINE M. SALINAS**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/82)