IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL ACTION NO. |
| v. | |
| | 1:17-cr-229-AT-CMS |
| JARED WHEAT,<br>JOHN BRANDON SCHOPP, and<br>HI-TECH PHARMACEUTICALS,<br>INC. | |

## REPORT AND RECOMMENDATION

This matter is before the Court on a motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) [Doc. 191] and three motions to suppress evidence seized from the offices of Defendant Hi-Tech Pharmaceuticals, Inc. ("Hi-Tech") during the execution of certain search warrants in September 2017 [Docs. 276, 278, 279]. For the reasons that follow, I recommend that each of these motions be denied.

## I.  BACKGROUND

### A.    The Indictment

On September 28, 2017, a federal grand jury in the Northern District of Georgia returned a first superseding indictment against Jared Wheat, John Brandon Schopp, and Hi-Tech.  [Doc. 7]. The 18-count superseding indictment includes charges of conspiracy, wire fraud, money laundering, introduction of misbranded

drugs into interstate commerce, and the manufacture and distribution of a controlled substance.  [*Id.*].

## B.   The Premises Warrants

On September 28, 2017, the same day that the first superseding indictment was returned, federal law enforcement officers presented United States Magistrate Judge Russell G. Vineyard with an affidavit and application for a series of search warrants authorizing the search of six business properties associated with Defendant Hi-Tech.  [Doc. 51-1].[1]  The affiant was Brian Kriplean, a Special Agent with the Food and Drug Administration-Office of Criminal Investigations ("FDA-OCI").   In his affidavit, Special Agent Kriplean averred that there was probable cause to believe that Hi-Tech was manufacturing, marketing, and distributing misbranded foods and/or drugs, some of which contained anabolic steroids, which are Schedule III controlled substances.  [Doc. 51-2 ("Kriplean Aff.") ¶ 3].

Special Agent Kriplean explained in his affidavit that the FDA is the federal agency responsible for protecting the health and safety of the American public by

---

[1] Five of the locations are in Norcross, Georgia and one is in Suwanee, Georgia: 6015 Unity Drive, Suites A, B, D, and F (Subject Location 1); 6020 Unity Drive, Suites D, E, F, G, and H (Subject Location 2); 6025 Unity Drive, Suite A (Subject Location 3); 5440 Oakbrook Parkway, Suites A and B (Subject Location 4); 500 Satellite Blvd, Suite B in Suwanee, Georgia (Subject Location 5); and 1256 Oakbrook Drive, Suite A (Subject Location 6).  [Doc. 51-2 at 12-13].

enforcing the federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-399f ("FDCA"). [*Id.* ¶ 9]. One of the FDA's roles is to ensure that drugs are safe and effective for their intended uses, and that drugs and foods bear labeling containing true and accurate information. [*Id.*]. The FDA's responsibilities under the FDCA include regulating the manufacturing, labeling, and distribution of all drugs and foods shipped or received in interstate commerce. [*Id.*].

In his affidavit, Special Agent Kriplean stated that in September 2016, federal law enforcement agents conducted undercover purchases from Hi-Tech of certain products that were marketed for sale as testosterone and prohormone supplements. [Kriplean Aff. ¶¶ 20–21]. He stated that based on his training and experience, he believed that such supplements "often contain non-dietary ingredients or Schedule III controlled substances, namely anabolic steroids." [*Id.* ¶ 20]. After receiving the products, agents submitted the products for chemical analysis to the FDA's Forensic Chemistry Center. [*Id.* ¶ 22]. According to Special Agent Kriplean, the testing revealed that five of the products—1-AD, 1-Testosterone, Androdiol, Equibolin, and Superdrol—contained Schedule III anabolic steroids, which fact was not disclosed on the product labels. [*Id.* ¶¶ 22–23]. According to Special Agent Kriplean, this false or misleading labeling rendered those five products misbranded under the FDCA. [*Id.*].

Special Agent Kriplean stated that in early August 2017, he reviewed Hi-Tech's website and confirmed that Hi-Tech offered for sale numerous testosterone and prohormone supplements, including the five products that had previously tested positive for anabolic steroids. [Kriplean Aff. ¶¶ 20, 22]. At the agents' direction, a cooperating source emailed a regional sales manager for Hi-Tech and inquired about Hi-Tech's prohormones. [*Id.* ¶ 24]. The Hi-Tech employee responded the next day, stating that "all [of Hi-Tech's prohormones] are compliant and DHEA compounds [. . .] bypass the liver so they are not toxic." [*Id.*]. Thereafter, on August 15, 2017, the cooperating source placed an order with the Hi-Tech regional sales manager for five bottles each of the prohormone products that had previously tested positive for anabolic steroids. [*Id.*].

On August 21, 2017, the cooperating source received the products from Hi-Tech. [Kriplean Aff. ¶ 25]. Special Agent Kriplean thereafter took custody of the still-sealed package, reviewed the respective product labels, and confirmed that they were consistent with the information on the labels of the products purchased. [*Id.*]. Special Agent Kriplean submitted samples of the products for chemical analysis. [*Id.* ¶ 26]. This second round of testing revealed that four of the products—1-AD, Androdiol, Equibolin, and Superdrol—contained Schedule III anabolic steroids. [*Id.*]. And, like the earlier-purchased products, the product labels did not list the

Schedule III anabolic steroids as ingredients.  [*Id.* ¶ 27].  The affidavit described the six Hi-Tech business locations to be searched, and provided specific facts tying each location to the investigation.  [*Id.* ¶¶ 29–40].

Judge Vineyard witnessed the applications and signed the warrants, hereinafter referred to as the "Premises Warrants."  [Doc. 23-1].  The Premises Warrants authorized law enforcement to search the Hi-Tech locations for "[e]vidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331 [relating to prohibited acts with respect to adulterated or misbranded food or drugs] and 21 U.S.C. § 841(a)(1) [making it a crime to manufacture, distribute, dispense, and possess controlled substances]."  [*Id.* at 4].  The Premises Warrants described eleven categories of what such "evidence, fruits, and instrumentalities" might be, including business records and computers.  [*Id.* at 4–10].

### C.    Facts Not Included in Special Agent Kriplean's Affidavit[2]

In their motion for a *Franks* hearing, Wheat and Hi-Tech state that Special Agent Kriplean failed to advise Judge Vineyard of several important facts, including

---

[2] Wheat and Hi-Tech have attached documents and expert testimony to support the facts in this section.  The Government does not appear to dispute these facts, at least for purposes of the *Franks* motion, although the Government disagrees about their relative importance.

that the results of the first testing of Hi-Tech's products in November 2016 came back negative for controlled substances. [Doc. 191 at 4]. The following month, Special Agent Kriplean requested additional testing using different and/or increasingly sensitive methods, which yielded mixed results: negative for controlled substances; a "tentative identification" and "questioned match;" and a "trace level" of steroids in two products. [*Id.* at 5]. Special Agent Kriplean then requested a third round of testing in January 2017, this time using various methods, including triple mass spectrometry, the most sensitive of the methods employed yet. [*Id.*]. That test yielded the same result as to all five products purchased in September of 2016: a "trace level" of steroids. [*Id.*]. When asked by the testers if he wanted to "quantitate" the "trace levels" of the steroids, Special Agent Kriplean said no. [*Id.*]. According to Wheat and Hi-Tech's expert, "trace" levels could be as low as 10 billionths of a gram of substance per tablet of product, which is insufficient to be "biologically active." [*Id.* at 5–6].

According to Defendants, Special Agent Kriplean also failed to inform Judge Vineyard that the test results confirmed that the most prominent steroid in the products was DHEA, a legal substance that does not convert into an active hormone until inside the body. [Doc. 191 at 6]. According to Wheat and Hi-Tech, prohormone supplements that contain only trace amounts of anabolic steroids are

6

not illegal.  Moreover, prosecutions involving prohormones do not generally involve otherwise legal prohormone supplements containing anabolic steroids.  [*Id.* at 6–7].  Instead, such prosecutions of prohormone products are based on products that are illegal because the prohormone is an anabolic steroid, made illegal as "designer steroids."  [*Id.* at 7].

### D.    The DMAA Warrants

The agents executed the Premises Warrants on the morning of October 4, 2017.  [Kriplean Aff. ¶ 15; Doc. 51 at 2].  Later that same day, the agents returned to federal court and presented United States Magistrate Judge Alan J. Baverman with affidavits and applications for new warrants authorizing the search of the same six Hi-Tech properties for evidence of crimes relating to adulterated or misbranded food or drugs, including supplements, raw materials, labels, and paraphernalia containing or relating to a substance known as "DMAA."  [Docs. 52-1, 52-2].  The affiant for these "supplemental" warrants was Gerald Dunham, another Special Agent with the FDA-OCI.  [Doc. 52-2 ("Dunham Aff.") ¶¶ 5, 20].

In his affidavit, Special Agent Dunham stated that there was probable cause to believe that Hi-Tech was violating federal laws by, among other things, introducing and delivering adulterated foods into interstate commerce.  [Dunham Aff. ¶ 3].  He averred that on October 4, 2017, while executing the Premises

Warrants, law enforcement officers "observed in plain view products labeled to contain DMAA (also known as '1, 3 Dimethylamylamine') or its chemical equivalent, as well as bulk containers of raw product labeled as containing DMAA or its chemical equivalent." [*Id.* ¶ 15]. He stated that the products containing DMAA were "adulterated foods" based on an April 3, 2017 judgment entered in a civil seizure action styled *United States v. Quantities of Finished and In-Process Foods, et al.*, No. 1:13-cv-3675-WBH, 2017 WL 4456903 (N.D. Ga. Apr. 3, 2017) ("the Civil Seizure Action"). [*Id.* ¶ 18]. In the Civil Seizure Action, United States District Judge Willis B. Hunt, Jr. had ruled that Hi-Tech's products containing DMAA were "adulterated foods." [*Id.*]. Special Agent Dunham stated that given Judge Hunt's ruling and the discovery of the DMAA products during the course of their search pursuant to the Premises Warrants, the agents determined that they should seize the DMAA products and that they were seeking "this supplemental search warrant to authorize the seizure of the current DMAA Products in an abundance of caution." [*Id.* ¶ 20].

Judge Baverman witnessed the applications and signed the warrants, hereinafter referred to the "DMAA Warrants." [Doc. 52-1].

8

## II.  DISCUSSION

### A.  Motion for a *Franks* Hearing [Doc. 191]

In their motion for a *Franks* hearing, Wheat and Hi-Tech complain that Special Agent Kriplean intentionally omitted important facts from his affidavit regarding two issues.  First, they argue that Special Agent Kriplean should have informed Judge Vineyard that the lab results showed "only trace (i.e., non-prosecutable) amounts of steroids."  They complain that the agents intentionally instructed the testers not to conduct quantitative analysis so that there would be no test results showing precisely how vanishingly small the "trace" amounts of anabolic steroids identified in the products were.  [Doc. 191 at 9].  Second, they take issue with Special Agent Kriplean's assertion that some of the products contained illegal prohormones, arguing that Special Agent Kriplean should have told Judge Vineyard that "DHEA is a *legal* prohormone."[3]  [*Id.* at 10–11].  They argue that Special Agent Kriplean was deliberately misleading when he stated that the Hi-Tech prohormones contained anabolic steroids; he should have, instead, advised Judge Vineyard that the Hi-Tech products contained a significant amount of DHEA, a *legal* substance, and only non-prosecutable trace amounts of *illegal* steroids.  By representing in his

---

[3] DHEA is exempted from the statutory definition of "anabolic steroid."  21 U.S.C. § 802(41)(A) & (C).

9

affidavit that the Hi-Tech products in question were simply "prohormones," they argue that Special Agent Kriplean deliberately and misleadingly omitted the fact that the Hi-Tech products he was describing included DHEA.

Affidavits supporting search warrants are presumptively valid. *Franks*, 438 U.S. at 171. "Thus, a defendant is generally not entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit." *United States v. Price*, 582 F. App'x 846, 850 (11th Cir. 2014). To be entitled to an evidentiary hearing on a motion to suppress based on the omission of a fact from a search warrant affidavit, a defendant must make a substantial preliminary showing that: (1) the affiant omitted material facts intentionally or with reckless disregard for the truth; and (2) the false statements or omissions would have negated the probable cause finding. *See Franks*, 438 U.S. at 171-72; *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). In its response, the Government addresses only the probable cause prong of the test, arguing that the facts allegedly omitted from the search warrant were not dispositive of the probable cause determination. [Doc. 218 at 2].

"Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170

F.3d 1350, 1352 (11th Cir. 1999).  The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched."  *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted).

"[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant."  *United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)). Courts are not to "interpret supporting affidavits in a hyper-technical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *Id.* (citing *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994)); *see also United States v. Robinson*, 62 F.3d 1325, 1331 (11th Cir. 1995) (requiring the reviewer to afford "great deference" to a judicial determination of probable cause).  If, after setting aside the material that is the subject of the alleged falsity or reckless disregard, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171–72.

I begin my analysis by easily concluding that the facts in the Kriplean Affidavit presented probable cause to believe that evidence of the specified crimes would be found at the various Hi-Tech locations. In his affidavit, Special Agent Kriplean averred that there was probable cause to believe that Hi-Tech was manufacturing, marketing, and/or distributing misbranded foods and/or drugs, some of which contain anabolic steroids, which is a Schedule III controlled substance. [Kriplean Aff. ¶ 3]. The Premises Warrants authorized agents to search for "[e]vidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331 [relating to prohibited acts with respect to adulterated or misbranded food or drugs] and 21 U.S.C. § 841(a)(1) [making it a crime to manufacture, distribute, dispense, and possess controlled substances]." [Doc. 23-1 at 4].

The evidence presented in the Kriplean Affidavit established probable cause to believe that Defendants manufactured, labeled, marked, and distributed at least four different supplements that contained non-dietary and/or controlled ingredients that were not properly declared on the label, and that this practice occurred over a significant period of time. While it was not a certainty that such evidence would be discovered, it was probable that it would, and that is all that the law requires. The facts presented regarding the test results from the two purchases of the various products supported Judge Vineyard's decision to issue the warrants because the

totality of the circumstances allow a conclusion that there was a fair probability of finding other adulterated and/or misbranded products and/or evidence of the crimes set forth in the affidavit.  *See Brundidge*, 170 F.3d at 1352.  It is evident that in deciding whether to sign the Premises Warrants, Judge Vineyard followed the law, used a commonsense, practical approach, and correctly found that there was probable cause to believe that the requested searches would yield evidence of violations of law.

Now I must evaluate the Kriplean Affidavit with the benefit of the additional facts that: (1) only trace amounts of anabolic steroids were found in the allegedly offending products; and (2) the prohormone DHEA is a legal substance.  Viewing the situation with the benefit of these additional facts, I conclude that probable cause still exists to support the Premises Warrants because the evidence shows that *some* anabolic steroids were found in the products.

In prior rulings in this case, this Court has already rejected the argument that no crime occurs when there is evidence of only "trace" amounts of an illegal substance.  The precise amount of anabolic steroids in the Hi-Tech products is an issue to be resolved at, or close to, the time of trial.[4]  [*See* Doc. 243 (R&R

_____

[4] In previous filings, the Government has represented that it intends to prove that the offending Hi-Tech products contained "significant" amounts of illegal

recommending denial of motion to dismiss based on the failure to allege a "criminal quantity" of anabolic steroids); Doc. 299 (Order adopting R&R)].   If a "trace" amount of anabolic steroids is enough to support the counts alleged in the indictment, it necessarily is enough to support a search warrant for evidence of those crimes. Stated another way, the Court has already concluded that it is premature to request pretrial dismissal based on the quantity of the anabolic steroids.  It follows, therefore, that even if Special Agent Kriplean had included more detail about the very small amounts of anabolic steroids detected in the Hi-Tech products, the Premises Warrants would still have been supported by probable cause.  Indeed, Wheat and Hi-Tech do not credibly dispute that what Special Agent Kriplean said was true, i.e., that certain of Hi-Tech's products contained *some* anabolic steroids.

Through this motion, Wheat and Hi-Tech are trying to obtain a pretrial ruling that failing to declare trace amounts of anabolic steroids on the label of a purported dietary supplement is not false or misleading, and that the Controlled Substances Act, 21 U.S.C. § 801, et seq. ("CSA"), is not violated when only trace amounts of

---

substances.  Judge Totenberg recently ruled that with respect to the counts alleging violations of the Controlled Substances Act (Counts Twelve through Fifteen) and introduction of misbranded drugs into interstate commerce (Counts Sixteen through Eighteen), the Government must inform Defendants at least seventy days before trial how it intends to prove that significant amounts of anabolic steroids were found in the Hi-Tech products.  [Doc. 299 at 10 n.2, 23].

anabolic steroids are involved.  But the law they cite does not support these positions. The FDCA, which prohibits the introduction of misbranded and/or adulterated articles into interstate commerce, deems a product misbranded if its labeling is "false or misleading *in any particular*."  *See* 21 U.S.C. §§ 343(a)(1) & 352(a) (emphasis added).  And, the CSA contains no minimum amount of a controlled substance necessary to amount to a crime.  *See* 21 U.S.C. § 841(a).

Wheat and Hi-Tech also argue that the Kriplean Affidavit does not contain facts to show a criminal intent [Doc. 226 at 4], but this is just another way of making the same argument that no crime occurred because the amounts were so small.  I reject this "criminal intent" argument for the same reasons that I reject the "criminal quantity" argument.

### B.    Motions to Suppress the Premises Warrants [Docs. 276, 278][5]

In their motion to suppress the Premises Warrants, Defendants make a variety of arguments that can be condensed into three main arguments: (1) that the Premises Warrants violate the Fourth Amendment's particularity requirement; (2) that the Premises Warrants are overbroad; and (3) that the manner in which the Government executed the Premises Warrants was unreasonable.  [Docs. 276, 278].  Through their

---

[5] A previous version of these motions is located at Docket Number 51.  On November 1, 2018, I denied that motion with leave to refile.  [Doc. 205].

motion to suppress, Defendants ask the Court to suppress all evidence obtained pursuant to the Premises Warrants and order the Government to return all the items seized pursuant to the Premises Warrants.  [*Id.*].  In response, the Government argues that the Premises Warrants were supported by probable cause, were not overbroad, and were sufficiently particularized.  [Doc. 285 at 10–27].  Alternatively, the Government argues that the good faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897, 926 (1984), applies to each of the Premises Warrants.  [*Id.* at 28–30].  Regarding the execution of the Premises Warrants, the Government argues that there was no flagrant disregard of the warrants, as shown by the fact that the Government seized only a fraction of the documents, dietary supplements, and other items at Hi-Tech's premises.  [*Id.* at 31–44].  Defendants have filed reply briefs.  [Docs. 293, 294].  I held oral argument on some of the issues raised in these motions on May 17, 2018, and a transcript was prepared.  [Doc. 151].

### 1. *Particularity*

Defendants first argue that the Premises Warrants amount to "general warrants" that are insufficiently particularized to satisfy the Fourth Amendment. [Doc. 278 at 8–15].  They point out first that the warrants did not incorporate Exhibit B to the Kriplean Affidavit (the list of things to be searched for), leaving agents free to rummage through Hi-Tech's properties without any limitations or restrictions.

16

[Doc. 276 at 8–10; Doc. 278 at 8–9].  Alternatively, Defendants claim that even if Exhibit B to the Kriplean Affidavit is considered, it is still faulty because Exhibit B is not sufficiently specific to identify which products, documents, and ESI the agents were allowed to search and seize.  [Doc. 278 at 9–15].

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  Thus, the Fourth Amendment requires that a warrant particularly describe both (1) the place to be searched and (2) the persons or things to be seized.  *Id.*; *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000) ("A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad."); *see* FED. R. CRIM. P. 41(e)(2)(A) ("the warrant must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned").  Here, Defendants do not take issue with the particularity of the place to be searched, only the things to be seized.

The notion of a "general warrant" derives from the Fourth Amendment's particularity requirement, which is meant to prevent the issuance of warrants that "authorize a general exploratory rummaging in a person's belongings."  *Coolidge v.*

17

*New Hampshire*, 403 U.S. 443, 467 (1971).  General warrants improperly permit the executing officers to use their unbridled discretion to explore a person's belongings in search of criminal evidence.  To protect against this concern, the description must be sufficiently particular to enable the searcher to reasonably ascertain and identify the things authorized to be seized.  *See United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982).  The Eleventh Circuit instructs that the particularity requirement "must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit."  *Id.* at 1349 (citations omitted).

Defendants begin with a technical argument, claiming that the Court should evaluate the particularity issue without the benefit of the Kriplean Affidavit (and its Attachment B) because the affidavit was not incorporated into the warrant itself. [Doc. 278 at 8–9].  In making this argument, Defendants rely on *Groh v. Ramirez*, 540 U.S. 551, 557 (2004), a case in which the search warrant omitted the items to be searched for and did not incorporate the probable cause affidavit.  *Id.* at 558.  The Supreme Court held that the warrant in *Groh* could not be saved by the list of specific items to be searched for in the affidavit because the affidavit was not incorporated by reference on the face of the warrant, leaving "no written assurance that the

18

Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." *Id.* at 560.

The facts of *Groh* are distinguishable from those presented here for two independent reasons.   First, the Premises Warrants specifically reference the Kriplean Affidavit (even if not expressly incorporating it).  The face of the Premises Warrants states:

> Affidavit(s) having been made before me by Brian Kriplean who has reason to believe that on the property described as:
>
> See Attachment A-1,
>
> in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,
>
> See Attachment B,
>
> which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use or used in committing a crime, concerning violations of Title 21, United States Code, Section(s) 331(a), 333(a)(2), 331(k) and 841(a)(l). I find that the affidavit(s) establishes probable cause to search for and seize the certain property, certain information, and certain data from the property described above.

[Doc. 51-1 at 2].  Second, the Premises Warrants include an attachment (Attachment B) that describes the items to be searched for, authorizing the seizure of "[e]vidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331 and 21 U.S.C. § 841(a)(1)" and itemizing specific categories of items that could be

seized.  [*Id.* at 4–10].  In this case, there is no facial invalidity akin to that in *Groh*, and, therefore, Defendants' reliance on that case is clearly misplaced.[6]

Defendants then move on to argue that even if the Kriplean Affidavit is considered, the list of items to be seized is not sufficiently particularized because it is not limited to the five products discussed in the affidavit and because it does not have a time limitation.  Defendants argue that these perceived shortcomings render the Premises Warrants general warrants that authorize the seizure of "any and every product and related items on the premises."  [Doc. 278 at 9; Doc. 276 at 18].  As explained below, this argument also fails because the Premises Warrants imposed

---

[6] In a related argument, Defendant Schopp contends that a hearing is necessary to determine whether the agents who conducted the search had possession of Attachment B to the Premises Warrants at the time of the search.  [Doc. 276 at 8–10].  This argument is meritless.  I agree with Judge Larkins, who recently rejected a similar argument, noting that "neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search. . . .  Since an officer need not have a search warrant in hand when conducting a search, it follows that if Exhibit B was not physically attached to the warrants at the time of the searches, suppression would not be not required either."  *United States v. Stokes*, No. 1:14-cr-290-TWT-JKL, 2017 WL 3493053, at *3–5 (N.D. Ga. June 23, 2017), R&R adopted at No. 1:14-cr-290-1-TWT, 2017 WL 3481680 (N.D. Ga. Aug. 14, 2017); *see also United States v. Hurwitz*, 459 F.3d 463, 472 (4th Cir. 2006) (stating that there is no "constitutional mandate that an executing officer possess or exhibit the affidavit or any other document incorporated into the warrant at the time of the search").

clear limitations that were consistent with the probable cause established in the Kriplean Affidavit.

The Eleventh Circuit has held that warrants are sufficiently particular where they include limitations on what may be seized based on the crimes under investigation, holding that such limitations enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized.   For example, in *United States v. Santarelli*, 778 F.2d 609 (11th Cir. 1985), the Eleventh Circuit upheld a warrant that authorized the seizure of "all property" constituting evidence of loansharking crimes.  *Id.* at 613–14.   The defendant later moved to suppress certain items seized in the search, including desk-top calendars, index cards, and slips of paper, all bearing notations relating to interest payments.  *Id.* at 614.   The district court denied the motion to suppress, and the Eleventh Circuit affirmed, noting that although these documents were not specifically described in the search warrant, they were properly seized because they fell within the portion of the warrant authorizing the seizure of "all property" constituting evidence of loansharking.  *Id.*  The Eleventh Circuit stated:

> because there is no evidence that the FBI had additional information that would have allowed the warrant applicant to give a more particularized description of the loansharking evidence located in Santarelli's residence, we  . . . conclude that the warrant satisfied the particularity requirement of the fourth amendment.

*Id.* at 615.

Similarly, in *Signature Pharmacy, Inc. v. Wright*, 438 F. App'x 741 (11th Cir. 2011), the Eleventh Circuit found a warrant to be sufficiently particular that authorized seizure of a number of items, such as documents, records, and computer equipment that were evidence of a criminal violation of laws prohibiting bad faith manufacture, purchase, sale, or delivery of anabolic steroids by prescription, and laws prohibiting the distribution of controlled substances. *Id.* at 745–46. The Eleventh Circuit held that "[b]ecause the descriptions in the warrants refer to items that are evidence of a violation of certain statutes relating to the sale of controlled substances, the items were described with sufficient particularity to allow Wright, a seasoned law enforcement officer, to identify the things to be seized." *Id.* at 746 (citing *United States v. Betancourt*, 734 F.2d 750, 754–55 (11th Cir. 1984)).

Like the searches in *Santarelli* and *Signature Pharmacy*, the agents in this case could not give an exact description of the items to be seized,[7] but the warrant

---

[7] In this case, the agents seized a variety of Hi-Tech products. During oral argument, the Government explained that the agents had a list of products that they believed were misbranded and/or adulterated, and they used the list in deciding what to seize. [Doc. 151 at 11–15]. This list could have been included—but was not included—in either the application or Attachment B to the Premises Warrants. During oral argument, I expressed concern that the agents did not inform Judge Vineyard about this list of products, but the Government stood firm in its position that it was not necessary to include all the facts relevant to the suspected illegal

was "as specific as the circumstances and nature of the activity under investigation

permit." *Wuagneux*, 683 F.2d at 1349.  The description of the items to be seized in

Attachment B was sufficiently detailed and particularized because it provided for

the seizure of things that constituted "[e]vidence, fruits, and instrumentalities of

violations of federal law," including the laws relating to adulterated and misbranded

food and drugs (21 U.S.C. § 331) and laws relating to controlled substances (21

U.S.C. § 841(a)(1)).  [Doc. 51-1 at 4].  Because the things to be seized were limited

to only those things connected with the crimes under investigation, there is a

sufficient "nexus" that satisfies the practical realities "that enable the searcher to

ascertain and identify things authorized to be seized."  *United States v. Smith*, 918

F.2d 1501, 1507–08 (11th Cir. 1990) (approving similar language for documents

pertaining to narcotics trafficking); *United States v. Mesika*, No. 1:16-cr-224-MHC-

CMS, 2018 WL 2124899, at *10 (N.D. Ga. Mar. 30, 2018), R&R adopted at 2018

WL 2125949 (N.D. Ga. May 7, 2018) (rejecting particularity challenge to a nearly

identical warrant).

---

conduct.  Having reviewed the arguments in the parties' briefs, Defendants have not
shown that the addition of additional facts related to the products on the list would
have changed the result here.

Defendants next complain that Attachment B gave no meaningful guidance to determine which products the agents were authorized to seize.  They point out that Attachment B does not mention the five offending products or any of Hi-Tech's other products, and they argue that only chemical analysis can determine if a product is misbranded.   As such, Defendants claim that the agents had no guidance whatsoever, and that the warrant should have been more specific about which products could be seized.  [Doc. 278 at 10–11].

The Government responds, and I agree, that the Fourth Amendment does not require such specificity.  *See Santarelli*, 778 F.2d at 614–15.  The requirement of particularity requires that the warrant guide the officers executing the warrant in what may be seized, but it does not require descriptions to a degree of scientific certainty.

The categories identified for seizure in Attachment B include the following: misbranded or adulterated food or drugs; Schedule III controlled substances; and raw materials, paraphernalia, electronic devices, advertising, and business records associated with the illegal distribution or manufacture of controlled substances or misbranded products.  These categories are sufficiently described so that the agents could ascertain and identify the things to be seized.  *See Santarelli*, 778 F.2d at 614. These categories describe evidence that would be relevant to the FDA-OCI's

24

investigation of Hi-Tech's alleged misbranding activities, including manufacturing, labeling, marketing, and distribution of misbranded "prohormone" dietary supplements containing non-dietary ingredients and/or undeclared controlled substances. Contrary to Defendants' arguments, the agents executing the Premises Warrants were not unguided and free to rummage through Hi-Tech's business premises.

Finally, Defendants take issue with Attachment B's "ostensible parameters" for the documents and ESI to be searched and seized, arguing that the parameters are so broad that they are virtually a blank check. [Doc. 278 at 14–15]. In making this argument, Defendants ignore the fact that Category 7 of Attachment B, which authorizes the seizure of certain business records, includes two limitations in addition to the statutory violation limitation discussed above. Category 7 provides for the seizure only of those business records "pertaining to the illegal purchase, possession, and/or unauthorized distribution of controlled substances and introduction into interstate commerce [of] any misbranded and/or adulterated foods and/or drugs." [Doc. 51-1 at 5–6]. In addition to that phrase, the business records category also provides: "The documents to be seized include those relating to the brokering, ordering, producing, purchasing, shipping, selling and distributing of misbranded and/or adulterated foods and/or drugs, including but not limited to . . . ."

25

[*Id.*].  This language sufficiently limited the scope of the Premises Warrants to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized.  *See Mesika*, 2018 WL 2124899, at *10.

Moreover, the Premises Warrants also included a detailed procedure for searching the computer devices.  [Doc. 51-1 at 8–10].   A thorough search of the computers was necessary to determine whether they contained evidence of the crimes under investigation and whether they contained any other information responsive to the specific categories of information.  *See Mesika*, 2018 WL 2124899, at *10.   While it is true that the Premises Warrants are broadly worded and encompass many items and documents, similar warrants have been upheld, especially in white-collar cases where a "paper puzzle" must be assembled "from a large number of seemingly innocuous pieces of individual evidence."  *Wuagneux*, 683 F.2d at 1349.  Evidence of misbranding and misconduct related to anabolic steroids would support the Government's efforts to determine the precise scope of Hi-Tech's suspected illegal activities.  Many documents could be relevant to piecing together the whole picture, and the extent of the alleged scheme justified authorization of seizure of the described categories of items.  *See Smith*, 918 F.2d at 1507–08 (holding that a warrant authorizing the seizure of documents was not overbroad where the warrant authorized the search for "cocaine, documents, letters,

26

photographs, business records, and other evidence relating to narcotics trafficking" because "[r]easonably read, this language is directed to materials having a nexus to narcotics trafficking.")  It was reasonable to believe that the illegal conduct that the agents had identified with respect to the five products extended to the rest of the company's business.  *See United States v. Bradley*, 644 F. 3d 1213, 1259–60 (11th Cir. 2011) (holding that even where the suspected illegal conduct is occurring in only one part of a business, a broad warrant may nevertheless be appropriate where traces of that illegal conduct are likely to be found spread out amongst the company's business records).

### 2.  *Overbreadth*

Defendants next argue that the Premises Warrants were overbroad because: (1) they were not limited to the five products at issue [Doc. 276 at 16–27; Doc. 278 at 18–21]; and (2) they contained no time limitation [Doc. 276 at 16-27; Doc. 278 at 18-19].   In making these arguments, Defendants appear to acknowledge that the Kriplean Affidavit established some probable cause, but they paint it very narrowly, contending that it was not sufficient to authorize any search for items other than evidence related to the five Hi-Tech products and the two purchases described in the Kriplean Affidavit.  [Doc. 276 at 21; Doc. 278 at 18].  The Government responds, and I agree, that Defendants' cramped view of the probable cause established by the

Kriplean Affidavit is hyper-technical and not supported by the case law. [Doc. 285 at 22–27].

The facts set out in the Kriplean Affidavit provided probable cause to believe that Hi-Tech was marketing and distributing "prohormone" products, and that such products often contained non-dietary ingredients or anabolic steroids. [Kriplean Aff. ¶ 20]. It is reasonable for the Government to be interested in determining or verifying how pervasive the misconduct was and the level of danger to the public. Thus, the undercover purchases of Hi-Tech's products could show not only isolated discrete acts of misconduct, but also potentially show a pattern of manufacturing or distributing products containing anabolic steroids—a practice that went on for more than a year. [*Id.* ¶¶ 21–27]. As such, the list of items to be seized in Attachment B was appropriately scaled to the evidence presented of repeated sales of misbranded and adulterated products. *See United States v. Maali*, 346 F. Supp. 2d 1226, 1239 (M.D. Fla. 2004) (denying a motion to suppress and finding probable cause to search thirteen locations in a case involving a complex scheme to employ and harbor aliens and to evade tax laws). The specific categories about which Defendants complain are not so far removed from the crimes alleged that they are not connected to the probable cause allegations, and they do not render the warrants unconstitutionally overbroad. *See Mesika*, 2018 WL 2124899, at *6 (rejecting overbreadth arguments

in circumstances nearly identical to those presented here); *United States v. Chan*, No. 1:14-cr-203-ODE-AJB, 2016 WL 627350, at \*3-4 (N.D. Ga. Feb 16, 2016) (same).

Defendants next complain that the Premises Warrants were overbroad because they contained no time restriction.  [Doc. 276 at 18–19; Doc. 278 at 13–15, 18].  I have previously rejected this argument in connection with Defendants' challenges to the email search warrants in this case, concluding that the lack of a time limitation does not render the searches unconstitutional.  [Doc. 109 at 26–27].  In the absence of binding authority holding that a temporal limitation is a mandatory requirement for a warrant, I will view this factor as one of many relevant to the inquiry.  *See United States v. DSD Shipping*, A.S., No. 15-00102-CG-B, 2015 WL 5164306, at \*8 n.9 (S.D. Ala. Sept. 2, 2015) ("a temporal restriction appears to be an element of determining particularity of data seized, but the case law cited does not indicate temporal restrictions are mandatory requirements").  Here, as discussed above, the Premises Warrants were adequately particularized based on the subject matter limitation, meaning that the lack of a temporal limitation does not render them unconstitutional.

Defendants also complain that nothing in the Kriplean Affidavit addressed potentially "adulterated" products, yet the Premises Warrants authorized seizure of

both misbranded and adulterated products.[8]  [Doc. 278 at 22–23].  This argument fails because the Kriplean Affidavit described multiple Hi-Tech products that contained anabolic steroids, a controlled substance, and he states that in his experience, prohormone products often contain controlled substances.  [Kriplean Aff. ¶¶ 20–27].  It was reasonable for Judge Vineyard to draw an inference that prohormone products containing such steroids could be "injurious to health," 21 U.S.C. § 342(a)(1), which would establish probable cause to believe that such prohormone products were both misbranded and adulterated.

Hi-Tech and Wheat also complain about the seizure of Hi-Tech's tax records, complaining that there was no probable cause to justify this category of information. [Doc. 278 at 24].  Category 8 of Attachment B authorizes the seizure of "All tax records, including summaries and schedules."   Although the tax portion of Attachment B does not contain its own limiting provision, the prefatory language of Attachment B applies, and the warrants authorized the seizure of only "evidence, fruits, and instrumentalities" of 21 U.S.C. §§ 331 and 841(a)(1) violations.  [Doc.

---

[8] Wheat and Hi-Tech's complaints about there being a lack of probable cause to seize adulterated products [Doc. 278 at 22–23] and tax records [*id.* at 23–24] are raised in the portion of their brief addressing the execution of the warrants.  These arguments appear to me to be overbreadth arguments, rather than execution arguments, and I have treated them as such.

51-1 at 4]. It is reasonable to assume that Hi-Tech's tax records would reflect the fruits of the alleged wire fraud and money laundering offenses alleged in the indictment—allegations that a grand jury had already found were supported by probable cause. *See United States v. Patel*, 429 F. App'x 885, 888 (11th Cir. 2011). Considering the nature of the offenses under investigation (and under indictment), Judge Vineyard did not err in concluding that Hi-Tech's tax returns would likely reflect the fruits of the alleged misconduct and additional evidence to support the charges.

Under these circumstances and giving the appropriate "great deference" to Judge Vineyard's decision to issue the Premises Warrants, I cannot say that the warrants were overbroad or that any of the categories of things to be seized were not supported by probable cause. I conclude that the Premises Warrants provided sufficient particularity to guide the officers and satisfy the particularity requirements of the Fourth Amendment.

### 3. *Leon Good Faith Exception to the Exclusionary Rule*

Even if the Premises Warrants were not sufficiently particular or were overbroad (which they were not), the good faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897, 926 (1984), saves the fruit of the Premises Warrants from suppression.

In *Leon*, the Supreme Court held that the Fourth Amendment will not bar admission of evidence seized pursuant to an invalid search warrant if the law enforcement officers were acting in reasonable reliance upon the warrant. *See United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing *Leon*, 468 U.S. at 922). Because the purpose of the exclusionary rule is to deter unlawful police misconduct, the *Leon* good faith exception requires suppression "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Leon*, 468 U.S. at 926. The Eleventh Circuit interpreted *Leon* as follows:

> The *Leon* good faith exception applies in all but four limited sets of circumstances [citation omitted]. The four sets of circumstances are as follows: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S. Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*Martin*, 297 F.3d at 1313 (internal quotation marks omitted).

Here, Hi-Tech and Wheat argue—in a single sentence—that the first and fourth exceptions apply. [Doc. 278 at 33]. They say simply that Kriplean "misled"

Judge Vineyard and that the warrants were "facially deficient." [*Id.*]. For the reasons discussed above, I disagree with both these contentions and can see no basis for finding that any of the four circumstances articulated in *Leon* is present here. Thus, even if the warrants were somehow found to be facially deficient, *Leon* would apply and prevent application of the exclusionary rule.

### 4. *Execution of the Premises Warrants*

The final issue presented by these motions to suppress is whether the agents executed the Premises Warrants in an unreasonable manner. In its response brief, the Government provided the Court with the following statement concerning how the Premises Warrants were executed:

> After obtaining the Premises Warrants, Agent Kriplean prepared an operational plan for the execution of the warrants. (Doc. 51-5). Based on the operational plan, the approximately 40 agents participating in the planned search held a briefing the day before the search to discuss the plan. (*Id.*) The operational plan specified that the search objective was to "[s]afely identify and collect evidence pursuant to Attachment B of the search warrant," and the plan attached both Attachments A and B to the Premises Warrants. (*Id.*) Agent Kriplean was the operational team leader, with assistant team leaders designated for each business location, and agents conducting the search were able to communicate by cell phones if any questions or issues arose. (*Id.*)

> The Premises Warrants were executed on October 4, 2017. During the search, agents imaged electronic devices for further off-site review for records within the scope of the warrant, pursuant to Attachment B of the Premises Warrants. Doc. 51-1 ¶¶ 6, 11. Imaging of these devices established that 12 terabytes of data was collected for further searches. *See* Feb. 2, 2018 Letter (attached as Exhibit A). In

addition, teams of agents collected hard copy documents at the Premises and conducted a responsiveness review on-site over the course of several hours.  A filter agent with the IRS who was not otherwise involved in the investigation was also on-site and segregated potentially privileged material, which was delivered to a filter attorney.  Doc. 278-4 at 3.  As a result of the review, the government collected approximately 158,000 pages of hard copy documents during the search and left non-responsive boxes of material at the Premises.  Doc. 134 at 3.  Finally, according to Hi-Tech, less than 14% of the bottles of Hi-Tech products present at the Premises were seized, which meant that more than 700,000 bottles of Hi-Tech's dietary supplement products were left untouched during the search.  Doc. 278-13 ¶¶ 5–6.

Following the initial collection, the government began a filter process for the electronically seized information ("ESI") and hard copy documents, during which the prosecution team had no access to the documents.  Exhibit A; Mar. 29, 2018 email (attached as Exhibit B).  For the ESI collected in the search, the document vendor segregated documents that hit on an attorney list provided by Hi-Tech and then filtered for responsiveness to the search warrant based on a list of 80 keyword search terms provided by the government.  Exhibit B; Doc. 278-10 (list of keyword search terms).  The vendor filter process was completed in May 2018 and culled the initial collection of 12 terabytes of ESI to a subset of 120 gigabytes, which were produced to Defendants on or about May 11, 2018.  Doc. 170 at 2–3.

After the vendor completed its processing and filtering of ESI, the 120 gigabyte subset was provided to a filter team of attorneys to conduct further review for potentially privileged documents, and the prosecution team did not have access to the documents pending the completion of that review.  *See* June 20, 2018 email (attached as Exhibit C).  This privilege review was ongoing as of October 29, 2018, *see* Oct. 29, 2018 email (attached as Exhibit D), and the Court granted the government until February 26, 2019 to complete its privilege review and further responsiveness review of the ESI.  (Doc. 205 at 2).  The Court ordered that the government could maintain a copy of all ESI collected from the Premises Warrants but prohibited it from further accessing the data after March 1, 2019, other than the seized subset

34

provided to Defendants, without prior Court approval. (*Id.*). Following the completion of the privilege review, Agent Kriplean conducted a second-level review of the ESI for responsiveness. *See* Mar. 18, 2019 email (attached as Exhibit E). Agent Kriplean used a list of search terms to assist his substantive document review, which were provided to Defendants. *Id.*

On March 1, 2019, the government produced the subset of ESI and hardcopy documents deemed seized pursuant to the Premises Warrants. *Id.* This production of seized materials consisted of 43 gigabytes, or 37,476 documents, seized pursuant to the warrants. Doc. 276 at 7; Doc. 278 at 5. Based on the government's multi-stage filtering process, the government culled 99.7% of the initial collection of more than 12 terabytes of data to the 43-gigabyte set of responsive data, and the government has access to only a fraction of 1% of the data initially collected pursuant to the Premises Warrants.

[Doc. 285 at 6–8].

To prevail on a claim that the Government exceeded the scope of the Premises Warrants in how it executed the warrants, Defendants must show a "flagrant disregard" of the warrants' terms. *See Wuagneux*, 683 F.2d at 1354 ("[A]bsent a 'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized.") (citations omitted). The Government states, and Defendants do not dispute, that "no case within the Eleventh Circuit has found flagrant disregard justifying blanket suppression, and flagrant disregard has been found in other jurisdictions only in extraordinary cases." [Doc. 285 at 32].

In their motions, Defendants raise three arguments for why they believe the agents executed the Premises Warrants in an unreasonable manner: (1) the keywords used to search for ESI were beyond the scope of the warrants [Doc. 278 at 24–26, 27–29]; (2) all searches of the ESI should have been conducted by a "clean team" independent of the prosecution team [*id.* at 26–27]; and (3) the Government's failure to complete step two of the electronic document review in a timely fashion renders the ESI search and seizure unreasonable [*id.* at 29–31].[9]   I will address these arguments in turn.

With respect to the keyword searches, I have reviewed the arguments and easily conclude that nothing about the keyword searches appears improper.   The searches were tailored to the scope of the Premises Warrants.   I disagree with Defendants' argument that only words specifically used in the affidavit could be used as a search term and note that they cite no legal authority for it.[10]   I conclude

---

[9] As noted above, Hi-Tech and Wheat claim that it was unreasonable to seize adulterated products and tax returns, but those items were specifically listed in Attachment B to the warrants.   Because the Premises Warrants expressly authorized the seizure of these items, there is nothing unreasonable about the agents' decision to seize them.

[10] Defendants complain about searches for "choledrene," "red yeast," and "lovastatin" [Doc. 276 at 24; Doc. 278 at 25], but these terms relate to Choledrene, which is identified in the First Superseding Indictment as being misbranded.   [Doc. 7 ¶¶ 20–35].   Defendants also complain about searching for the terms "DMAA" and "Geranium," but each of these terms pertain to products containing DMAA, which,

that such a restrictive read of search warrants would violate the commonsense approach that should be employed in interpreting warrants. Moreover, even if some of the evidence seized was outside the scope of the warrant, Defendants have failed to make the requisite showing of a flagrant disregard of the warrants' terms. *See Maali*, 346 F. Supp. 2d at 1254 ("[A]ny finding of flagrant disregard in this case must be founded upon something other than the sheer volume of documents seized or the fact that some items outside the scope of the warrants were taken.")

As for Defendants' contention that there should have been a "clean team" for the original responsiveness review [Doc. 278 at 26–27], this argument rings hollow. While the review process was far from perfect, Defendants have not shown any Government misconduct or actual infringement on the attorney-client privilege, much less flagrant disregard of the warrants' terms.

---

as discussed below in connection with the DMAA warrants, had been determined to be adulterated foods under the FDCA. *See United States v. Quantities of Finished and In-Process Foods, et al.*, No. 1:13-cv-3675-WBH, 2017 WL 4456903, at *4 (N.D. Ga. April 3, 2017). Defendants complain about keywords pertaining to GMP certifications and certificates of free sale, but the Premises Warrants specifically authorized the seizure of "certificates of free sale, GMP certifications, [and] GMP audit reports" for suspected misbranded or adulterated products. [Doc. 51-1 at 7]. Finally, they complain about searches related to Hi-Tech's suppliers and customers [Doc. 276 at 24; Doc. 278 at 25], but again the Premises Warrants specifically authorized seizure of "documents identifying suppliers and customers." [Doc. 51-1 at 5].

Finally, Defendants argue that the Government's failure to complete step two of the electronic document review in a timely fashion renders the ESI search and seizure unreasonable. They contend that seventeen months for completion of the step-two seizure of ESI data justifies total suppression. [Doc. 278 at 29–31]. In response, the Government points out that other document reviews of a much longer duration have been found to be reasonable. *See United States v. Jarman*, 847 F.3d 259, 266-67 (5th Cir. 2017) (review lasting 23 months was not unreasonable); *United States v. Lee*, No. 1:14-cr-227-TCB-2, 2015 WL 5667102, at *4 (N.D. Ga. Sept. 25, 2015) (review lasting more than three years did not signify unreasonableness)). I conclude that seventeen months to review more the twelve terabytes of data was not unreasonable, especially when coupled with the complex privilege review that also took place. *See United States v. Bradley*, 644 F.3d 1213, 1258 n.95 (11th Cir. 2011) (holding that a three-year delay involving the search of 103 computers and one TB of data was not unreasonable).

Here, there has been no showing of a flagrant disregard that would justify an evidentiary hearing. The seizures made pursuant to the Premises Warrants were reasonable under the circumstances. *See Chan*, 2016 WL 627350 at *3 (denying an evidentiary hearing under similar circumstances); *United States v. Nsoedo*, No. 1:08-cr-351-JEC-JFK, 2009 WL 10669746, at *31 (N.D. Ga. July 31, 2009) (denying

38

claim for flagrant disregard without an evidentiary hearing where the defendant failed to produce evidence, in the form of affidavits or otherwise, that would support a finding that the searching agents and officers acted in flagrant disregard of the warrants' terms and provided only a vague description of categories of allegedly improperly seized items but furnished no basis for the court to conclude that any specific item was improperly seized).

### C.   Motion to Suppress the DMAA Warrants [Doc. 279]

Wheat and Hi-Tech have also filed a motion to suppress all evidence obtained pursuant to the DMAA Warrants.  [Docs. 52, 279].[11]  As noted above, the agents requested the DMAA Warrants after they had observed large quantities of DMAA at Hi-Tech's locations during the execution of the Premises Warrants.  The agents advised Judge Baverman that Judge Hunt had recently ruled that products containing DMAA were "adulterated foods" in the Civil Seizure Action.  [Dunham Aff. ¶ 18].  According to Wheat and Hi-Tech, agents seized nearly $19 million worth of DMAA-containing products—an amount so large that it would have required at least five tractor-trailers to remove it from the premises.  [Doc. 52 at 3].  In their motion, which

---

[11] This motion was originally filed at Docket Number 52.  After I denied it with leave to refile [Doc. 205], Wheat and Hi-Tech filed a new motion, in which they simply adopted their previously-filed motion. [Doc. 279, adopting Doc. 52].

was originally filed in November 2017, Wheat and Hi-Tech raise several arguments, none of which stands the test of time.

First, Wheat and Hi-Tech take aim at the Premises Warrants, arguing that those warrants did not contain facts to establish probable cause to believe that adulterated products were present at the various locations. [Doc. 52 at 14–19]. For the reasons stated earlier in this Report and Recommendation, this argument fails. The Premises Warrants were not general warrants, were sufficiently particular, were not overbroad, and were supported by probable cause.

Second, Wheat and Hi-Tech argue that Special Agent Dunham made false and materially misleading statements in his affidavit concerning the legal effect of Judge Hunt's summary judgment ruling in the Civil Seizure Action. [Doc. 52 at 19]. They argue that Judge Hunt's ruling in that case applied only to the specific DMAA-containing products that were the subject of the Civil Seizure Action, as opposed to DMAA in general, stating: "Agent Dunham failed to inform the magistrate judge that Judge Hunt's judgment in the [Civil Seizure Action] was, by its own terms, limited to the items seized in November 2013. . . .  It was not an injunction, despite the DOJ's attempts to turn it into one." [*Id.*].  They contend that Judge Hunt's order could not be applied to any other DMAA-containing products, and therefore "the

Government deliberately misled the magistrate judge" by construing the order as applying to the products found at the Hi-Tech locations during the search.  [*Id.*].

This argument is meritless.  The Dunham Affidavit states only that the "reasoning in the Civil Seizure Action" applies to the DMAA products observed at the Hi-Tech locations.  Judge Hunt's order was attached as an exhibit to the Dunham Affidavit, leaving Judge Baverman to make his own legal determination about the scope of that ruling.  [Dunham Aff. ¶¶ 19, 63–76].  Moreover, Judge Baverman was presented with this precise argument just a few weeks after he signed the DMAA Warrants, in the context of ruling on Defendants' motion to modify Defendants' bail conditions.  [Doc. 62].  Judge Baverman rejected this argument, concluding that all DMAA-containing foods for human consumption—not just the specific products at issue in the Civil Seizure Action—are adulterated foods.  [*Id.* at 10].  Thus, Judge Baverman obviously agreed with Special Agent Dunham's assessment of the scope and effect of Judge Hunt's order, both at the time he signed the warrant and later in

the context of reviewing the bail conditions.  There is nothing false or misleading about Special Agent Dunham's statement in the affidavit.[12]

Finally, Wheat and Hi-Tech argue that the DMAA-containing products should be returned to them.  [Doc. 52 at 24].  This issue is moot in light of my ruling last year requiring the Government to return the seized DMAA-containing products to Hi-Tech.  [Doc. 251].

In conclusion, Wheat and Hi-Tech have failed to meet the *Franks* standard for an evidentiary hearing.  They have not shown any material misrepresentation or omission in the Dunham Affidavit.  The DMAA Warrants were supported by probable cause.  Accordingly, the motion to suppress evidence seized pursuant to the DMAA Warrants should be denied.

---

[12] Wheat and Hi-Tech also claim that Special Agent Dunham should have told Judge Baverman about certain positions that the Government had taken in the Civil Seizure Action prior to Judge Hunt's ruling [Doc. 52 at 19–21], but they have failed to show how those positions are material.

### III.   CONCLUSION

For the reasons stated above, I **RECOMMEND** that the four motions addressed herein [Docs. 191, 276, 278, 279] be **DENIED**.

**IT IS SO RECOMMENDED**, this 28th day of May, 2020.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE