IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JARED WHEAT, HI-TECH
PHARMACEUTICALS,
INC., and BRANDON SCHOPP,

Defendants.

CRIMINAL ACTION NO.

1:17-cr-229-AT-CMS

**SUPPLEMENT TO**
**REPORT AND RECOMMENDATION DATED MAY 28, 2020**

On May 28, 2020, I issued a Report and Recommendation ("R&R") in which

I recommended that Defendants' request for a *Franks* hearing and three motions to

suppress evidence be denied.  [Doc. 314].  Thereafter, in an Order dated November

6, 2020, Judge Totenberg withheld ruling on these motions and directed me to hold

a *Franks* hearing based on the fact that Defendants had made certain "credible

allegations."  [Doc. 363 at 6].  She noted that Defendants had credibly alleged that

at the time the agents sought the Premises Warrants, the agents knew and failed to

disclose that:

- the analysis of Hi-Tech products demonstrated that the illegal
  anabolic steroids existed only in trace amounts not sufficient to
  render the products illegal;

- multiple rounds of increasingly precise testing were required to
  detect the steroids;

1

- the prohormone in the relevant supplements was legal DHEA; and

- trace amounts of anabolic steroids may remain in DHEA products as a result of the manufacturing process.

[*Id.*].   Moreover, Judge Totenberg stated that based on these allegations, Special Agent Brian Kriplean's affidavit might have (and perhaps should have) included wording along the lines of:

> We tested the products we received from Hi-Tech through two methods and those tests did not reveal the presence of anabolic steroids. We asked the lab to test the products again using a more sensitive test, and those tests did not reveal the presence of anabolic steroids. We asked the lab to test the products a third time using an even more sensitive test, and those tests revealed the presence of only trace amounts of steroids at levels not sufficient to be biologically active. These results are consistent with the manufacturing process for making DHEA, a legal substance. We did not take the opportunity to quantitate those trace levels, so we do not know exactly how low the levels of anabolic steroids in the Hi-Tech products are.

[*Id.* at 7–8].

Judge Totenberg instructed me (1) to hold a *Franks* hearing regarding alleged omissions and misrepresentations in the search warrant application and (2) to take at least ninety minutes of evidence regarding the manner in which the Government and lead agent executed the search.   [Doc. 363; Doc. 366 at 2].   In March 2021, I conducted a two-day evidentiary hearing addressing these issues.   [Docs. 393, 394]. At that hearing, Special Agent Kriplean testified, as did Dr. Thomas Brueggemeyer, a chemist with the Forensic Chemistry Center ("FCC").   The parties agreed that the

testimony that had previously been provided by various scientists at a multi-day *Daubert* hearing could also be considered for purposes of the *Franks* motion. [Doc. 393 at 18]. Below are my factual findings and additional analysis, which are intended to supplement my May 28, 2020 R&R.

## I.   *Franks* motion

### A. Facts concerning alleged material omissions/misrepresentations in the affidavit supporting the Premises Warrants[1]

At the *Franks* hearing, Special Agent Kriplean testified that in 2016, he and other agents were investigating certain nutritional supplements known as prohormones, which he described as products designed to promote muscle growth. The investigators were looking for prohormone products that contained non-dietary ingredients and anabolic steroids. [*Franks* Hearing Transcript, "*Franks* Tr." at 73–74[2]]. As part of that investigation, agents purchased certain Hi-Tech products in two undercover transactions. In October 2016, Special Agent Kriplean contacted the FCC, the laboratory that conducts chemical analyses for the United States Food and

---

[1] This supplement presumes that the reader has already read, and is familiar with, my R&R. [Doc. 314]. In my R&R, I summarized the arguments presented in Defendants' *Franks* motion, set out the legal standard for showing entitlement to a *Franks* hearing, and recited the legal standard for probable cause. [*Id.* at 9–11]. I refer the reader to those portions of my R&R and will not restate them here.

[2] The transcript of the *Franks* hearing is 476 pages long, filed in two volumes. Pages 1-283 are located at Docket Entry 393, and pages 284–476 are at Docket Entry 394. My citations are to the numbers printed on the transcript by the court reporter, not to the CM/ECF page numbers.

Drug Administration ("FDA") and requested testing of eight Hi-Tech products.  [*Id.* at 37–39; Doc. 409-2; Doc. 330-1 ¶ 3].   The written "Request for Laboratory Services" form reflected a request that the lab conduct a "Drug/API Identification" analysis[3] and that it do so on an expedited basis due to "grand jury."  [Doc. 409-2 at 2].   The lab request stated: "If drugs/APIs found, please compare actual contents to stated label claims."  [*Id.*].   In this written request, Special Agent Kriplean did not specify any particular type of testing that he wanted the lab to use, nor did he request quantification of the ingredients.  [*Id.*; *Franks* Tr. at 40].

Special Agent Kriplean was questioned at length about the fact that he did not ask the lab to quantify the ingredients.   He stated that he had worked for the FDA for approximately fourteen years.  [*Franks* Tr. at 26].   During that time, he was never trained about a need to establish a specific quantity in order to establish probable cause for a criminal offense.   [*Id.* at 33–34, 36–37].   He testified that he was not aware of any criminal offense that required a specific quantity of an illegal substance.   [*Id.* at 36–37].   He testified that in deciding whether to request quantification from the lab, he is guided primarily by whether the quantity is an element of the offense, and that his decision in this instance not to request quantification was in line with his general practice.   [*Id.* at 41].   Dr. Thomas

---

[3] API stands for "active pharmaceutical ingredient."  [Doc. 369, *Daubert* Tr., at 45]. For example, the API for Tylenol is acetaminophen.  [*Id.*].

Brueggemeyer also provided evidence on the issue of when the FCC performs

quantitative[4] analysis:

> FCC often conducts qualitative analysis for the presence of known
> active pharmaceutical ingredients or other drugs on product samples
> submitted by other FDA components, including FDA-OCI, without
> conducting quantification analysis at the same time. In some instances,
> FCC may conduct quantification analysis at the same time as qualitative
> analysis or at a later date; in other cases, quantification analysis may
> never be performed. Whether an FDA component such as FDA-OCI
> requests quantification of any given substance that has been identified
> by FCC in a sample is determined on a case-by-case basis.

[Doc. 330-1 ¶ 4].

In mid-November 2016, FCC chemist Dr. Enrique Yanes Santos conducted

the first round of qualitative testing using liquid chromatography-mass spectrometry

analysis ("LC-MS").  [Doc. 412-6; *Daubert* Hearing Transcript ("*Daubert* Tr.")  at

304, 320–21[5]].  A report summarizing the testing stated that the ingredients in the

Hi-Tech products were "compared to data obtained from reference standards

---

[4] Quantitative testing should be distinguished from qualitative testing.  Qualitative
testing refers to identifying the components in a sample, while quantitative testing
tells you the precise amounts of each component that has been identified.  [*Franks*
Tr. at 408–09].  As explained below, several rounds of qualitative testing were done
on the Hi-Tech samples before Special Agent Kriplean applied for the Premises
Warrants, but quantitative testing was not done until long after those warrants were
signed.

[5] The transcript of the *Daubert* hearing is 642 pages long, filed in three volumes.
Pages 1-201 are located at Docket Entry 369; pages 202–469 are at Docket Entry
370; and pages 470–642 are at Docket Entry 371.  My citations are to the numbers
printed on the transcript by the court reporter, not to the CM/ECF page numbers.

analyzed under identical LC-MS conditions." [Doc. 412-6 at 1].  The report listed out certain ingredients that the scientists were able to identify, none of which was illegal.  [*Id.*].  The report, however, also noted: "Additional peaks were detected in each of the items but they were not identified." [*Id.*].[6]

In November 2016, Dr. Tom Brueggemeyer, a supervisory chemist at the FCC, decided that the FCC should look at the samples using another technique—gas chromatography-mass spectrometry analysis ("GC-MS")—to see if they could identify any other components in the samples.  On November 28, 2016, he sent the following email to Dr. Yanes Santos (the lead analyst on the case) and Anissa Kelley (an FDA chemist specializing in GC-MS testing):

> I just spoke with OCI SA Brian Kriplean (12:45 PM, Monday Nov. 28, 2016), and explained that you were finding steroids in the sample (non-scheduled) as well as some unknown peaks. I said that it was possible that these unknowns were steroids (scheduled or not) or possibly API's, but that they may not be.  I asked about the December 13th grand jury date. He said that if we had not finished by that date, he would ask for an extension. So, we agreed to look at the samples with another technique (GC-MS) and see if we could identify any other components. I said that after our first time through the samples with GC-MS, we'd let him know about where we stood.  He knows that if there are tentative ID's, we may need to order standards before a true identification. If GC-MS does not find anything new, or of interest, then we would probably be done.

---

[6] Defendants repeatedly argue that these November 2016 tests came back "negative" for anabolic steroids and that Judge Vineyard should have been so advised.  *See, e.g.,* [Doc. 382 at 3].  I disagree; the results were not "negative."  Certain steroids (reflected in the peaks) were ***detected***; they just had not yet been ***identified***.  [Doc. 412-6 at 1].

[Doc. 409-3].  Thus, the evidence showed that the FCC chemists advised Special Agent Kriplean about the LC-MS results, explained that the unknown peaks might be steroids, and suggested further testing.  [*Franks* Tr. at 42–43; Doc. 409-3].

At the *Franks* hearing, Dr. Brueggemeyer was asked about the email, and he explained that the statement that "we may need to order standards" reflects that the FCC might need to purchase some additional reference standards before they could definitively identify the steroids.  [*Franks* Tr. at 44–46; Doc. 409-3; *Daubert* Tr. at 74–75].  Reference standards are the known substances that chemists use to identify unknown substances.  [*Franks* Tr. at 44, 373].  Dr. Brueggemeyer explained that in order to make an identification, the FCC must match a compound to a physical reference standard, which is a sample of the actual steroid.  [*Id.* at 372; *see also Daubert* Tr. at 21 (explaining what a reference standard is)].  According to Dr. Brueggemeyer, "the selection of standards can be an ongoing process depending on what the preliminary findings appear to be."  [*Franks* Tr. at 374].

Dr. Yanes Santos's original November 2016 tests compared Hi-Tech's products to seven steroid reference standards, none of which included the schedule III steroids alleged in the indictment.  [*Compare* Doc. 412-6 at 3-4 *with* Doc. 7 at 14; *Franks* Tr. at 373].  Dr. Brueggemeyer testified further that having unidentified substances in a sample was "pretty common" in qualitative analysis; it just means

that those substances were not in the lab's library of reference standards.   [*Franks Tr.* at 374–75].

At the *Daubert* hearing, Dr. Yanes Santos testified that GC-MS testing was necessary because GC-MS had a more extensive mass spectrum library, compared to the limited library for LC-MS, and that GC-MS testing would facilitate identification:

> So in that particular case, so when I submitted my report, there were several components that I couldn't determine the identity right away. So they were—the same way with the intention that we will need to use a different technique to help us determine the identity. One of the—at that time when I did the analysis, one of the drawbacks of LC-MS at that particular period of time is that we didn't have access to mass spectrum libraries. And then you have to go to the Internet and spend a lot of hours trying to figure out. While GC-MS at that time has an extensive mass spectrum library, so that was—the idea was that it was—it was going to be easier to use GC-MS for the identification of those components that I detected, but I was not able to determine the identity.

[*Daubert Tr.* at 320–21].  Special Agent Kriplean testified credibly that it was the FCC chemists who suggested conducting GC-MS testing and that he (Kriplean) had never (in this particular case or in his entire career) specified what type of testing that a lab should conduct.  [*Franks* Tr. at 46].  He testified, "I don't know what those methods are or why you would use one [type of chemical analysis] versus another. I'm not a chemist.  I don't pretend to be one.  That's their role."  [*Id.*].

FCC chemist Anissa Kelley was assigned to conduct the GC-MS analysis. She testified credibly that the FCC's standard operating procedures recommended

using both LC-MS and GC-MS to identify steroids because certain steroids could be identified using only one technique.[7]  [*Daubert* Tr. at 9–11, 19].  At the *Daubert* hearing, she was shown Dr. Brueggemeyer's November 28, 2016 email and asked about his use of the term "tentative IDs."  She explained:

> Tentative ID, in reading the e-mail, what Dr. Brueggemeyer is speaking of is if—once an analysis is done by GC-MS, we have this huge database of around 500—300 to 500,000 compounds. So you do a search of the peak, and that gives you an idea of maybe what you're dealing with. So that would be a tentative identification, but we would follow it up with a true identification by running a reference standard of that component.  . . .  A tentative identification would be a library match, and an identification would be using a reference standard.

[*Daubert* Tr. at 45–46].  Kelley performed GC-MS analysis on the samples in late November and early December 2016.  [Doc. 330-1 ¶ 6]. That testing confirmed the presence of three minor Schedule III steroids, but she was not able to definitively identify them.  [*Id.; Daubert* Tr. at 49; Doc. 409-4].

On December 8, 2016, Special Agent Kriplean again spoke with Dr. Brueggemeyer.  [*Franks* Tr. at 46–47; Doc. 409-4].  During that conversation, Dr.

---

[7] In their pre-hearing brief [Doc. 382], Defendants point out that Dr. Yanes Santos answered "[n]ot really" in response to the following question: "[W]ith respect to the GC-MS testing, is it part of standard operating procedures to run both LC-MS and GC-MS on certain samples?"  [*Daubert* Tr. at 329].  Defendants, however, neglect to mention that one page later, he testified that "[s]ome steroids can only be detected by LC-MS. So utilizing both GC-MS and LC-MS is recommended when analyzing a sample suspected [of containing] steroids."  [*Id.* at 330].  He was then asked, "Is that what happened in this case?"  And he responded, "So in this particular case, yes. So utilizing both LC-MS and GC-MS, it is recommended."  [*Id.*].

Brueggemeyer indicated that the chemists had detected three minor Schedule III steroids in the samples, but had not yet identified them, and they agreed to a plan to identify them using reference standards. [*Franks* Tr. at 47–53; Doc. 409-4]. In an email memorializing the conversation, Dr. Brueggemeyer wrote that they had agreed to:

> Identify with standards the three minor Schedule III steroids we are finding in the samples. I told him that in addition to confirming these, we would be sure that their presence is not a result of any type of chemical interconversion taking place in the GC-MS instrumentation. I told him that we can't say whether these low-level components were added intentionally or were the result of impurities such as cross-contamination. He said it didn't matter.

[Doc. 409-4]. Special Agent Kriplean testified that the word "minor" meant that it was not the predominant ingredient in the product. [*Franks* Tr. at 47]. He also testified that they did not discuss the specific quantities of the steroids that had been found in the products. [*Id.* at 50]. In early January 2017, Ms. Kelley again ran GC-MS testing, but was still unable to identify the steroids.

An FCC Telephone Log dated January 18, 2017 was introduced into evidence that reflected a telephone call between Special Agent Kriplean and Dr. Yanes Santos. It states "Q: If any Schedule III steroids are detected at trace levels, do we need to quantitate those steroids? A: No." [Doc. 409-5]. At the *Franks* hearing, Special Agent Kriplean testified that this call log reflected a conversation he had had in which he told the lab not to quantify the steroids because the offense being

10

investigated did not require quantification.  [*Franks* Tr. at 62].  He testified that the conversation about whether to quantitate likely occurred because of time constraints; the chemists knew that they were dealing with a limited time frame, and they needed to determine whether they had the resources to do the additional testing.  In his view, the exchange had nothing to do with the chemists thinking that there were extremely small amounts of illegal substances in the samples.  [*Id.* at 153–54].

In late January 2017, Dr. Yanes Santos again conducted LC-MS testing on Hi-Tech's products after obtaining new reference standards, and that round of testing identified Schedule III steroids (androstanedione; boldione (androstadienedione); 4-androstenediol; and/or 5-androstenediol) in five of the Hi-Tech products that were tested (Androdiol, 1-AD, 1-Testosterone, Equibolin, and Superdrol).  [Doc. 330-1 ¶ 8;  Doc. 330-1 at 9–10, 12–14; Doc. 412-7; *Daubert* Tr. at 337].  The lab reports from the January testing that were sent to Special Agent Kriplean did not reflect the quantity of the steroids.  [Doc. 330-1 at 9–10, 12–14; *Franks* Tr. at 63–65; *Daubert* Tr. at 337].  The reports contain the following footnote that refers to the Schedule III steroids:

> Indicates a DEA Schedule Ill steroid. Based on the LC-MS signals, these steroids were found to be not the most predominant steroids in the sample items. Based on this information and communication with SA

Brian C. Kriplean on January 18, 2017, no quantitation of these steroids was performed.

[Doc. 330-1 at 10, 13].  Dr. Yanes Santos testified that the Schedule III steroids had not been quantified at that time, that his testing revealed their presence in "low levels," and that there were other substances that were "more predominant" than the Schedule III steroids.  [*Daubert* Tr. at 337].

Thereafter, the agents made another undercover purchase of Hi-Tech nutritional supplements.  On August 22, 2017, the agents submitted four products to the FCC for analysis, noting that they needed the results in less than one month (by September 15, 2017) because they were planning to present the findings to a federal grand jury.  [*Franks* Tr. at 66; Doc. 409-7 at 1–2; Doc. 330-1 ¶ 11].  Special Agent Kriplean did not request quantification at that time.  [*Franks* Tr. at 67].  Dr. Yanes Santos analyzed composite samples of these products and identified the presence of steroids in four of the Hi-Tech products (Androdiol, 1-AD, Equibolin, and Superdrol).  [Doc. 330-1 at 16–17].  He created a lab report dated September 14, 2017, reflecting his findings.  [*Id.*].  The report did not specify whether the identified steroids were scheduled controlled substances, and it did not reflect the quantity of the steroids that had been detected.  [*Id.*; *Franks* Tr. at 67–68].

Upon receiving the September 14, 2017 report [Doc. 409-8], Special Agent Kriplean contacted Dr. Brueggemeyer to obtain clarification regarding the names of some of the steroids identified in the report and to determine whether the steroids

were scheduled controlled substances. [Doc. 409-9]. Dr. Brueggemeyer emailed to explain that the chemical compound named "boldione" in the DEA's list of controlled substances is the same chemical compound identified by the names "androstadienedione" and "1,4-androstadien-3,17-dione" in the lab report. [*Id.*]. During this email correspondence, there was no mention of the quantity of steroids that had been detected in the samples. [*Id.*; *Franks* Tr. at 69–70]. Special Agent Kriplean testified that he did not ask for quantification at that time, and he had no reason to believe that the FCC chemists conducted any quantification tests. [*Franks* Tr. at 70].

Special Agent Kriplean testified that at the time he applied for the Premises Warrants, he knew that the predominant ingredient in the Hi-Tech samples was DHEA (because it was disclosed on the label) and that the level of detected illegal steroids was low. And he acknowledged that he did not include these facts in his affidavit. He explained that he would not expect the illegal anabolic steroid to be the major component and that it was not a surprise that the major component was a lawful substance. He testified that his job was to advise the magistrate judge about what was ***illegal*** in the product, and there was no need to also advise the judge that there were legal components in the samples. [*Franks* Tr. at 74–76, 117]. He testified that he was aware that some DHEA is legal but that he knew "nothing" about its synthesis process or its manufacturing process. [*Id.* at 55, 136, 143]. In response to

13

the Court's questions, Special Agent Kriplean testified that he had no idea how much of an anabolic steroid was necessary to have an effect on the body, and that it never occurred to him to try to learn the answer to that question.  [*Id.* at 148–52].

At the hearing, Special Agent Kriplean went through the affidavit he had presented to Judge Vineyard and explained why he included the facts therein and testified that there was nothing inaccurate in the affidavit.  [*Franks* Tr. at 80].  He also identified a number of facts that he could have included, but did not include, such as: (1) that Mr. Wheat has a criminal history including two previous felony convictions [*id.* at 88–89]; (2) that a person named Brandon Hodges had lodged a complaint with the FDA alleging that certain ingredients in Hi-Tech's products were non-dietary ingredients [*id.* at 89–91]; and that the FDA's Center for Food Safety and Nutrition ("CFSAN") had conducted a label review of certain Hi-Tech products and determined that some of the listed ingredients on Hi-Tech's products were non-dietary in nature [*id.* at 91–93; 134–35].

In response to my questions, Special Agent Kriplean testified unequivocally that in preparing the warrant package, there was never any discussion about adding to his affidavit, or removing from his affidavit, information concerning: (1) the quantity of steroids found in the samples; (2) DHEA being the main ingredient; or (3) the DHEA manufacturing process.  [*Franks* Tr. at  249–50].

Testing to establish the quantity of the schedule III steroids was not performed until July 2018, several months after the Premises Warrants were signed.  [Doc. 330-1 at 19–26].

### B. Discussion[8]

Judge Totenberg ruled that Defendants were entitled to an evidentiary hearing because Defendants had credibly ***alleged*** that at the time the agents presented the Premises Warrants to Judge Vineyard, the agents knew: (a) that the analysis of Hi-Tech products demonstrated that the illegal anabolic steroids existed only in trace amounts not sufficient to render the products illegal; (b) that multiple rounds of increasingly precise testing were required to detect the steroids; and (c) that trace amounts of anabolic steroids may remain in DHEA products as a result of the manufacturing process.[9]   [Doc. 363 at 6].   As explained below, the evidence presented at the hearing did not support any of these allegations.

> ### *(1) There was no evidence that Special Agent Kriplean believed that there were only trace amounts of the illegal substances*

---

[8]  I refer the reader to pages 5–7 and 9–15 of my R&R [Doc. 314], in which I originally addressed the *Franks* arguments.

[9] Judge Totenberg also noted that Defendants had alleged that Special Agent Kriplean should have informed Judge Vineyard that the products contained a significant amount of DHEA, which is a legal prohormone.  [Doc. 363 at 3].  I agree with Special Agent Kriplean that the judge would have been interested in the ***illegal*** substance contained in the samples, rather than the legal primary ingredient that was reflected on the label.

*in the samples at the time he swore out his affidavit in support of the Premises Warrants.*

The evidence showed that at the time Special Agent Kriplean presented the Premises Warrants to Judge Vineyard, the amount of illegal steroids contained in the Hi-Tech products had not yet been quantified; the only analysis that had been conducted by that time was qualitative in nature. The quantitative testing was not performed until July 2018, long after the affidavit was presented to Judge Vineyard. [Doc. 330-1 at 19–26]. The chemists testified that during the relevant time period (i.e., before the Premises Warrants were signed), they did not communicate with Special Agent Kriplean about the quantity. [*Franks* Tr. at 466, 472; *Daubert* Tr. at 414]. Moreover, Special Agent Kriplean testified credibly that the FDA lawyer he was working with had reviewed the lab results (which characterized the illegal substances as "minor") and that he and the FDA lawyer never discussed drug quantity as a problem with the case. [*Franks* Tr. at 312–13]. Thus, there is no evidence that Special Agent Kriplean knew how much of the illegal substances were in the samples at the time he signed his affidavit, much less that he knew they were present "in trace amounts not sufficient to render the products illegal." Although Special Agent Kriplean said "no" when the FCC asked if he wanted the scientists to perform quantitative analysis, he testified credibly that he did not think that the quantity was important to his investigation at the time. [Doc. 409-5 at 1; *Franks* Tr. at 33–34]. There was no evidence presented that Special Agent Kriplean was being

intentionally blind or otherwise acting in bad faith with respect to the amount of the illegal substances in the samples.

The evidence showed that Special Agent Kriplean was aware that there were low amounts of anabolic steroids in the Hi-Tech products. However, as I pointed out in my R&R, the presence of a low amount of an illegal substance is enough to support a prosecution under the Controlled Substances Act. Defendants insinuate that Special Agent Kriplean believed that the anabolic steroids were an unintentional byproduct of the manufacturing process, and that he structured his affidavit in a way to mislead the magistrate judge. But none of the evidence presented at the *Franks* hearing supports this theory. Indeed, Special Agent Kriplean's testimony that "in almost every situation," the illegal undeclared ingredient is a minor component makes sense and was supported by the testimony of the FCC chemists. [*Franks* Tr. at 47–48, 65, 347–48; *Daubert* Tr. 69].

And, to the extent that Defendants fault Special Agent Kriplean for (1) not quantifying the amounts of the illegal substances before obtaining the search warrants; or (2) not following up on the possibility of cross-contamination from the manufacturing process [Doc. 416 at 18], this argument fails. An affiant's alleged failure to conduct further investigation fully to rule out innocent explanations for incriminating evidence "does not establish a *Franks* violation, even if that further investigation might have negated probable cause." *United States v. Lebowitz*, 647

F. Supp. 2d 1336, 1348 (N.D. Ga. 2009), *aff'd*, 676 F.3d 1000 (11th Cir. 2012); *see also United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) ("[F]ailure to investigate fully is not evidence of an affiant's reckless disregard for the truth.") (quoting *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993)).  The fact that Special Agent Kriplean did not quantify the Schedule III steroids or look into the byproducts issue does not establish reckless disregard for the truth.  *See Dale*, 991 F.2d at 844.

### (2) *There was nothing improper about the various tests that the FCC chemists performed on the samples.*

The evidence showed that before the Premises Warrants were issued, the FCC had used several techniques with varying degrees of sensitivity to analyze the samples.  The evidence showed that Special Agent Kriplean had no role in the decision to conduct those tests; the FCC chemists decided which tests to run.  [*Franks* Tr. at 42–46; *Daubert* Tr. at 17, 19, 326–27; Doc. 409-3].  Moreover, those tests were run to identify the particular steroids that had already been detected in the samples, not because the amount of the steroid in the samples was very low, as Defendants contend.  There was extensive evidence showing that the illegal substances were initially detected (but not yet identified) in the first round of testing; that the chemists recommended additional testing with additional reference standards in order to identify the unknown substances; and that there was no relationship between the chemists' inability to identify the substances and the

quantity of the substances. [*Franks* Tr. at 372–79, 390; *Daubert* Tr. at 11, 19, 82, 320–21].   The evidence simply does not support the nefarious motive that Defendants seek to ascribe to the fact that multiple tests were run on the samples before the Premises Warrants were issued.

### (3) *There was no evidence that Special Agent Kriplean knew or even suspected that the anabolic steroids in the samples were a mere byproduct of DHEA synthesis.*

Finally, although there is some expert evidence in the record to show that under certain circumstances, anabolic steroids may be byproducts of DHEA synthesis, there was no evidence that Special Agent Kriplean suspected that the steroids detected in the Hi-Tech samples were, in fact, such byproducts.  He testified credibly that he was not aware of the DHEA synthesis or manufacturing process. [*Franks* Tr. at 55, 136, 143].  Moreover, the FCC chemists testified credibly that the chemical testing would not show whether any particular ingredient was intentionally added.  [*Id.* at 385, 430].  Given this evidence, I conclude that Defendants have failed to show that Special Agent Kriplean omitted material facts intentionally or with reckless disregard for the truth, and the facts that he did omit would not have negated Judge Vineyard's probable cause finding.

## II.    "Flagrant Disregard" Argument

### A. Facts Regarding Execution of the Premises Warrants

As noted above, Judge Totenberg also instructed me to take testimony regarding Defendants' allegations that the agents acted improperly with respect to execution of the Premises Warrants.  The questions defense counsel posed concerned two areas: (1) the large amount of Hi-Tech produces that the Government seized; and (2) the search terms that the Government used to review Hi-Tech's electronic information.

With respect to the nutritional supplements that the agents seized, the evidence showed that approximately fifty agents were involved in the search of the Hi-Tech locations, that the search lasted approximately sixteen hours, and that the agents seized approximately 40 truckloads of items from the Hi-Tech facilities. [*Franks* Tr. at 106–07, 138; Doc. 51-6].  Special Agent Kriplean testified that before the Premises Warrants were executed, he provided the agents with an operational plan that he had prepared.    [*Franks* Tr. at 99–100].  He did not provide the agents with his affidavit, but he did give them Attachment B to the Premises Warrants, which, in his view, specified exactly which items and information could be seized. [*Id.* at 100–01].  He testified that he sent the "team leaders" a document that contained some general information about the various products that Hi-Tech distributes.  [*Id.* at 102–03].  He also printed out screenshots from the Hi-Tech website of certain

prohormone products and other "DMEA products," and he also sent them supplement "facts panel" information for products that listed non-dietary ingredients. [*Id.* at 219–21]. Special Agent Kriplean testified that based on the information he provided to the agents, "it was very clear what we were there to seize." [*Id.* at 222].

Among the Hi-Tech items seized were Helladrol and Stanabol, products that had not tested positive for anabolic steroids and were not mentioned in the affidavit. Special Agent Kriplean could not explain why they were seized without looking at his notes, but he testified that he believed that the agents had some evidence that these products were either misbranded or adulterated. [*Franks* Tr. at 127–31]. He testified that it was possible that the products were among those identified by the CFSAN audit as having non-dietary ingredients on the label. [*Id.* at 131]. He provided similar answers when questioned about the seizure of Metanabol, Estrogenex, 1-Andro, ArimiPlex, Dianabol, Decabolin, Vegan ISO Vanilla, and products from Blackstone Lab. [*Id.* at 132–33, 139–41]. Defendants did not present evidence to dispute this assertion.

On cross-examination, Special Agent Kriplean conceded that his affidavit did not mention adulterated products or use the word "adulteration." But he pointed out that his affidavit referenced 21 U.S.C. §§ 331(a), which prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device,

tobacco product, or cosmetic that is ***adulterated or misbranded***." [*Franks* Tr. at 144–45 (emphasis added)].

As for the search terms for the electronic information, Special Agent Kriplean testified that law enforcement provided Madison & Associates (the vendor hired to search the seized ESI dataset) with a list of search terms. [*Franks* Tr. at 160, 226; Doc. 410-1]. He conceded that many of the terms on the list—such as "certificate of free sale"—were not specifically tied to the anabolic steroid crimes that were discussed in his affidavit. When asked about this, Special Agent Kriplean responded that the items on the list were related to the items included on Attachment B to the Premises Warrants and were part of his investigation. [*Franks* Tr. at 240–41; *compare* Doc. 410-1 *with* 409-10 at 3–10]. He testified that he drafted Attachment B—which included items related to counts in the indictment other than the controlled substances counts—and that during the drafting process, very few edits, if any, were made to it. [*Franks* Tr. at 243–44, 261; Doc. 409-10 at 3–10].

He testified that he had originally included in his affidavit a reference to the misdemeanor provision of the FDCA (which imposes strict liability misdemeanor punishment for violations of 21 U.S.C. § 331 that are committed without mens rea), but that the AUSA assigned to the case removed that reference. [*Franks* Tr. at 165–67, 246–47].

During cross examination, defense counsel repeatedly pointed out that items on the search-term list provided to Madison appeared unrelated to the alleged discovery of anabolic steroids in the Hi-Tech products. In response, Special Agent Kriplean repeatedly stated that he crafted his search-term list based on Attachment B to the Premises Warrants (rather than the affidavit), and that he made clear in his affidavit that he had not included all of the facts of the investigation. [*See, e.g.*, *Franks* Tr. at 255–60, 264]. He pointed out that Attachment B to the Premises Warrants was reviewed by multiple attorneys and was approved by the judge. [*Id.* at 259].

### B. Analysis[10]

Defendants seek suppression of the evidence obtained from the search based on law enforcement's execution of the Premises Warrants. To prevail on this claim, Defendants must show that the Government flagrantly disregarded the warrants' terms. *See United States v. Wuagneux*, 683 F.2d 1343, 1354 (11th Cir 1982) ("[A]bsent a 'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized.") (citations omitted). Under the Fourth Amendment, "the relevant inquiry is whether the search and seizures were reasonable under all the circumstances." *Id.* at 1352.

---

[10] I refer the reader to pages 33–39 of my R&R [Doc. 314], in which I originally addressed these arguments.

"Total suppression of all items seized, including items within a warrant's scope, is not appropriate unless the executing officers' conduct 'exceeded any reasonable interpretation of the warrant's provisions.'" *United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007) (quoting *Wuagneux*, 683 F.2d at 1354); *see also United States v. Schandl*, 947 F.2d 462, 465 (11th Cir. 1991) ("The seizure of items not covered by a warrant does not automatically invalidate an otherwise valid search."). Thus, for purposes of this inquiry, the focus is on the terms of the Premises Warrants and whether the agents flagrantly disregarded them.

The Premises Warrants were broad, authorizing law enforcement to search the Hi-Tech locations for "[e]vidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331 [relating to prohibited acts with respect to adulterated or misbranded food or drugs] and 21 U.S.C. § 841(a)(1) [making it a crime to manufacture, distribute, dispense, and possess controlled substances]." [Doc. 51-1 at 4]. The Premises Warrants described eleven broad categories of what such "evidence, fruits, and instrumentalities" might be, including business records and computers. [*Id.* at 4–10].

During cross-examination, defense counsel insinuated that it was wrong for the Government to search for, and to seize, products that were adulterated because the affidavit used only the word "misbranded," but not the word "adulterated." [*See, e.g.*, *Franks* Tr. 303]. The problem with this argument is that Attachment B to the

Premises Warrants expressly authorized the seizure of, among other things, "[a]ny misbranded and/or adulterated foods and/or drugs." [Doc. 51-1 at 4]. In fact, Attachment B to the Premises Warrants uses the word "adulterated" nine times. [*Id.* at 4–10]. Similarly, Defense counsel pointed out that some of the search terms for the electronic evidence (such as "Certificates of Free Sale") were not mentioned in the affidavit. But Defendants cannot escape the fact that the term "Certificates of Free Sale" is specifically included in item 7 of Attachment B. [Doc. 51-1 at 5].

Defense counsel's questions reflect frustration with the breadth of Attachment B, and they have raised this issue in their motions. To the extent Defendants have challenged the breadth of the Premises Warrants, such arguments reflect an attack on the facial validity of the warrants. I have already addressed this issue in my R&R and will not restate my conclusions here. [Doc. 314 at 27–31]. For purposes of the *Franks* motion, however, the agents cannot be faulted for searching for items that Judge Vineyard specifically authorized them to search for. I am aware of no rule that agents may search only for words specifically used in the affidavit or the warrant. Indeed, application of such a rule would violate the "realistic and commonsense approach" that district courts are required to use in interpreting warrants. *See United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). The Premises Warrants authorized the seizure of business records "pertaining to . . . any misbranded and/or adulterated foods and/or drugs," and the items on the

list appear to be tailored to identify items within the scope of the warrants. [Doc. 51-1 at 5].

Moreover, to the extent the agents seized items beyond the scope of Attachment B, such seizure, on its own, is insufficient to satisfy the flagrant disregard standard. *See United States v. Khanani*, 502 F.3d 1281, 1290–91 (11th Cir. 2007) (affirming finding of no flagrant disregard based on culling of ESI with keyword searches, even when government agents could not recall what keyword searches were conducted); *United States v. Maali*, 346 F. Supp. 2d 1226, 1254 (M.D. Fla. 2004) ("[A]ny finding of flagrant disregard in this case must be founded upon something other than the sheer volume of documents seized or the fact that some items outside the scope of the warrants were taken."); *see also United States v. Schandl*, 947 F.2d 462, 465 (11th Cir. 1991) (noting that it is "inevitable that some irrelevant materials would be seized as agents search[] through numerous documents for evidence" in complex fraud cases); *United States v. Nsoedo*, No. 1:08-CR-0351-JEC-JFK, 2009 WL 10669746, at *31 (N.D. Ga. July 31, 2009) (rejecting "flagrant disregard" claim even though "a few of the items seized seem of questionable evidentiary value and appear to fall outside the scope of the authorized search"); *United States v. Lee*, 1:14-CR-227-TCB, 2015 WL 5667102, at *10 n.11 (N.D. Ga. Sept. 25, 2015).

For all of these reasons, I conclude that there was no flagrant disregard of the Premises Warrants' terms that would justify suppression of evidence in this case.

## III.   Conclusion

In conclusion, nothing presented during the *Franks* hearing changes my opinion regarding the disposition of the *Franks* motion [Doc. 191] or the three motions to suppress [Docs. 276, 278, 279].  In the absence of evidence of material misrepresentations in the affidavit, there is no basis to continue to explore Special Agent Kriplean's intent.  To the extent Defendants have moved to reopen the *Franks* hearing, to obtain more documents, and to ask more questions about why Special Agent Kriplean worded his affidavit and Attachment B the way he did [Doc. 401], I **RECOMMEND** that this motion be **DENIED**.[11]

This 11th day of August, 2021.

CATHERINE M. SALINAS
United States Magistrate Judge

---

[11] Defendants' offer of proof on this issue is filed under seal at Doc. 414-1.  Without disclosing the details of that filing, Defendants want to explore Special Agent Kriplean's *mens rea,* including his communications with the Government lawyers and the strategic decisions that were made about what facts and statutes to include in (and to delete from) the affidavit and the warrants.  To the extent that I thought such information might be relevant before (and during parts of) the *Franks* hearing, I have changed my mind.  Simply put, the Defendants' allegations about misrepresentations and omissions were not borne out by the evidence, and further intrusion into the Government's decision-making process is not warranted.