IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:17-CR-0229-AT |
| JARED WHEAT, JOHN BRANDON | : | |
| SCHOPP, AND HI-TECH | : | |
| PHARMACEUTICALS, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## ORDER

This matter is before the Court on several related motions filed by the United States in this action, seeking to exclude certain expert testimony proffered by Defendants: (1) Motion to Exclude Irrelevant Expert Testimony [Doc. 322], (2) Motion to Exclude Impermissible Expert Testimony Relating to Legal Conclusions and State-of-Mind Opinions [Doc. 323], and (3) Motion to Exclude Irrelevant and Improper State-of-Mind Expert Testimony [Doc. 584]. As the motions are related, the Court will address them together.

# I. Background

## A. Procedural History

The Government indicted Jared Wheat and his pharmaceutical company Hi-Tech Pharmaceuticals ("Hi-Tech") in 2017 for wire fraud; money laundering; introducing misbranded drugs into interstate commerce; and manufacturing and distributing dietary supplements containing anabolic steroids, a controlled substance. (Docs. 1; 7). John Brandon Schopp is charged solely in connection with Count 1 – 3, entailing wire fraud related charges. The next seven years entailed protracted discovery and motion practice. In December 2024, the Government issued a Second Superseding Indictment, which included additional charges of manufacturing and distributing controlled substances as well as counts related to the alleged introduction of adulterated foods into interstate commerce. (Doc. 514).

As relevant here, Defendants Wheat and Hi-Tech are charged in Counts 12-18 of the Second Superseding Indictment with manufacturing and distributing five dietary supplement products in violation of the Controlled Substances Act ("CSA") and the Federal Food, Drug, and Cosmetic Act ("FDCA"). (*Id.* ¶¶ 37-65). These five products include Superdrol, Equivolin, 1-AD, 1-Testosterone, and Androdiol, all of which the Government contends contain Schedule III Controlled anabolic steroids. (*Id.* ¶ 41). Additionally, Defendants are charged in Counts 10 and 11 of the Second Superseding Indictment with introducing misbranded drugs into interstate commerce. (*Id.* ¶¶ 20-35). The misbranding charges specifically stem from the Government's allegation that Hi-Tech's product Choledrene contains Lovastatin,

an active ingredient in prescription drugs, but is falsely and misleadingly branded because it fails to identify that ingredient on the label and is marketed as a dietary supplement rather than a drug. (*Id.* ¶¶ 21-23).

All three Defendants are charged in Counts 1-3 of the Second Superseding Indictment with wire fraud. (*Id.* ¶¶ 1-14). The wire fraud charges stem from the Government's allegations that Defendants created fraudulent certificates of free sale, good manufacturing practice ("GMP") certificates, and GMP audit reports. (*Id.*). The Government asserts that Defendants created these documents for the purpose of defrauding current and prospective customers into believing that the FDA's Center for Food Safety and Nutrition had certified Hi-Tech's products as marketed in the United States and eligible for export (in the case of the certificates of free sale), and that a third-party independent auditor had certified the products as compliant with current GMP regulations (in the case of GMP certificates and audit reports). (*Id.* ¶¶ 6-14).

### B. Motions at Issue

The Government's motions take aim at a range of proffered defense expert testimony on the various grounds of relevance, risk of confusing or misleading the jury, and improper opinion on ultimate legal issues. Much of the expert testimony at issue is challenged on more than one ground. First, the Government challenges Defendants' proposed expert testimony regarding the safety and pharmacological effects of the dietary supplements at issue. The Government avers such matters are irrelevant to the charges Defendants face and will serve only to confuse or mislead

the jury. Second, the Government challenges Defendants' proposed expert testimony regarding the legal necessity or other value to the company of having certificates of free sale, GMP certificates, and GMP audit reports. Again, the Government argues such testimony is irrelevant to the elements of the wire fraud counts related to those certificates—that is, the legal necessity of the certificates has no bearing on whether Defendants forged them. In a separate motion, the Government also contends this testimony improperly offers opinions on ultimate legal issues and should be excluded under Rule 704.

Third, the Government seeks to exclude testimony from several defense experts that the Government contends wade too far into ultimate legal issues. With respect to all of these experts, the Government argues that it is improper for a defense expert to opine on issues of law rather than issues of fact, and that the Court should be the jury's only source of law. Specifically, the Government challenges the proposed testimony of defense expert William Salinski, CPA, who is expected to testify that the monetary transactions identified in the money laundering counts of the indictment are routine business transactions. Similarly, the Government challenges the proposed testimony of attorney Edmund J. Novotny regarding the "legal status" of 1-DHEA and its derivatives and of red yeast rice and monacolin K. The Government also challenges proposed testimony from three defense experts—Dr. Bannister, Mr. Levin, and Dr. Schauss—who are expected to opine that the Government should have pursued proper alternatives to criminal prosecution, such as FDA citations or other agency regulation. The

Government opposes this proffered testimony regarding the Government's charging decisions as irrelevant and prejudicial under Rules 702 and 403 of the Federal Rules of Evidence.

Finally, the Government challenges Defendants' proposed testimony from expert Dr. David Gortler that the case agent's initial instructions to the FDA chemists who tested the products departed from generally accepted scientific practice, because the agent did not request that the chemists quantify any Schedule III steroids found in the products. The Government asserts that the initial lack of steroid quantification results is no longer a live issue because the Government did indeed perform a quantification analysis later. Consequently, the Government argues testimony about the case agent's initial instructions to the FDA is irrelevant and would serve only to confuse the jury.

## II. Legal Standard

The motions at hand are not typical *Daubert* motions, in that the Government does not seek to exclude Defendants' experts altogether. Rather, the Government's motions are aimed at precluding particular defense experts from testifying as to certain topics that the Government contends are irrelevant, or from testifying as to certain opinions that impermissibly touch on ultimate legal issues.

To the extent the motions challenge the relevance of the proffered expert testimony, they are perhaps better characterized as motions in limine than *Daubert* motions. Defendants make this point in their omnibus response to the motions, contending that the Government's so-called *Daubert* motions raise

"arguments on the *scope* of each expert's testimony that are more appropriately raised in a motion in limine or at trial." (Doc. 328 at 16). That said, proffered expert testimony must be relevant in addition to being reliable, and the relevance requirement is not satisfied where the testimony does not assist the trier of fact under Rule 702. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004).

Ultimately, this distinction matters little as the trial date draws nearer. Whether the Government's arguments are best labeled as "*Daubert*" motions or motions in limine, the time is now ripe to resolve many of the parties' evidentiary disputes regarding the scope, content, and admissibility of the proffered expert testimony.

Moreover, although the question of relevance is the overarching issue across the three motions at hand, many of the Government's arguments do implicate other considerations under Rules 702 and 704, which govern the admissibility of Defendants' proffered expert testimony. Specifically, Rule 702 provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise . . . [if]:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In assessing admissibility, federal courts act as "'gatekeepers' tasked with screening out 'speculative' and 'unreliable expert testimony.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)). That gatekeeping role requires the Court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). "However, it is also the rule that where the proffered evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." *Holt v. United States*, 342 F.2d 163, 166 (5th Cir. 1965).[1] Indeed, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

The Eleventh Circuit has "distilled the expert admissibility inquiry into the following three factors":

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

*Moore,* 995 F.3d at 850–51. While there is overlap, these three requirements—qualification, reliability, and helpfulness—remain "distinct concepts and the courts must take care not to conflate them." *Id.* at 851 (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

The Court's analysis of the admissibility of certain expert testimony touching on ultimate legal issues is governed by Rule 704. That rule dictates that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, the Rule contains an essential exception that applies only in criminal cases—namely, "an expert witness must not state an opinion about whether defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). Under Rule 704(b), then, if the charged crime requires the defendant to have acted "knowingly," "willfully," "intentionally," or "recklessly," for instance, an expert cannot offer his opinion on that subject. *United States v. Herrera*, 2025 WL 40265, at *4 (11th Cir. Jan. 7, 2025), *cert. denied*, 2025 WL 1727395 (U.S. June 23, 2025).

Even if the Court finds the disputed expert testimony overcomes the barriers set by Rules 702 and 704, the Government asserts the testimony should nonetheless be excluded under Rule 403, which provides that the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *Frazier*, 387 F.3d at 1263 (quoting *Daubert*, 509 U.S. at 595). "Indeed, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id.* (cleaned up). Accordingly, "[w]here an expert's testimony could mislead the jury by addressing factors which as a matter of law are not relevant to the issues in the dispute, then exclusion under Rule 403 is appropriate." *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1042 (11th Cir. 1988).

In the background of these evidentiary rules, however, is the principle that criminal defendants must be permitted to offer a fulsome case in their defense. "A defendant's right to a fair trial is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor." *United States v. Hurn*, 368 F.3d 1359, 1363 (11th Cir. 2004) (quoting *United States v. Ramos*, 933 F.2d 968, 974 (11th Cir. 1991)). *See also United States v. Kelly*, 888 F.2d 732, 743 (11th Cir. 1989) ("The trial court is vested with broad discretion in ruling upon the relevancy and admissibility of evidence. . . . Such discretion does not, however, extend to the exclusion of crucial relevant evidence necessary to establish a valid defense."). In other words, the right "to call witnesses [on] one's own behalf [has] long been recognized as essential to due process." *United States v. Morris*, 489 F.

App'x 407, 414 (11th Cir. 2012) (citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)). And "where constitutional rights directly affecting the ascertainment of guilt are implicated," evidentiary rules should "not be applied mechanistically to defeat the ends of justice." *Id.* at 302.

Rule 403's protections against misleading or confusing expert testimony also has limits. "Where an adversary system provides a party a full opportunity to refute an expert's testimony during cross-examination, exclusion due to the danger of misleading the jury is generally inappropriate." *United States v. 0.161 Acres of Land*, 837 F.2d at 1042.

## III. Discussion

As outlined above, the Government challenges much of the proposed expert testimony at issue on more than one ground. The Court therefore organizes its discussion of the testimony primarily by the topic of the challenged testimony rather than by the legal basis of the Government's challenge. However, nearly all of the testimony challenged as impermissible state-of-mind testimony or testimony relating to legal conclusions under Rules 702 and 704 will be addressed together due to the Court's lengthy discussion of the applicable law to that issue.

### A. Expert Testimony Regarding Amounts and Pharmacological Effects of Steroids in the Products and the Safety of the Products

Across all three motions, the Government challenges certain proffered defense testimony regarding the relative safety of the Hi-Tech products and the amounts and pharmacological effects of steroids in the products. First, in the Motion to Exclude Irrelevant Expert Testimony [Doc. 322], the Government

challenges proffered testimony from four defense experts—Gortler, Levin, Lee, and Heuer—regarding the pharmacological, clinical, or physiological effect of the Schedule III anabolic steroids in the Hi-Tech products. [*Id.* at 4-5]. The Government also challenges proffered testimony from Dr. Lee and Dr. Heuer that Choledrene—the Hi-Tech product that allegedly contained Lovastatin—was "safe" when used as directed. [*Id.* at 5].

Next, in the Government's Motion to Exclude Impermissible Expert Testimony Relating to Legal Conclusions and State-of-Mind Opinions [Doc. 323], the Government challenges Dr. Heuer's proffered testimony that he "does not believe that the presence of trace amounts of 'illegal' steroids in Hi-Tech products was the result of intentional 'spiking' of the products." [*Id.* at 14]. The Government also challenges Dr. Heuer's proffered opinion that "it is technically extraordinarily difficult to intentionally include such small amounts of 'illegal' steroids" and that "it makes no sense" that some products within the same product line would have steroids and others would not. [*Id.* at 14-15].[2]

Third, in the Government's more recently filed Motion to Exclude Irrelevant and Improper State-of-Mind Expert Testimony [Doc. 584], which reiterates much of the argument from the motions filed earlier, the Government challenges testimony from five defense expert witnesses who are slated to opine that the

---

[2] Although this challenged Heuer testimony concerns the amounts of steroids in the products, the Government argues that it should be excluded as an improper state-of-mind opinion under Federal Rule of Evidence 704(b). [Doc. 323 at 15-16]. Accordingly, the Court will address the admissibility of this particular testimony in more detail below in Section III.C., which deals with expert testimony on ultimate issues.

anabolic steroids in Defendants' products are present in such small amounts as to be "biologically inactive" or "inert," or otherwise too minimal to pose any risk to human health. [*Id.* at 3-4].

In particular, the Government challenges proffered testimony from Dr. Bannister, Mr. Hillyer, Dr. Lee, Mr. Levin, and Dr. Schauss. Dr. Bannister is slated to testify that the concentration of steroids purportedly detected by the FCC's chemists all represent "vanishingly small amounts" or "trace amounts" that are not "biologically active." [*Id.* at 3]. Mr. Hillyer will testify that "the quantities [of steroids] are too small to be 'biologically significant,' toxic, or pose any health consequences." [*Id.* at 4]. Dr. Lee will testify that the quantities of anabolic steroids detected in the products "would not produce a physiological effect," that the steroids are "inert," and that they "would produce neither a short nor long term danger of toxicity[.]" [*Id.*]. Mr. Levin will opine that the quantities of anabolic steroids detected are "negligible" and would not be expected to have a clinically significant physiological effect. [*Id.*]. Finally, Dr. Schauss is expected to testify "that the quantities [of steroids] at issue are at or less than the weight of a single human hair and . . . . fails to be shown by experimental methods using scientific procedures to place a reasonable level of exposure to consumers to present a risk to human health[.]" [*Id.*].

Thus, in all, the Government's motions challenge the testimony of seven defense experts on this issue of the amounts and pharmacological effects of the steroids in the Hi-Tech products as well as the safety of the products, including

Choledrene: Gortler, Levin, Lee, Heuer, Bannister, Hillyer, and Schauss. The Government argues the Court should exclude any evidence regarding the safety or pharmacological effects of the substances charged in the indictment under Rules 702 and 403. [Doc. 322 at 8-19; Doc. 584 at 8-11].

The Government argues that the proffered expert testimony is "wholly unrelated to the facts and legal elements in dispute"—in other words, it is irrelevant. [Doc. 322 at 1; *see also* Doc. 584 at 8-11].[3] To understand why testimony regarding the toxicity and pharmacological effects of the steroids or the overall safety of Hi-Tech's products may arguably be irrelevant, one must look to the elements of the charged crimes.

The Government begins with the charges under the Controlled Substances Act. [Doc. 322 at 8-14; Doc. 584 at 8-9]. The Government notes that "the plain language of the Controlled Substances Act, the regulatory scheme, and precedent make clear that the health risks or impact of the Schedule III anabolic steroids found in Hi-Tech's products have no bearing on the Section 841 charges in Counts 12-16." [Doc. 584 at 9]. The Government points out that, because the anabolic steroids at issue in this case are Schedule III controlled substances, they fall under the specific enumerated steroids in 21 U.S.C. § 802(41)(A) rather than § 802(41)(C). Thus, the Government asserts, it is not required to show evidence of any pharmacological effect to prove the CSA charges. [Doc. 322 at 9]. The

---

[3] As noted above, the Government advances an additional argument that much of the testimony amounts to improper state-of-mind opinion under Rule 704(b). The Court will address that argument in Section III.C. below.

Government also cites to Eleventh Circuit caselaw for the proposition that the fact that a controlled substance is inert is not "legally significant in any way" to Controlled Substances Act charges. [Doc. 322 at 12-13; Doc. 584 at 8-9 (quoting *United States v. Pair*, 312 F. App'x 176, 183 (11th Cir. 2008) and citing *Reece v. United States*, 119 F.3d 1462, 1469 (11th Cir. 1997), two cases dealing with the lack of any distinction under the guidelines between "L-methamphetamine," an inert form of methamphetamine with little or no physiological effects, and "D-methamphetamine," the active version of methamphetamine)].

The Government makes a similar argument as to the relevance of the amounts of anabolic steroids in the Hi-Tech products. In particular, the Government notes that the Eleventh Circuit has found that the quantity of a controlled substance is not an element of a § 841 offense for federal indictment purposes. *See United States v. Sanchez*, 269 F.3d 1250, 1275 (11th Cir. 2011) (en banc), *abrogated in part on other grounds by United States v. Duncan*, 400 F.3d 1297, 1308 (11th Cir. 2005) ("[I]n any § 841 case, an indictment charging that a defendant violated § 841 properly charges a complete federal crime without any reference to either drug type or quantity."); *United States v. Carson*, 520 F. App'x 874, 897 (11th Cir. 2013) ("For purposes of a conviction under § 841(a)(1) and by extension § 846, the specific amount and type of drugs involved do not matter, and the government's failure to prove the amount or type charged in the indictment does not merit reversal. The amount and quantity of drugs only matter for purposes of [sentencing considerations under] § 841(b) . . . . [N]either the type of

drug nor the quantity of that drug is an element of the offense of conspiracy to violate § 841(a)(1).") (internal citation omitted). Along these lines, the Eleventh Circuit has held that Schedule III controlled substances should not be treated differently from "street drugs" in terms of how the total weight of the substance is measured at sentencing. *United States v. Lazarchik*, 924 F.2d 211, 214 (11th Cir. 1991).[4]

The Government next argues that the toxicity of the anabolic steroids is not relevant to the FDCA charges in Counts 17-18 of the Second Superseding Indictment. Those charges arise under §§ 331(a) and 342(g)(1) of the FDCA. (Doc. 514 at 16-22). The Government points out that, under one provision of the FDCA, a food (including a dietary supplement) may be deemed adulterated if it contains any "deleterious substance which may render it injurious to health[.]" 21 U.S.C. § 342(a)(1). Had Defendants been charged under that provision of the FDCA, the Government concedes that Defendants' proffered expert evidence related to the toxicity of the anabolic steroids in Hi-Tech's products would be relevant. However, Defendants here are charged with violating Section 342(g)(1) of the FDCA, which deems a food "adulterated" if it is a dietary supplement that "has been prepared, packed, or held under conditions that do not meet current good manufacturing practice regulations[.]" 21 U.S.C. § 342(g)(1). Since Section 342(g)(1) "requires no showing of health risks or toxicity," the Government avers that any evidence

---

[4] The Court notes that many of these arguments are repeated in the Government's trial brief. (Doc. 611). The Court will address the parties' trial briefs at the upcoming Pretrial Conference.

Defendants seek to introduce to show that their products are not dangerous is irrelevant. [Doc. 584 at 9-10].

The Court agrees with the Government's premise, but not necessarily its conclusion. That is, the Government does not need to prove that Schedule III Controlled anabolic steroids were present in Defendants' products in any particular amount, or that the steroids caused harm to consumers' health, in order to prove the elements of the CSA and FDCA charges in the Second Superseding Indictment (Counts 12–18). Nor must the Government prove that Hi-Tech's Choledrene product was unsafe or harmful in order to prove the elements of the misbranding charges in Counts 10–11 of the Second Superseding Indictment.

However, it does not follow that there is no other permissible use of the proffered evidence regarding the quantity and pharmacological effects of the anabolic steroids in the Hi-Tech products. Defendants are entitled to put on a defense to the Government's case. And the right to present one's own witnesses to establish a defense "is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). To prove its case at trial, the Government must establish that Defendants had the requisite intent to commit the crimes charged. Indeed, all of the offenses in the Second Superseding Indictment—wire fraud, money laundering, introducing misbranded drugs into interstate commerce, introducing adulterated food into interstate commerce, and manufacturing and distributing controlled substances—are also charged separately in conspiracy counts. (*See* Second Superseding Indictment, Doc. 514). The conspiracy counts

16

carry an even higher bar for the Government to meet—to prove those charges, the Government must show that Defendants acted knowingly and willfully. All of the non-conspiracy counts, as charged in the indictment, also require a showing of knowing and/or intentional conduct. The amount of steroids in the products and the pharmacological effects the products had on consumers are relevant to these questions of Defendants' intent, knowledge, and willfulness.

Defendants' proffered expert opinions plainly paint a picture of the defense theory that, even if there were anabolic steroids in Hi-Tech's products, Defendants cannot be found to have acted intentionally because there would be no motive or reason to include such small amounts of anabolic steroids in the products at issue. Defendants underline this purpose of the proffered evidence in their brief: "The small amount of steroids and the lack of pharmaceutical effect creates an inference to the jury that [] these meaningless amounts of steroids were not intentionally placed in the products for sale." (Doc. 328 at 21). That is a permissible and relevant purpose to introduce the evidence, because it "logically advances a material aspect of the proposing party's case." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand)). Whether the Government is required to prove that the products were harmful or that anabolic steroids were present in any particular amount to prove *the prosecution's case* is beside the point. It is permissible for Defendants to introduce circumstantial evidence to negate an inference of intent, as needed to advance their defense.

The Government's alternative argument that the evidence should be excluded under Rule 403 fares no better. The probative value of the evidence is not "substantially" outweighed by the danger of confusing or misleading the jury. The Court understands the Government's position that the quantity and pharmacological effects of the anabolic steroids in Hi-Tech's products do not matter to its CSA charges. But it is incumbent upon the Government to convince the jury of the same. Courts must be careful not to fix the match or to "be overly pessimistic about the capabilities of the jury and of the adversary system generally." *Daubert,* 509 U.S. at 580. "Where an adversary system provides a party a full opportunity to refute an expert's testimony during cross-examination, exclusion due to the danger of misleading the jury is generally inappropriate." *United States v. 0.161 Acres of Land*, 837 F.2d at 1042. Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 580. Accordingly, the Court rejects the Government's argument that any of the proffered expert testimony regarding the quantities or pharmacological effects of anabolic steroids in the Hi-Tech products should be excluded as irrelevant.

In the same vein as its arguments regarding the effects and quantities of the steroids in Hi-Tech's products, the Government seeks to exclude Defendants' proffered expert testimony that Choledrene is safe and effective to use as directed. The Government asserts this testimony is not relevant to the misbranding charges

in Counts 10-11 of the Second Superseding Indictment, which concern the Choledrene product. [Doc. 322 at 17-19]. The indictment does not allege that the Choledrene product was "adulterated," but instead alleges it was "misbranded" within the meaning of § 352(a) of the FDCA, which only requires proof that the drug's "labeling is false or misleading in any particular." 21 U.S.C. § 352(a). Specifically, in support of the misbranding charges in the Second Superseding Indictment, the Government accuses Defendants Hi-Tech and Wheat of labeling and marketing Choledrene as a "dietary supplement," when in fact the product "contained lovastatin, the active ingredient in several FDA-approved prescription drugs." (Doc. 514 at 9). The Government alleges that "[d]ue to the presence of lovastatin, Choledrene was not a 'dietary supplement' under the FDCA, and instead was a 'drug' because it was an article other than food intended to affect the structure or function of the human body." (*Id.*). Further, the Government alleges that Lovastatin was not listed as an ingredient on the label of the Choledrene product. (*Id.*). Thus, the Government argues that testimony that Choledrene was safe or harmless is immaterial to the elements of the misbranding charges and would not assist the trier of fact under Rule 702. [Doc. 322 at 18].

On this point, the Court agrees with the Government. The Court struggles to find a relevant purpose for the proffered testimony of Dr. Lee and Dr. Heuer that Choledrene is "safe and effective" or "safe for consumption" when used as directed. (*See* Doc. 321-1 at 6; Doc. 321-2 at 6). Defendants argue that the safety of the Choledrene product is "relevant to Defendants' lack of intent to distribute . . .

Lovastatin[,]" reasoning that, since there were no "adverse reports or customer complaints" associated with the products, Defendants had no reason to suspect the products contained foreign substances or impurities. (Doc. 328 at 23-24). This argument does not sufficiently connect the dots between the safety of the product and Defendants' intent.

The Court understands that one of the defense theories of the case is that it is not possible to distinguish between monacolin K (a naturally occurring compound found in red yeast rice) and biosynthetic Lovastatin, and therefore Defendants could not have formed the intent to knowingly distribute a mislabeled product—here, Choledrene. (*Id.* at 24). Defendants will be permitted to put on evidence regarding the chemical and structural identity between monacolin K and Lovastatin to bolster that defense. Defendants may also present evidence that there were no adverse events reported or customer complaints with regard to the Choledrene product, to negate an inference of intent with respect to the misbranding charges. That evidence is sufficient to make out a defense to the *mens rea* element of the charge.

However, Defendants fail to persuasively explain the connection between the proposed testimony regarding the safety of Choledrene and the question of whether Defendants knew it contained Lovastatin. Defendants could have known the product contained Lovastatin, whether or not the product was safe and effective when used as directed. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can

argue in closing arguments." *Frazier*, 387 F.3d at 1262-63. Therefore, seeing no relevance of the proffered testimony that Choledrene is safe and effective to the crimes charged or the defenses in the case, the Court agrees such evidence would serve only to mislead the jury regarding the elements of the misbranding charges and will exclude that portion of the proffered testimony from Drs. Heuer and Lee under Rule 403.

That said, the proffered evidence may become relevant if the Government puts on evidence during its case-in-chief that places into issue the safety of the Choledrene product. In that event, Defendants shall be permitted to rebut such evidence with testimony that Choledrene is safe when used as directed.

## B. Expert Testimony Regarding the Legal Necessity or Other Value of GMP Certificates, Audit Reports, and Certificates of Free Sale

The Government next challenges Defendants' proffered expert testimony that certificates of free sale are not legally required for domestic or many foreign shipments. [Doc. 322 at 21-22]. The Government argues this testimony is irrelevant to the elements of the wire fraud counts related to those certificates.[5] That is, the legal necessity of the certificates has no bearing on whether Defendants forged them. [*Id.* at 21].

---

[5] Separately, the Government also challenges testimony of two expert witnesses, Michael Levin and Dr. Heuer, whom Defendants plan to call to testify regarding the "worth" and meaningfulness of GMP certificates and audit reports to contract manufacturing customers. . The Government challenges this testimony as improper testimony on the ultimate legal issue of materiality. [Doc. 323 at 10-12]. The Court will accordingly address it in Section III.C. below.

The Court finds this proffered testimony is relevant for the same reasons the testimony regarding the quantities and amounts of anabolic steroids is relevant. Evidence that there would be no commercial or economic reason to create fraudulent GMP Certificates or Certificates of Free Sale is relevant to the questions of Defendants' intent, knowledge, and willfulness with respect to the wire fraud charges. Defendants are entitled to offer evidence to negate an inference of intent by showing that they would have no reason to knowingly violate the law. Moreover, to prove the wire fraud charges in the indictment, the Government must show that Defendants made false representations about a material fact. Evidence regarding the value or worth of GMP Certificates and Certificates of Free Sale to customers will assist the trier of fact in determining whether the element of materiality is met.

The Court also rejects the Government's alternative argument that, even if the evidence is relevant, its relevance is outweighed by the risk of misleading or confusing the jury under Rule 403. The Court will instruct the jury on the law, and the Government may request a limiting instruction if necessary to correct any possible misconception that the legal necessity of Certificates of Free Sale is a legal question in the case.

### C. Expert Testimony Related to Ultimate Legal Issues and State-of-Mind Opinions

Having addressed the Government's motions to exclude certain expert evidence on the basis of relevance, the Court now turns to the Government's motions to exclude expert testimony related to ultimate legal issues and state-of-mind opinions.

Across the three motions, the Government seeks to exclude several different aspects of Defendants' proffered expert testimony as improperly speaking to ultimate legal issues. Much of the testimony at issue is challenged by the Government as impermissible "state-of-mind" testimony—that is, testimony offering an opinion on Defendants' mental state or condition, which the Government challenges under Federal Rule of Evidence 704(b). Specifically, the Government seeks to exclude the following testimony on the grounds that it either concerns ultimate legal issues or opines directly on Defendants' intent: (1) testimony from Hillyer, Bannister, and Levin regarding the low amounts of anabolic steroids in the products; (2) testimony from Novotny regarding the legal status of 1-DHEA and monacolin K; (3) testimony from Levin and Heuer regarding the materiality of the purportedly false GMP Certificates and Certificates of Free Sale; and (4) testimony from Salinski regarding money laundering.

The Government asserts that expert testimony regarding ultimate legal issues is inappropriate because "[a] witness [] may not testify to the legal implications of conduct; the court must be the jury's only source of law." [Doc. 323 at 9 (quoting *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990))]. However, this is an oversimplification of the governing law.

As discussed, Rule 704(b) proscribes state-of-mind testimony from experts. In applying Rule 704(b), the Court must "distinguish[] between an expert expressly stating an inference, which is impermissible under Rule 704(b), and an expert leaving the inference for the jury to draw, which is permissible." *United*

*States v. Viramontes*, 419 F. App'x 938, 941 (11th Cir. 2011)."[T]he distinction between whether challenged testimony is either an admissible factual opinion or an inadmissible legal conclusion is not always easy to perceive." *Hanson v. Waller*, 888 F.2d 806, 811 (11th Cir. 1989). More recently, the Supreme Court has interpreted the limitations of Rule 704(b) very narrowly, explaining that the rule "exclusively addresses mental states and conditions that are 'element[s] of the crime charged or of a defense.'" *Diaz v. United States*, 602 U.S. 526, 534 (2024) (quoting Fed. R. Evid. 704(b)). Thus, the rule "proscribes only expert opinions in a criminal case that are about a particular person ('the defendant') and a particular ultimate issue (whether the defendant has 'a mental state or condition' that is 'an element of the crime charged or of a defense')." *Id.* "Moreover, the Rule does not preclude testimony 'about' mental-state ultimate issues in the abstract. Instead, it targets conclusions 'about whether' a certain fact is true: '[T]he defendant did or did not have a mental state or condition.'" *Id.* at 537. The Supreme Court thus concluded that the language of the Rule as a whole "conveys that Rule 704(b) is limited to conclusions as to the defendant's mental state." *Id.* at 537. Or, as the Eleventh Circuit explained in its application of the *Diaz* holding, Rule 704(b) "does not bar opinions that simply *relate* to the mental-state issue." *Herrera*, 2025 WL 40265, at *5.

The majority of the challenged testimony does not run afoul of the rule. To elucidate, the Court will address each category of testimony in turn.

### i.    Expert Testimony Regarding Intent to Include Anabolic Steroids in the Products

The first category of challenged testimony relates to whether Defendants intentionally added anabolic steroids to the Hi-Tech products. [Doc. 584 at 14-16]. Specifically, the Government challenges: (1) the testimony of Mr. Hillyer that "the controlled steroids purportedly detected by the FCC chemists were not intentionally added to the Hi-Tech products"; (2) the testimony of Dr. Bannister that "there is no commercial reason to intentionally add steroids in such small amounts"; and (3) the testimony of Mr. Levin that, based on the quantities of steroids found in Hi-Tech's products, "there is no economic or commercial justification to intentionally add these steroids to Hi-Tech products" and that Hi-Tech's Standard Operating Procedures "reflected an intention to fully abide by and comply with GMPs for dietary supplements." [*Id.* at 5-6]. In an earlier-filed motion, the Government also challenges (4) the testimony of Dr. Heuer that he "does not believe that the presence of trace amounts of 'illegal' steroids in Hi-Tech products was the result of intentional 'spiking' of the products"; that "it is technically extraordinarily difficult to intentionally include such small amounts of 'illegal' steroids"; and that "it makes no sense" that some products within the same product line would have steroids and others would not. [Doc. 323 at 14-15].

The Government argues the testimony outlined above amounts to expert opinion about Defendants' state of mind that is prohibited under Rule 704(b). The Court finds that, with two exceptions, the challenged testimony does not violate Rule 704(b).

Dr. Bannister and Mr. Levin are both slated to testify that there would be no economic or commercial reason to intentionally add steroids to Hi-Tech's products in such small amounts. Those opinions are based on their respective fields of expertise. Mr. Levin is an executive in the dietary supplement field whose proffered testimony includes his opinion that the amounts of Schedule III steroids in the products are "typical of industrial impurities which are ubiquitous in the food supply chain, impossible to wholly eliminate, acceptable in dietary supplements manufactured in full compliance with cGMPs[6] and do not represent any reasonable threat whatsoever to public health or safety." (*See* Summary of Defense Expert Testimony, Doc. 321-1 at 4). Dr. Bannister has a doctorate in pharmaceutical chemistry and intends to testify that the manufacturing process for legal steroids can result in the presence of trace amounts of illicit anabolic steroids. (*Id.* at 6).

Experts may provide specialized knowledge about their fields to assist the trier of fact in applying the law to the evidence. Fed. R. Evid. 702. *See also Frazier*, 387 F.3d at 1262 (explaining that expert testimony "assist[s] the trier of fact . . . if it concerns matters that are beyond the understanding of the average lay person."). The proffered testimony of Bannister and Levin will provide important context to the jury to assist them in understanding whether Defendants would have a motive or reason to commit the crimes charged, but it does not go so far as to opine directly on Defendants' actual mental state or condition. Therefore, the testimony is not barred by Rule 704(b). *See Herrera*, 2025 WL 40265, at *5 ("[E]xperts can still

---

[6] "cGMPs" stands for "current" Good Manufacturing Practices.

help the jury decide the mental-state issue by providing valuable relevant information. They just can't directly opine on the ultimate issue.").

The same is true for Levin's interpretation of Hi-Tech's Standard Operating Procedures. Without testimony from an expert in the field, lay jurors would not otherwise have insight into good manufacturing practices for dietary supplements, let alone how a pharmaceutical company's standard operating procedures might reflect an intent to adhere to GMPs. Of course, the testimony "relates to the mental-state issue" and no doubt bears on the issue of whether Defendants had the requisite intent for a finding of guilt. However, the proffered opinion does not amount to an express statement about Defendants' state of mind—it "leav[es] the inference for the jury to draw, which is permissible." *Viramontes*, 419 F. App'x at 941.

Two portions of the proffered expert testimony, however, do violate the narrow proscription of Rule 704. These include, first, Mr. Hillyer's opinion that "the controlled steroids purportedly detected by the FCC chemists were not intentionally added to the Hi-Tech products." (Hillyer Expert Report, Doc. 584-2 at 5). Similarly, Dr. Heuer's testimony that "[he] does not believe that the presence of trace amounts of 'illegal' steroids in Hi-Tech products was the result of intentional 'spiking' of the products" is not permissible. (Supp. Expert Disclosures, Doc. 323-2 at 5).[7] A direct opinion on Defendants' intent goes too far, transforming

---

[7] The other challenged aspects of Dr. Heuer's testimony (*see* Doc. 323 at 14-17) will not be excluded.

the testimony from a permissible factual opinion that embraces an ultimate issue to "his opinion on the legal conclusions to be drawn from the evidence[,]" which cannot be admitted under Rule 704. *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Indeed, these opinions fall squarely within the prohibition under Rule 704(b), as they amount to opinions that "the defendant did or did not have a mental state or condition." *Diaz*, 602 U.S. at 537.

Mr. Hillyer may offer and explain his opinion that the controlled steroids found in the Hi-Tech products "were likely present in the raw materials or created in the chemical synthesis process and are the inevitable result of the transformation used to produce DHEA variants." (Doc. 584-2 at 5). Dr. Heuer may offer his similar proffered testimony regarding possible alternative explanations for the presence of anabolic steroids in Hi-Tech's products. (*See* Doc. 323-2 at5). And, based on that testimony, the jury may (or may not) draw the conclusion that Defendants did not possess the requisite intent for a finding of guilt on the counts related to adding anabolic steroids to the Hi-Tech products. However, Mr. Hillyer and Dr. Heuer may not offer opinion testimony that Defendants did not act intentionally. That amounts to an opinion about whether they had "a mental state or condition" that "is an element of the crime charged or of a defense." Fed. R. Evid. 704(b). Such an opinion "both invades the court's province and is irrelevant." *Owen*, 698 F.2d at 240. As such, it must be excluded under Rule 704(b).

### ii.    Expert Testimony Regarding the Legal Status of DHEA and Monacolin K

Next, the Court turns to the testimony of Edmund Novotny regarding the legal status of DHEA and monacolin K, which is a more difficult evidentiary question. Mr. Novotny is an attorney with expertise in counseling dietary supplement and pharmaceutical clients regarding regulatory issues, including the regulatory status of various substances under the Dietary Supplement Health and Education Act of 1994 ("DSHEA") and the Designer Anabolic Steroid Control Act of 2014 ("DASCA"). (Doc. 321-2 at 6-7). His testimony is explicitly offered to "shed light on what Mr. Wheat's state of mind was at the time." (Doc. 328 at 46). Specifically, according to Defendants, Mr. Wheat "was advised that DHEA was a legal substance" and that "while biosynthetic Lovastatin cannot be placed into a product, naturally occurring monacolin K from red yeast rice can be used in a dietary supplement." (*Id.*). Mr. Wheat thus wishes to present the Novotny testimony as "circumstantial evidence of [Wheat's] state of mind" that will undermine the Government's case that "Defendants knowingly and intentionally manufactured and distributed products with Schedule III steroids" and that they "knowingly intentionally mislabeled a product containing Lovastatin, rather than monacolin K." (*Id.* at 46-47).

The Government is correct that Mr. Novotny may not instruct the jury on what the law is. That is the exclusive province of the Court. Experts "may not testify to the legal implications of conduct" or "tell the jury what result to reach." *Montgomery*, 898 F.2d at 1541. The Court must also take "adequate steps to

protect against the danger that [an] expert's opinion would be accepted as a legal conclusion." *United States v. Herring*, 955 F.2d 703, 709 (11th Cir. 1992).

However, in cases involving complex legal regimes, expert witness testimony that may be helpful in explaining those regimes to the jury may be admitted. *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011). "[C]ourts and commentators have consistently concluded that expert testimony that ordinarily might be excluded on the ground that it gives legal conclusions may nonetheless be admitted in cases that involve highly technical legal issues." *Id.* (collecting cases). Applying this principle, at least one other court in this district has allowed similar testimony from an expert regarding the defendant's compliance with a complex FDA regulatory scheme. *Cason v. C.R. Bard, Inc.,* 2015 WL 9913809, at *12–13 (N.D. Ga. Feb. 9, 2015) (Shoob, J.). There, the court explained that although an expert may not tell the jury what result to reach or communicate a legal standard to the jury, "[t]his does not mean [] that an expert may not explain to the jury the regulatory requirements applicable to the product at issue and express his opinion as to whether the manufacturer complied with these requirements." *Id.* The Court will thus allow at least some of Mr. Novotny's proffered testimony, with some important caveats.

First, Defendants are cautioned that Mr. Novotny may not go so far as to offer a direct opinion on Mr. Wheat's state of mind. Defense counsel may use Mr. Novotny's testimony about the advice given to Mr. Wheat to present their own argument at the close of evidence about how that testimony bears on Mr. Wheat's

intent to commit the crimes charged in the indictment. But under Rule 704(b), Mr. Novotny may not connect those dots himself.

Second, Mr. Novotny may not opine in front of the jury about whether Defendants violated the law in this case. The Court takes Defendants at their word when they acknowledge in their brief that whether or not the legal advice given to Mr. Wheat regarding the legal status of DHEA and monacolin K was "actually true as a matter of law is irrelevant." (Doc. 328 at 46). Defendants must be continuously mindful of that concession when eliciting testimony from Mr. Novotny. It is irrelevant whether the legal advice given to Mr. Wheat was true as a matter of law. Mr. Novotny may not invade the province of the Court or the fact-finder by directly opining about whether Defendants' conduct was or was not legal. To shed light on the issue of Mr. Wheat's intent, Mr. Novotny may discuss how the legal status of 1-DHEA and other DHEA derivatives under the FDCA (as amended by DSHEA and DASCA) affects the legal advice he provides to clients in the pharmaceutical industry. He may also provide testimony about the legal advice given to Mr. Wheat on that topic, if he has relevant firsthand knowledge. But—this bears repeating— Mr. Novotny may not opine in front of the jury about whether Defendants actually violated the law with respect to the manufacture, labeling, or distribution of the Hi-Tech products.

Additionally, the Court will exclude one aspect of the proffered Novotny testimony. Mr. Novotny is slated to testify that "the starting material used to create virtually all DHEA compounds is either 4-Androstenedione or 4-Androstenediol

and that trace amounts of these precursors remain in DHEA after synthesis has occurred." (Doc. 321-2 at 7). Again, Mr. Novotny is an attorney who specializes in the regulatory scheme governing dietary supplements and pharmaceuticals. (*Id.* at 6-7). He is thus qualified to testify regarding the complex regulatory scheme governing the production and sale of dietary supplements and pharmaceuticals, to include providing information to the jury about the "legal status" of 1-DHEA and other DHEA derivatives under the FDCA. (*Id.* at 7). However, as an attorney, he is not qualified as an expert to testify about the chemical processes used to manufacture pharmaceutical or dietary supplement products. Defendants should introduce any such evidence regarding the process of synthesizing DHEA through one of their many scientific experts with relevant expertise in the formulation and manufacturing of dietary supplements.

### iii.   Expert Testimony Regarding GMP Certificates and Certificates of Free Sale

The Government also challenges specific testimony from Mr. Levin and Dr. Heuer regarding the materiality of Defendants' purportedly fraudulent GMP Certificates. Mr. Levin is slated to testify that because participating in GMP certification programs is not required by law, there is no objective worth of having, or not having, certification through any third-party certification program; some customers seek these certifications out and others do not. [Doc. 323 at 4]. Dr. Heuer is slated to testify that contract manufacturing customers typically do not rely on GMP certification by a third-party auditor, that customers frequently conduct their own inspections of potential contract manufacturers, and that

customers look to the results of FDA inspections and the issuance of 483s[8] as a more important source of information than third party GMP certification. [*Id.* at 4-5].

The Government argues that this is improper expert testimony concerning an ultimate legal issue in the case, because it directly instructs the jury as to the legal implications of Defendants' conduct. That is, it amounts to an opinion that the false representations embodied by the fraudulent GMP certificates were material, which is an element of the wire fraud charges in the indictment. The Government thus argues that the proffered testimony of Mr. Levin and Dr. Heuer regarding the lack of importance or meaningfulness of GMP Certificates to customers "improperly offers a legal conclusion regarding the materiality of the GMP Certificates." [Doc. 323 at 11].

However, the defense experts' proffered testimony that the GMP Certificates have little worth to customers is not framed in terms of a legal conclusion. It is permissibly framed as information from experts within a specialized field about the value of GMP certification to customers within that field, a topic that will likely be wholly unfamiliar to lay persons on the jury. Courts have permitted testimony as to "materiality" from the perspective of an expert within a particular specialized industry to assist the jury in applying the law to the facts. For example, the Fourth

---

[8] An FDA Form 483 is a report documenting any observed violations of the FDCA following an inspection by an FDA investigator. *Inspection Observations*, U.S. Food & Drug Administration (Jan. 13, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspection-observations (last visited Sep. 12, 2025).

Circuit upheld the admission of testimony from an expert witness on the mortgage industry regarding the materiality of alleged misrepresentations over objection from the defendant that the testimony amounted to a mere "legal conclusion under Rule 702." *See United States v. Wolf*, 860 F.3d 175, 193-94 (4th Cir. 2017). The court reasoned that, in context, the expert "was not offering legal conclusions. She was testifying, based on her extensive experience, about the mortgage process, about which most lay people know very little. Expert testimony intended to help the jury understand the relevant industry is admissible." *Id. Accord United States v. Spencer*, 700 F.3d 317, 321 (8th Cir. 2012) (allowing similar expert testimony on mortgage underwriting standards to give the jury "a basis for determining whether [the defendant's] alleged misrepresentations were material.").

Although the proffered testimony no doubt touches on the considerations the jury must make to evaluate whether the materiality element of the wire fraud charges is met, Defendants' expert disclosures show that Mr. Levin and Dr. Heuer are not presented as legal experts and will not speak to the question of "materiality" in the legal sense of the word. Rather, the testimony provides contextual information to the jury that a layperson would not otherwise have regarding the value of GMP Certificates and Certificates of Free Sale within the relevant specialized industry of dietary supplements and pharmaceuticals. The testimony also bears on the issue of intent, insofar as the purpose of the proffered testimony is to show that Defendants would have no motive to create fraudulent GMP certificates and audit reports. That is another permissible purpose.

For these reasons, the Court will deny the Government's motion to exclude the testimony of Mr. Levin and Dr. Heuer regarding the worth of GMP Certificates, audit reports, and Certificates of Free Sale. Notwithstanding this ruling, Defendants are cautioned that their experts may not go so far as to directly opine that any false representations made by Defendants were not material. That is a legal conclusion that invades the province of the jury. Any testimony that crosses the line into directing the jury on the law will be subject to exclusion.

### iv.    Expert Testimony Regarding Money Laundering

The Government next challenges the proffered expert testimony of William Salinski, CPA, who is expected to testify that the monetary transactions identified in the money laundering counts of the indictment are "routine business transactions" that are "not similar to other activities that are central to traditional money laundering." (Doc. 328 at 48).

More specifically, in their disclosures, Defendants describe Mr. Salinski's proffered testimony as follows:

> Mr. Salinski will testify regarding his review of Hi-Tech's invoices and other relevant financial documents as well as emails with Hi-Tech's customers, including those involving 6476724 Canada, Inc., VPX Sports Nutrition ("VPX"), Dorian Yates Sports Nutrition Ltd. ("Dorian Yates Nutrition") and their employees. Mr. Salinski's expected testimony will cover his analysis of these transactions, including temporal issues with the alleged money laundering transactions, his findings that Hi-Tech's customers received the goods that they paid for, and his analysis of payment or non-payment of goods by Hi-Tech's customers during the relevant time periods. Mr. Salinski will also testify that his analysis of invoices demonstrates that Hi-Tech's products for certain customers were delivered only in the United States (where no Certificate of Free Sale or Certificate of Good

Management Practices was required), contrary to the allegations in the Indictment. Furthermore, it is anticipated that Mr. Salinski will also testify that certain transactions do not exceed the $10,000 statutory threshold required by 18 U.S.C. § 1957.

Finally, Mr. Salinski will testify about his review of the alleged substantive money laundering transactions set forth in Counts 5 through 9 and his opinion is that these transactions are routine business transactions, which are not indicative of traditional money laundering.

(Doc. 321-1 at 7-8).

In opposition to the Government's motion to exclude the proffered testimony, Defendants explain that Mr. Salinski is "an experienced CPA and former IRS Special Agent" who is "well-experienced with conducting complex fraud and financial investigations focusing on money laundering." (Doc. 328 at 47). Because methods of money laundering and structuring are complex matters that are "not self-evident to a layperson[,]" Defendants assert "expert testimony is necessary to conceptually explain what money laundering is—and what it is not—to the jury." (*Id.* at 48 (quoting *United States v. Bates*, 2012 WL 1579590, at *1 (D. Idaho May 4, 2021)).

The Court will permit the majority of Mr. Salinski's proposed testimony. However, Defendants' position that it is proper for Mr. Salinski to "explain what money laundering is—and what it is not—to the jury" threatens to invade the province of the Court. "[A]n expert witness may not substitute for the court in charging the jury regarding the applicable law." *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977). To that end, "experts 'may not testify to the legal implications of conduct' or 'tell the jury what result to reach.'" *Commodores Ent.*

*Corp. v. McClary*, 879 F.3d 1114, 1128 (11th Cir. 2018) (quoting *Montgomery*, 898 F.2d at 1541). Therefore, the Court will exclude any testimony from Mr. Salinski that is offered to explain to the jury what constitutes "money laundering" under the law.

The Court recognizes that the Government sought to exclude the proffered testimony from Mr. Novotny based on the same legal premise that the Court now applies to exclude a portion of Mr. Salinski's testimony. However, the Salinski testimony differs from the Novotny testimony in one key regard. Mr. Salinski's testimony is offered to explain to the jury what the law *charged in the indictment* means and whether Defendants' conduct violates that law. In contrast, Mr. Novotny will explain the regulations governing 1-DHEA and monacolin K, which are not the subject of any of the charged offenses—indeed, they are not illicit substances at all. Therefore, Mr. Novotny's testimony will provide context to the jury about the FDA's regulatory regime under which Hi-Tech was operating, which may in turn give insight into Mr. Wheat's state of mind. Although that testimony may necessarily include information about what the law is, it does not cross the line into direct opinion on whether Defendants violated the law as charged in the indictment. *See Offill*, 666 F.3d at 175; *Cason*, 2015 WL 9913809, at *12–13. In contrast, Mr. Salinski's proffered testimony, to the extent that it exceeds the boundaries discussed above, would go to the heart of a question that is for the jury alone to decide: did Defendants commit money laundering, the crime charged in the indictment?

To put a finer point on this ruling, Mr. Salinski may explain his opinion that the money laundering transactions set forth in Counts 5 through 9 of the indictment "are routine business transactions," as proposed. (Doc. 321-1 at 8). However, he cannot provide an ultimate opinion as to whether these or other transactions "are not indicative of traditional money laundering." (*Id.*). With the exception of that quoted portion of testimony, Mr. Salinski's proffered testimony is permissible. Defendants must be careful, however, not to allow Mr. Salinski to cross the line into directly stating that Mr. Wheat and Hi-Tech did not commit money laundering. Nor may Mr. Salinski invade the province of the Court by advising the jury with what the law is. In other words, he "may not substitute for the court in charging the jury regarding the applicable law[,]" *Milton*, 555 F.2d at 1203 or "testify to the legal implications of conduct." *Commodores Ent. Corp.*, 879 F.3d at 1128.

Beyond the parameters set forth in this Order, the Court tends to agree with Defendants that much of the necessary line-drawing between permissible and impermissible testimony from Mr. Salinski may be better addressed during trial "[i]f the Government finds any specific aspects of Mr. Salinski's testimony objectionable" while he is on the stand. (Doc. 328 at 50). More importantly, the Court does not know at this juncture whether the Government intends to offer any witness testimony during its case-in-chief about what types of activities or transactions constitute money laundering. If the Government opens the door by presenting witness testimony to explain to the jury what money laundering is,

Defendants' expert Mr. Salinski may rebut that testimony with his own. For both of those reasons, the Court does not consider the question of the permissible scope of Mr. Salinski's testimony to be closed and is amenable to reconsidering this ruling as the evidence is developed at trial.

### D. Expert Testimony Regarding the Government's Charging Decisions

The Government also challenges testimony from three defense experts—Bannister, Levin, and Schauss—that it contends improperly raises the issue of the Government's charging decisions. The Government specifically challenges the following aspects of each expert's testimony on this basis:

(1)     Dr. Bannister's proffered testimony that the FDA has "authority, through its regulatory powers, to dictate the level of steroids in any dietary supplement product"; that the FDA's "Closer to Zero Initiative" sets permissible levels for carcinogens and other materials; and that the FDA has not set permissible levels of steroids in products. (Doc. 584-1 at 8).

(2)     Mr. Levin's proffered testimony that Defendants' alleged GMP violations typically would result in a voluntary corrective action plan, not criminal charges. (Doc. 584-6 at 5); and

(3)     Dr. Schauss's proffered testimony that "the purported record keeping and documentation [of] violations of GMPs . . . could easily have been handled by issuing citations for GMP violations without the need to criminally indict the company." (Doc. 584-5 at 7).

The Government characterizes all of this testimony as improper opinions on the Government's charging decisions and argues it should be excluded as irrelevant and misleading to the jury under Rule 403. [Doc. 584 at 11-14].

For their part, Defendants argue that the proffered testimony regarding the Government's charging decisions is not for the purpose of attacking the Government's exercise of prosecutorial discretion but is rather meant to refute the Government's theory that Defendants knowingly and intentionally violated the law. (Doc. 592 at 10-13). Defendants assert that their experts' opinions will establish that "Defendants did not knowingly violate any law, because there had been no formal notice" that their products violated Good Manufacturing Practices. (*Id.* at 11). Although Defendants continued to manufacture the products after being indicted in this case, they contest the initial testing conducted by the FDA-FCC, "and to this day do not believe the results are accurate." (*Id.*). Accordingly, they insist their experts' testimony contrasting the actions of the FDA in this case with its typical processes will serve "as evidence that the Defendants were not on notice of any violation." (*Id.*).

For the reasons that follow, the Court will exclude the specifically identified challenged testimony from Mr. Levin and Dr. Schauss but will deny the Government's motion with respect to Dr. Bannister's challenged testimony.

The Court is not persuaded by Defendants' argument that the Government's charging decisions in this case are relevant to whether Defendants knowingly and intentionally committed the crimes alleged. If one of the defense theories is that

they did not have notice that their products violated Good Manufacturing Practices because they received no warning letters or any other form of regulatory process, Defendants may put those facts into evidence via fact witnesses. But it is not relevant whether the Government *typically* handles GMP violations through criminal prosecution or through a less severe regulatory approach. That evidence impermissibly invites the jury to consider the issue of selective prosecution, which is "an issue for the court to decide, not an issue for the jury." *United States v. Jones*, 52 F.3d 924, 927 (11th Cir. 1995). The risk of the jury using the proffered testimony for improper reasons is too great, and the relevance of the testimony too minimal, to permit it to be introduced at trial.

That does not mean that Defendants cannot broach the subject of FDA norms at all. For example, Defendants' disclosure regarding Mr. Levin's proposed rebuttal testimony to the Government's expert Dr. Welch includes a summary of Mr. Levin's review of data from thousands of publicly available inspection observations reported by the FDA. (Doc. 584-6 at 5). That review showed, among other things, that "the purported GMP violations described in Dr. Welch's disclosure were commonplace within the dietary supplement industry." (*Id.* at 5). Evidence that GMP violations like the ones charged in the indictment were commonplace within the industry could arguably bear on the question of whether Defendants were acting in knowing violation of the law. Therefore, the Court will permit Defendants to present that kind of testimony. But Defendants may not venture into the question of how the Government typically responds to such

violations without impermissibly presenting testimony on selective prosecution, absent other evidentiary developments. Therefore, the challenged testimony from Mr. Levin and Dr. Schauss will be excluded.[9]

In the Court's view, however, Dr. Bannister's proposed testimony regarding FDA guidance and the FDA's regulatory authority to dictate the level of steroids in dietary supplements does not implicate the Government's charging decisions in the same way as the other challenged testimony. Moreover, the testimony is relevant, and its relevance is not outweighed by the risk of confusing or misleading the jury. Dr. Bannister's proposed testimony that the FDA has not set minimal levels for anabolic steroids as part of its "Closer to Zero Initiative" "even though these steroids can be found in many food products" says nothing about how the FDA typically handles identified GMP violations. Thus, unlike the challenged testimony from Levin and Schauss, it does not invite the jury to wonder why Defendants' violations were treated more harshly than similar violations committed by others. Additionally, this testimony is relevant to Defendants' intent. If it is the case that the amount of anabolic steroids in Defendants' products is comparable to amounts in other foods and dietary supplements, jurors may draw an inference that Defendants did not intentionally violate the law by

---

[9] This ruling is limited to the specific testimony challenged by the Government in its motion. To refresh, that testimony includes Mr. Levin's proffered testimony that Defendants' alleged GMP violations typically would result in a voluntary corrective action plan, not criminal charges, and Dr. Schauss's proffered testimony that Defendants' alleged violations of GMPs "could easily have been handled by issuing citations for GMP violations without the need to criminally indict the company."

manufacturing and distributing products containing anabolic steroids. Of course, the Government may rebut such testimony through vigorous cross-examination if they believe evidence shows that Dr. Bannister has mischaracterized industry norms and standards for the level of steroids in food and dietary supplements. *See Daubert*, 509 U.S. at 580. Accordingly, the Court will deny the Government's motion to exclude that challenged portion of Dr. Bannister's testimony.

### E. Expert Testimony Regarding the Case Agent's Initial Testing Instructions to the FDA Chemists

Finally, the Government challenges Defendants' proffered testimony from their expert Dr. Gortler regarding the case agent's initial instructions to the FDA laboratory that tested Hi-Tech's products in January 2017. [Doc. 322 at 19-20]. Specifically, Dr. Gortler is expected to testify that the initial decision by FDA Special Agent Brian Kriplean not to request quantification of the Schedule III steroids in the Hi-Tech products "flouted both the scientific method generally and Good Laboratory Practices." [*Id.* at 6 (quoting Doc. 322-1 at 3)]. The Government argues this proposed testimony is irrelevant and would be "designed solely to invite jury nullification." [*Id.* at 19]. In addition, the Government notes the Court previously rejected Defendants' contention that the case agent's initial instructions to the FDA lab were faulty in not requesting quantification, in connection with their motion for a *Franks* hearing and motions to suppress. [*Id.* at 20]. The Government contends that permitting Defendants to introduce the same arguments to the jury "would, in effect, ask the jury to circumvent the Court's

findings on this issue." [*Id.*].[10] The Government also asserts that the initial lack of quantification results from the January 2017 testing is no longer a live issue, because the Government did perform the quantification analysis later. [*Id.*]. Testimony questioning the initial request would thus not assist the jury and would go into irrelevant matters, "engender vindictive passions within the jury or confuse the issues." [*Id.* at 21 (quoting *United States v. Green*, 548 F.2d 1261, 1268 (6th Cir. 1977))].

Defendants respond that the expert testimony regarding Special Agent Kriplean's instructions to the FDA chemists "is relevant to highlighting bias in the scientific process used by chemists." (Doc. 328 at 26). In other words, the purpose of the testimony is to attack the credibility of the findings by the chemists that ultimately led to Defendants being indicted on Controlled Substances Act charges. Evidence that calls into question the credibility and reliability of the FDA chemists' findings is relevant and permissible, notwithstanding the fact that later testing of the products did include quantification results. Again, Defendants are entitled to put on a robust defense, which includes challenging the credibility of the Government's witnesses and evidence. Allowing Defendants to do so does not "circumvent the Court's findings" regarding Defendants' earlier challenges to Special Agent Kriplean's warrant application, as the Government argues. [Doc. 322

---

[10] It is worth noting that the Court initially rejected that portion of the Magistrate Judge's Report and Recommendation denying Defendants' request for a *Franks* hearing on this point (Doc. 363), before later adopting the R&R after a *Franks* hearing was held. (Doc. 479). However, the Government's brief was filed before the Court issued either ruling.

at 20]. Presenting evidence about the credibility of a Government agent to the jury does not amount to asking the jury to reconsider whether the evidence obtained by that agent should be suppressed.

In short, the evidence is relevant and admissible. To the extent the Government thinks that Defendants are unfairly emphasizing the initial FDA testing of Hi-Tech's products while ignoring later testing, the proper avenue to attack such "shaky but admissible" evidence is not exclusion but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]" *Daubert*, 509 U.S. at 580.

## IV. Conclusion

For the reasons explained above, the Court **GRANTS in part** and **DENIES in part** the Government's Motion to Exclude Irrelevant Expert Testimony [Doc. 322]. Specifically, the Motion is **GRANTED** with respect to the proffered testimony of Drs. Heuer and Lee that Choledrene is safe and effective. However, if the Government opens the door by placing the safety of Choledrene at issue during its case-in-chief, Defendants shall be permitted to rebut any such evidence with the proffered testimony that Choledrene is safe. The Motion is **DENIED** in all other respects.

The Court **GRANTS in part** and **DENIES in part** the Government's Motion to Exclude Impermissible Expert Testimony Relating to Legal Conclusions and State-of-Mind Opinions. [Doc. 323]. Specifically, the Motion is **GRANTED** with respect to the proffered testimony of Dr. Heuer that he "does not believe that

the presence of trace amounts of 'illegal' steroids in Hi-Tech products was the result of intentional 'spiking' of the products." The Motion is also **GRANTED** with respect to the proffered testimony from defense expert William Salinski, CPA that the monetary transactions identified in the indictment "are not indicative of traditional money laundering." Mr. Salinski will not be permitted to directly opine as to whether Defendants' conduct amounts to the crime of money laundering. However, if the Government opens the door by presenting witness testimony to the jury that purports to explain that Defendants' conduct does constitute money laundering, Defendants shall be permitted to rebut the same through Mr. Salinski's proffered testimony that it does not. The Motion is **DENIED** in all other respects.[11]

The Court **GRANTS in part** and **DENIES** in part the Government's Motion to Exclude Irrelevant and Improper State-of-Mind Expert Testimony. [Doc. 584]. Specifically, the Motion is **GRANTED** with respect to the proposed testimony from experts Michael Levin and Dr. Schauss about the Government's charging decisions, although Dr. Bannister's opinions about the FDA's regulatory powers to dictate the level of steroids in dietary supplements will be permitted. The Court further **GRANTS** the Government's Motion to exclude testimony from defense expert Gregory Hillyer that "the controlled steroids purportedly detected

---

[11] Although the Court denies the Government's motion to exclude the testimony of attorney expert Edmund Novotny regarding the legal status of 1-DHEA and monacolin K, the Court will exclude any testimony from Mr. Novotny regarding the chemical process by which DHEA compounds are synthesized.

by the FCC chemists were not intentionally added to the Hi-Tech products." The Motion is **DENIED** in all other respects.

As a final note, the Court cannot predict with perfect foresight how the evidence will develop during trial. For that reason, all pretrial evidentiary rulings are subject to being reopened as necessary to respond to the changing tides of trial. Counsel should look to the Court's evidentiary rulings as guideposts to understand the parameters within which the Court expects them to operate when presenting their respective cases, and they should not take this as an invitation to rehash any and all pretrial motions. But the Court recognizes that no amount of preparation can pin down precisely how the evidence will be presented in real time. The Court is thus amenable to revisiting or refining the rulings reached in this Order during trial as the picture of the evidence takes clearer shape.

**IT IS SO ORDERED** this 12th day of September, 2025.


**Honorable Amy Totenberg**
**United States District Judge**