IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : : : |
| JARED WHEAT, JOHN BRANDON SCHOPP and HI-TECH PHARMACEUTICALS, INC., | : CRIMINAL ACTION NO. : 1:17-cr-229-AT-CMS : : |
| Defendants. | : : |

# **ORDER**

The Government has moved for reconsideration of the Court's October 18, 2025 Order (Doc. 715), which granted the exclusion of evidence related to the unfinished NSF International ("NSF") audit of Hi-Tech Pharmaceuticals, Inc. [Doc. 718]. For the reasons below, the Court's prior Order (Doc. 715) is **VACATED** and the Motion to Reconsider [Doc. 718] is **GRANTED**, subject to the limitation that the NSF audit must be referred to as incomplete and the other conditions identified herein. First and foremost, the Government may not imply or state that Hi-Tech failed the audit given the evidence and circumstances presented. The Defendants will be allowed to challenge any evidence presented to create such an inference as well as to adduce rebuttal evidence.

The parties are aware of the unfortunate procedural maneuvering preceding entry of this Order. In brief: On Saturday, October 18, 2025, the Court issued an order excluding any evidence of the unfinished NSF audit. (Doc. 715). The

Government quickly moved for reconsideration the next day, Sunday [Doc. 718]; the defense in turn filed an opposition that night (Doc. 721); and the Court thereafter promptly set oral argument for Monday morning (Doc. 719).

On Monday morning, October 20th, the Court convened and began discussion of pretrial logistical matters, including regarding one juror who had been absent both the previous Friday and that morning, and thus remained unsworn.[1] After more than two hours of courtroom discussion regarding pretrial matters—and after the Court made clear it would imminently hear argument on the pending Motion for Reconsideration—the U.S. Attorney for the Northern District of Georgia, Theodore Hertzberg, filed a Notice of Appeal as to the Court's prior Order of October 18th. Mr. Hertzberg then indicated, on the record, that the Government would withdraw the Notice of Appeal *if* the Court committed to make no decision as to the absentee juror until deciding the instant motion. Defense counsel contended that the Government's Notice of Appeal immediately divested this Court of all jurisdiction over the matter. The Court, however, found that "the Government's Notice of Appeal does not divest it of jurisdiction to consider and decide the pending Motion for Reconsideration" and scheduled oral argument for

---

[1] On the preceding Friday, October 17, 2025, the Court concluded jury selection and swore in 11 jurors and 4 alternates. The final juror was absent due to a miscommunication, and the Court had planned to swear him in imminently on Monday morning. The single unsworn juror was the basis of the U.S. Attorney's belief that jeopardy had not attached, purportedly allowing it to file a Notice of Appeal under 18 U.S.C. § 3731.

The Court has already indicated that "it does not necessarily agree with the Government's position that jeopardy has not yet attached simply because one of sixteen jurors selected on Friday was not administered the jury oath, as fifteen qualified jurors were, in fact, sworn in." (Doc. 726 at 3 n.1).

Tuesday, October 21, 2025. (Doc. 726). The Court subsequently heard oral argument on this matter on Tuesday morning.

The last several days have brought forth lapses in judgment by all sides: defense counsel's selective portrayal of the timeline underlying the NSF audit; the Government's failure to clarify the record on numerous occasions as to vital timeline issues; and, most recently, the U.S. Attorney's Office's questionable filing of a Notice of Appeal on the very morning that the Court had set for oral argument on the issues at stake, even though the Court scheduled this hearing promptly after reviewing the Government's Motion for Reconsideration on the day it was filed (and even though 14 jurors had already been sworn in and were waiting in the jury room to begin trial).

The Court has already made clear on the record that it is, for lack of any other appropriate word, gobsmacked by the Government's actions, given the fact that the Government's Motion for Reconsideration had just been filed on Sunday, October 19th at 12:36 PM and that, at 4:49 PM on that same Sunday, the Court promptly scheduled oral argument on the Government's Motion for the following morning. While the Court well recognizes the Government's statutory appeal rights under 18 U.S.C. § 3731, such an appeal in this circumstance is both ill-timed and inexplicable given the Court's intent to *immediately* hear oral argument and decide on the issue. (*See, e.g.*, Doc. 719 ("The Court will consider the Motion expeditiously.")).

Having dispensed with the numerous issues plaguing the record, the Court turns to the merits of the Motion for Reconsideration.

## I. LEGAL STANDARD

### A. Reconsideration Standard

"[A] motion for reconsideration of a district court order in a criminal action is not expressly authorized by the Federal Rules of Criminal Procedure[,]" but "federal district courts necessarily have substantial discretion in ruling on motions for reconsideration." *United States v. Russell*, 994 F.3d 1230, 1243 n.4 (11th Cir. 2021) (quoting *United States v. Vicaria*, 963 F.2d 1412, 1413 (11th Cir. 1992); *United States v. Razz*, 387 F. Supp. 3d 1397, 1402 (S.D. Fla. 2019)). District courts in the Eleventh Circuit "generally employ the standards underlying motions for reconsideration in civil cases." *Id.*; *see, e.g.*, *United States v. Hawkins*, 2024 WL 3363849, at *1 (S.D. Ala. July 10, 2024) ("In adjudicating motions for reconsideration in criminal cases, district courts have relied on the standards applicable to motions for reconsideration filed in civil cases pursuant to Rule 59, Federal Rules of Civil Procedure.").

The Court thus turns to the civil standard. Under Local Rule 7.2(E), "[m]otions for reconsideration shall not be filed as a matter of routine practice," but only when "absolutely necessary." L.R. 7.2(E), NDGa. "The decision to grant a motion for reconsideration is committed to the sound discretion of the district court." *Bazemore v. Int'l Longshoremen's Ass'n, ILA Loc. 1475*, 2025 WL 2380575, at *4 (S.D. Ga. July 14, 2025) (citing *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1216 (11th Cir. 2000)). "Reconsideration is only 'absolutely necessary' where there is: (1) newly discovered

evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact." *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258–59 (N.D. Ga. 2003); *Smith v. Ocwen Fin.*, 488 F. App'x 426, 428 (11th Cir. 2012).

"The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party . . . or has made an error not of reasoning but of apprehension." *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D. Va. 1983)). "Parties may not use a motion for reconsideration as an opportunity to show the court how it 'could have done it better'" or "to present the court with arguments already heard and dismissed or to repackage familiar arguments to test whether the court will change its mind." *Bryan*, 246 F.Supp.2d at 1259 (citing *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,* 916 F.Supp. 1557, 1560 (N.D. Ga. 1995)).

**B. Admissibility Standard**

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The major function of Rule 403 is 'limited to excluding matter[s] of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985) (citing *United States v.*

*McRae*, 593 F.2d 700, 707 (5th Cir. 1979), *cert. denied*, 444 U.S. 862 (1979)). "Put another way, 'because it permits a trial court to exclude concededly probative evidence, Rule 403 is an extraordinary remedy which should be used sparingly.'" *Stepanovich v. City of Naples*, 728 F. App'x 891, 900 (11th Cir. 2018) (citing *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983)).

## II. DISCUSSION

### A. Factual Discrepancies

The Government's Motion is a tale of two timelines. The Court's prior order was based on a timeline presented by the Defendants' briefing and elucidated by the parties' argument during the pretrial conference. To some degree, the Court's understanding remains solid: Between November and December 2010, independent third party NSF International conducted an audit of Hi-Tech's Good Manufacturing Practices ("GMP") compliance. (Doc. 640 at 3; Doc. 718-1 at 108:5). Following the audit, in December 2010, NSF provided a report identifying 75 outstanding compliance issues; in January 2011, Hi-Tech responded with corrective action information. (Doc. 718 at 4; Doc. 718-1 at 108:13–25). NSF replied with an updated report identifying that "26 of the 75 issues were resolved, which meant that there were 49 deficiencies remaining for Hi-Tech to cure." (Doc. 718 at 4–5; Doc. 718-1 at 108:23–25). In February 2011, co-Defendant John Brandon Schopp, who ran Contract Manufacturing for Hi-Tech, checked in with NSF for an update on the audit process, and an NSF employee referred him to the "most recent corrective action report" with 49 deficiencies identified. (Doc. 718 at

6

4–5). On May 4, 2011, "NSF reache[d] back out to Mr. Schopp and Hi-Tech noting that there are still 49 deficiencies noted in the audit report." (Doc. 718 at 5–6; Doc. 718-1 at 109:4–6). Also at this point, NSF indicated to Hi-Tech that it would need to conduct a "re-audit" given the outstanding issues. (*Id.*; *see also* Doc. 615-1 at 2).

Here, the timeline becomes muddier. The Defendants previously represented that "Hi-Tech's lengthy package of documents sent to address the additional information requested [by NSF] was left sitting on the departed employees' desk, unreviewed." (Doc. 615 at 6). And the Government, prior to its instant Motion for Reconsideration, represented that "on May 19, 2011, there's these additional responses that are provided by Hi-Tech that are submitted for [NSF's] review." (Doc. 718-1 at 110:5–7). In fact, both accounts were incomplete, and ultimately yielded a picture for the Court that was also not complete. On one hand, Hi-Tech implied that, for months, it sat awaiting NSF's assessment of its documentation. It also represented that NSF had sat still in its communications with relevant Hi-Tech high-level staff between February 2011 and late May 2011, after the first audit deficits were noted in NSF's December 2010 report. On the other hand, the Government's presentation in earlier briefs and at the pretrial conference did not clarify for the Court the timelines associated with NSF's review of voluminous documentation that Hi-Tech had furnished to NSF staff, as well as other issues pertaining to NSF's communications with Hi-Tech.

In the instant Motion filed on October 19th, the Government has now provided extensive email documentation between NSF and Hi-Tech to clarify its

7

case—a submission not previously made either at briefing or during argument at the pretrial conference. The most important timeline is as follows: On May 4, 2011, Lindsay Bartlein, a Certification Project Manager at NSF, emailed Mr. Schopp to schedule a re-audit. (Doc. 718-8 at 3). On May 10, Mr. Schopp replied that Hi-Tech would like to respond to the "last of the open audit items," but noted he would prefer to send the responses via FedEx because of the size of the documents. (*Id.* at 2). On May 11, NSF's Christie Miller indicated that the information would need to be entered into the auditor's electronic system. (*Id.*). Mr. Wheat responded that day underscoring the significant volume of documentation. (*Id.*). Finally, also that day, Ms. Miller provided for the first time a physical address for Hi-Tech to mail its documentation to. (*Id.*). On May 15, Ms. Miller's employment at NSF terminated. (Doc. 615-2 at 2). On May 19, Ms. Bartlein flagged for fellow NSF employee Mollie Kober that there was a "HUGE stack of CARS on [Ms. Miller's] desk that [Hi-Tech] mailed her." (*Id.*). NSF scanned and processed those documents and issued its next iteration of the corrective action report on May 28. (Doc. 718-9).

As noted earlier, prior to the Government's Motion for Reconsideration, neither party provided that necessary and complete record. At oral argument on this Motion in Limine during the pretrial conference, Government counsel said:

> I think what the Court is suggesting is there was a delay due to the personnel change that happened at NSF. And I do think that that in part was correct. I don't think that there's any evidence that Hi-Tech followed up with NSF to try to seek the certification on this end. But the materials that were submitted -- what I think Mr. Leach just

8

> represented and he represented similarly in the motion -- that Hi-Tech cured all these issues -- when the material is submitted to Mollie Kober -- and there certainly can be a question was it -- should it have been submitted earlier or not. But when it is submitted to Mollie Kober, it cures 6 of the 49 deficiencies that NSF had noted. And when they note that for Hi-Tech and say there's 43 deficiencies remaining, Hi-Tech does not follow up. That is the end of the process.

(*Id.* at 111:17–112:8).

The questions of when Hi-Tech submitted its updates on corrective actions to NSF, and how long NSF allowed those voluminous documents furnished by Hi-Tech to sit on a departed employee's desk without review, are crucial facts. But the parties' prior presentations merely muddied the waters. The Government has now clarified that Hi-Tech only mailed its additional information to NSF on or after May 11, 2011—after NSF employee Christie Miller, who left the company just days later, provided a mailing address. (Doc. 718 at 6 (citing Doc. 718-8)). The parties' previous failure to establish this fact for the record created the misperception that NSF "neglected to process the information and documentation for several months due to an [] employee's departure and prior failure to disseminate the information." (Doc. 715 at 2). In fact, it appears now that NSF processed that documentation within the next weeks, despite the employee's departure.

A motion for reconsideration may not be used "as an opportunity to show the court how [a party] 'could have done it better'" or "to present the court with arguments already heard and dismissed." *Bryan*, 246 F. Supp. 2d at 1259. The defense contends that the Government seeks to do just that, characterizing the Motion as a vehicle to supplement the prior record. Undoubtedly, the Court agrees

9

that *both parties* could have better elucidated the timeline at a previous juncture. Nevertheless, the Court will not allow an Order based on a wholly unfactual premise to stand. "While the [clarifications to the timeline] [are] not newly discovered evidence, as noted above [they] do[] evidence a manifest error of fact" perpetuated by the Court's prior Order. *Latin Elec. Workforce, Inc. v. W. River Constr., LLC*, 2023 WL 3773944, at *2 (S.D. Ala. Apr. 28, 2023).[2]

Acknowledging the inaccuracy in its prior factual premise, which was based on the timeline then before the Court—as well as the additional context omitted by the Government in its previous briefing—the Court addresses two ways in which these additional disclosures modify its prior analysis. If Rule 403 is a set of scales, balancing the relative prejudice and probativeness of a piece of evidence, the new context elucidated by the Government recalibrates the Court's prior weighing of the evidentiary disputes at issue here.

**B. Relative Fault**

First, the Government's new submissions regarding the chain of events between NSF and Hi-Tech reallocate the blame for the long delay in resolving the audit's outstanding issues. The Court's previous perception was that "Hi-Tech properly submitted its corrective action reports to NSF in the wake of its initial

---

[2] The defense also contends that "[n]owhere in its response does [the Government] offer evidence or argument of a timeline of events that it does, for the first time, in its motion for reconsideration." (Doc. 721 at 3). Thus, according to the Defendants, the Government has waived its ability to argue as such. It is true, as the Court has emphasized, that both parties' presentation of the evidence left much clarity to be desired. But a lack of clarity in the Government's factual presentation does not constitute waiver of its underlying argument.

December 2010 audit—as is contemplated by the audit process—but was left adrift by [NSF's] negligence." (Doc. 715 at 5). Thus, in the Court's prior understanding, "the reason Hi-Tech had not 'corrected all of their audit variances' was, in fact, that NSF had not properly processed the information that Hi-Tech had provided." (*Id.*). This perception was informed by defense counsel's representation that "the NSF employee who Hi-Tech had been working with in 2010 and early 2011 departed NSF, and Hi-Tech's lengthy package of documents sent to address the additional information requested was left sitting on the departed employees' desk, unreviewed." (Doc. 615 at 6). And it was reinforced by the Government's confirmation that "there was a delay due to the personnel change that happened at NSF," and "that in part was correct." (Doc. 718-1 at 111:19–20).

Clearly, the Court's understanding was based on incomplete information. Most notably, the Government has now made clear that the "HUGE stack of [Corrective Action Reports] on [Ms. Miller's] desk" were submitted by Hi-Tech no more than eight days before that email was sent—not months. (Doc. 615-2 (May 2011 internal NSF email)). The period of silence between February 2011 and May 2011—when no additional action was taken to resolve outstanding compliance issues—was a result of *both* the company's and the auditor's negligence. Neither entity actively followed up in that period, when they should have. Both parties could, and should, have acted with proactivity. But when NSF did reach out in May 2011—and Hi-Tech then provided a large volume of additional information—NSF

11

started processing the documents in a timely manner and returned an updated report within weeks. (Doc. 718 at 6–7).

In short, Hi-Tech bears at least equal fault with NSF for Hi-Tech's failure or inability to use the audit as a proactive tool and to communicate actively with NSF staff about the audit. And, NSF apparently did not reach out to Hi-Tech to discuss in person the various deficiencies previously noted or, even more importantly, to follow up immediately after Hi-Tech's delivery to NSF of hundreds of pages of relevant documents in the early May. In sum, the introduction of the incomplete NSF audit is not as prejudicial, or at least not as unfairly so, as it would have been if NSF bore the sole responsibility for the incomplete results.

### C. Probative Value

The Government also uses the instant Motion to underscore two additional probative purposes for admitting the NSF audit. First, the Government alleges that Defendant made false representations about the results of NSF's audit to customers, and that these statements are core to the wire fraud allegations. (Doc. 718 at 17–18). This is a puzzling omission from the Government's first brief and oral argument on the issue. Second, the Government indicates that NSF auditor Bill Kracht will testify to the falsity of the allegedly doctored Pharmatech audit, which purports to have been conducted on the precise same days as the NSF audit. Specifically, Mr. Kracht will testify that "he was inspecting Hi-Tech on behalf of

NSF at [that] time" and that "he did not notice any other third-party audit team." (*Id.* at 18).³

Amid this new factual landscape, at least one element of the Court's previous Order remains true: "The central question for the Court, then, is whether evidence related to the incomplete NSF audit . . . is so prejudicial as to substantially outweigh its probative value." (Doc. 715 at 4). But the new information provided by the Government in its Motion for Reconsideration alters both sides of that analysis. In the instant Motion, the Government has provided significant additional context indicating why the NSF audit would be probative of the wire fraud charges. The Government had previously made clear that the NSF audit was probative evidence because Defendants purportedly used the document as a template for their own allegedly fraudulent audit report. Here, the Government also indicates that it intends to identify additional material statements *about* the audit on the part of Defendants that, apparently, the Government plans to argue separately constitute fraud. (Doc. 718 at 17–18).

On the other side of the scales: An incomplete audit—one, in other words, that does not establish GMP compliance—is, of course, prejudicial. But, as the facts now make clear, it was also Hi-Tech, and not only NSF, who so severely delayed the necessary corrective actions and caused the circumstances that led to Hi-Tech's decision to disengage from the audit. This reality calls into question the Court's

---

³ The Government also reiterates the importance of introducing the incomplete NSF audit because it was used as a template for the allegedly falsified Pharmatech audit. (Doc. 640 at 7–8; Doc. 718 at 2–3).

13

previous conclusion that the audit is *unduly* prejudicial, such that it should be entirely excluded. Rather, the Court finds that its previous erroneous premise as to the sequence of events involving NSF's handling of the voluminous documentation that Hi-Tech provided to it in early May 2011 (as opposed to an earlier timeframe) constitutes "a clear error of fact" and thus justifies reconsideration of its prior order. The Court will thus allow admission the incomplete NSF audit.

As a corollary to this ruling, the defense will also be able to robustly rebut the evidence related to the NSF audit and any inferences it may create. For example, Defendants may underscore the unfinished nature of this audit. They may introduce the extensive back-and-forth between Hi-Tech and NSF reflecting Hi-Tech's multiple attempts over several months to submit additional corrective action information (*see, e.g.*, Docs. 718-4; 718-8), as well as the final version of the audit corrective action report, which, according to Defendants, "affirmatively indicated that all of the previous deficiencies had either been 'approved' or just needed additional information to be approved." (Doc. 721 at 5 n.4). They may also point out that "prior to and during the relevant time period, Hi-Tech did not receive any FDA-483s following its many inspections by the FDA." (Doc. 615 at 5–6; *see also id.* at 4 ("Hi-Tech was inspected by the FDA 16 times between 2001 and 2013 with no FDA-483 observations by the FDA.")).[4] Furthermore, the parties are

---

[4] In its prior Order, the Court reflected that "[n]either the parties nor the Court can precisely speak to the circumstances at NSF that caused its negligence in handling Hi-

welcome to propose a compromise solution, including potential redactions to the Government's exhibits, that may ameliorate the Court's continued concern about the potentially unfair prejudicial nature of the unfinished audit.

### III. CONCLUSION

In discussing the breakdown of the audit process here, the Government previously said: "I think it was ball-dropping on both sides, if any." (Doc. 718-1 at 111:9–10). The same is true in regard to this evidentiary dispute. While the Court regrets any error in its prior understanding, it has also identified shortcomings in both parties' presentation of argument related to the original Motion in Limine herein: the defense included conveniently selective details, and the Government failed to either correct the record or thoroughly argue the probative value of this evidence. For the reasons above, the Motion for Reconsideration [Doc. 718] is **GRANTED**.

That said, the Government's sudden filing of an interlocutory appeal under the current circumstances—when the Government's own Motion for Reconsideration had been filed only one day earlier, and the Court had thereafter immediately scheduled a hearing on this matter for the next day—introduced an

---

Tech's documents and audit[,]" creating "[t]he distinct possibility of a mini trial over the validity of the NSF audit management." (Doc. 715). This concern remains salient: after all, not only Hi-Tech, but also NSF, failed to follow up on the outstanding corrective actions required. In the instant Motion, the Government argues that this concern is both erroneous and unfounded. For the sake of efficiency, the Court hopes that may be true. But admission of the unfinished NSF audit also opens the door for the defense to explain *why* they decided to cut the audit short, and whether and how NSF's shortcomings in processing the corrective action reports factored into that decision. As the extended oral argument on the instant Motion made clear, this issue is likely to be highly contested.

unnecessary and short-sighted procedural distraction. Such tactics only further delay this long-awaited and resource intensive trial.

**IT IS SO ORDERED** this 21st day of October, 2025.

_____
**Honorable Amy Totenberg**
**United States District Judge**