IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____
                                            )
UNITED STATES OF AMERICA                    )
                                            )
        v.                                  )     No. 1:17-cr-0229-AT-CMS
                                            )
JARED WHEAT, and                            )
HI-TECH PHARMACEUTICALS, INC.               )
_____    )

DEFENDANTS JARED WHEAT AND HI-TECH PHARMACEUTICALS,
INC.'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO
RULE 29(a) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

COME NOW Defendants Jared Wheat and Hi-Tech Pharmaceuticals, Inc.,

("Hi-Tech"), by and through undersigned counsel of record and move this Court

for entry of an Order, pursuant to Fed. R. Crim. P. 29(a), granting them a judgment

of acquittal as to Counts One through Eleven of the Second Superseding

Indictment ("Indictment") in the above-captioned matter. In support of this request,

Defendants respectfully show this Court the following:

**The Applicable Legal Standard**

Rule 29(a) provides in relevant part:

> (a) Before Submission to the Jury. After the government closes its
> evidence or after the close of all the evidence, the court on the
> defendant's motion must enter a judgment of acquittal of any
> offense for which the evidence is insufficient to sustain a
> conviction. The court may on its own consider whether the

evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

"To grant a Rule 29 motion for acquittal, 'the Court must conclude, after viewing the evidence in the light most favorable to the government, that a rational jury would have to have entertained reasonable doubt as to the defendant's guilt.'" *United States v. Bradley*, 2005 U.S. Dist. LEXIS 42570, *5 (S.D. GA 2005) (quoting, *U.S. v. Manolatos*, 192 F.Supp.2d 621, 624 (E.D. LA 2002).

Judgment of acquittal is warranted when testimony is "so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, … no reasonable person would believe it beyond a reasonable doubt." *United States v. Chancey*, 715 F.2d 543, 546-47 (11th Cir. 1983).

## Argument and Citation of Authorities

**I. This Court Should Grant a Judgment of Acquittal as to Counts One through Three (Conspiracy to Commit Wire Fraud and Wire Fraud) Because No Reasonable Jury Could Find Defendants Guilty on the Evidence Presented by the Government.**

The Government has failed to present sufficient evidence on which a reasonable jury could find Defendants Jared Wheat and Hi-Tech guilty beyond a

reasonable doubt of conspiracy to commit wire fraud and substantive wire fraud in Counts One through Three of the Indictment.

Defendants Jared Wheat and Hi-Tech are charged in Count One with conspiring to commit wire fraud in violation of 18 U.S.C. § 1349, which requires proof beyond a reasonable doubt:

> [T]o devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses and representations, and by the omission of material facts, well knowing and having reason to know that said pretenses and representations were and would be false and fraudulent when made and caused to be made and that said omissions were and would be material, and, in so doing causing interstate wire communications to be made in furtherance of the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

Doc. 514 at 1-2.

The Government has alleged a scheme to defraud designed to "enrich [Defendants] unjustly by distributing to prospective and current customers, via email, false, fraudulent, and misleading documents and representations regarding the regulatory compliance of HI-TECH and its products, including false, fraudulent, and misleading FDA Certificates of Free Sale, GMP certificates, and GMP audit reports." *Id.* at 3-4. The two substantive counts in the Indictment charge an email on July 17, 2012, from Defendant Wheat to customer "M.M." transmitting a "false GMP from PharmaTech" (Count Two) and an email on the

3

same date from Defendant Wheat to the same customer "transmitting false GMP

audit report from PharmaTech" (Count Three). *Id*. at 5-6.

Title 18 U.S.C. Section 1343 provides in relevant part:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by means of
> false or fraudulent pretenses, representations, or promises, transmits
> or causes to be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any writings,
> signs, signals, pictures, or sounds for the purpose of executing such
> scheme or artifice, shall be fined under this title or imprisoned not
> more than 20 years, or both.

18 U.S.C. § 1349 provides that "Any person who attempts or conspires to commit

any offense under this chapter shall be subject to the same penalties as those

prescribed for the offense, the commission of which was the object of the attempt

or conspiracy."

"The elements of wire fraud under 18 U.S.C. § 1343 are (1) intentional

participation in a scheme to defraud and (2) use of the interstate wires in

furtherance of the scheme." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th

Cir. 2003). A scheme to defraud "requires proof of a material misrepresentation,

or the omission or concealment of a material fact calculated to deceive another out

of money or property." *United States v. Bradley*, 644 F.3d 1213, 1238-39 (11th

Cir. 2011) (quoting *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir.

2009)). "Proof of intent to defraud is necessary to support convictions for mail

4

fraud and wire fraud." *Id*. at 1239 (citing *United States v. Jennings*, 599 F.3d 1241, 1250 (11th Cir. 2010)); *see also Eleventh Circuit Pattern Jury Instructions (2022)*, Instruction O51 (same).

Conspiracy to commit wire fraud, 18 U.S.C. § 1349 requires the Government to prove (1) a conspiracy to commit wire fraud; (2) knowledge of the conspiracy; and (3) that the defendant knowingly and voluntarily joined the conspiracy. *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019). "Mere presence, guilty knowledge, even sympathetic observation" and close association with a co-conspirator are insufficient, without more, to support a conviction for conspiracy." *United States v. Geter*, 274 Fed. Appx. 805, 809 (11th Cir. 2009) (citing, *United States v. Lyons,* 53 F.3d 1198, 1201 (11th Cir. 1995). *See*, *also*, *United States v. Smith,* 255 Fed. Appx. 391, 398 (11th Cir. 2007) (mere presence, guilty knowledge, even sympathetic observation and close association with a co-conspirator are insufficient, in aiding and abetting a Hobbs Act Robbery and 924(c)).

## A.    For a Number of Reasons, the Conspiracy Count Fails

Regarding the conspiracy charged in Count One, the Government has failed to show the existence of a single agreement and a common objective to commit a specific crime or that Defendants joined in any such agreement. Count One charges

a single conspiracy concerning three types of documents:  Certificates of Free Sale ("COFS"), GMP certificates, and GMP audit reports. Viewing the evidence of the COFS allegations in the light most favorable to the Government,  Brandon Schopp emailed COFS to certain customers of Hi-Tech that were forged, rather than created by the FDA's Center for Food Safety and Nutrition ("CFSAN").  As to the GMP certificates and audits, the government presented no evidence that Brandon Schopp had any knowledge of the purportedly forged signatures  on the certificates and audits.  Thus, there were two separate and distinct conspiracies, each of which must stand on its own. They cannot.

> 1.    **The Conspiracy Surrounding the Certificates of Free Sale Must be Dismissed Because It Falls Outside the Statute of Limitations.**

"Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  18 U.S.C. § 3282.  "This general federal statute of limitations applies to both wire fraud and money laundering offenses." *United States v. Anghaie*, 2011 U.S. Dist. LEXIS  at *2 (N.D. FL 2011) (citing *United States v. Evans*, 473 F.3d 1115 (11th Cir. 2006) and *United States v. Torres*, 318 F.3d 1038 (11th Cir. 2003).  "The statute of limitations is a matter of defense that

must be asserted at trial by the defendant." *United States v. Najjar*, 283 F.3d 1306, 1308 (11th Cir. 2002). In a conspiracy prosecution, "the statute of limitations does not begin to run on a co-conspirator until the final act in furtherance of the conspiracy has occurred or until the co-conspirator withdraws from the conspiracy." *United States v. Reed*, 980 F.2d 1568, 1584 (11th Cir. 1993). *See, also*, *United States v. Xavier*, 2021 U.S. Dist. LEXIS at *4 (S.D. FL 2021).

In the instant case Count One alleges the conspiracy began on or about March 2011 and continued to "at least July 17, 2012." The only evidence produced[1] pertaining to a COFS came during the government's presentation of Gregory Watts, the representative from Dorian Yates Sports Nutrition ("Dorian Yates").[2] Mr. Watts was shown a number of exhibits pertaining to his procurement of COFS from Brandon Schopp. The exhibits consist of e-mail

---

[1] To be fair, the government presented Mariton Dos Santos, Talisha Williams, and Parshat Dadlani who testified about COFS. Mr. Dos Santos searched the FDA's database for Hi-Tech COFS's during the relevant time period. He found two, but the COFS given to Dorian Yates (Gov. Ex. 9 & 11) were not contained in the database. Talisha Williams, whose signature appears on the bogus COFS testified that she had retired from the FDA before the June 17, 2011 date on the COFS. Lastly, Mr. Dadlani testified that he obtained a legitimate COFS for Hi-Tech products on June 10, 2010 and provided copies to Hi-Tech via Jeff Jones.

[2] The government presented no evidence that any other purported victim received a bogus COFS. Thus, Mr. Wheat's exposure on this conspiracy rises or falls with Dorian Yates Sports Nutrition.

exchanges with some including attachments.  In total there were thirteen exhibits

(in order of admission,Gov. Ex.  67, 69, 7, 71,73, 9 11, 12, 78, 81, 82 & 77)[3]

consisting of email exchanges between Mr. Watts and people at Hi-Tech.  In three

of those e-mail exchanges the COFS[4] in question were attachments.  The earliest e-

mail was May 4, 2011, wherein Mr. Watts indicated that the distributors needed

COFS for the governments of foreign countries.  The last e-mail exchange

pertaining to a bogus COFS that was from anyone at Hi-Tech occurred on

November 28, 2011, when Brandon Schopp sent Mr. Watts the color copy of the

COFS that Mr. Watts had requested three days earlier.[5]  *See* Gov. Ex. 12.  There

are emails in 2012 and 2013 between Mr. Wheat, Hi-Tech personnel and Mr.

Watts regarding COFS but those communications relate to actual COFS

procurement. *See* Gov. Ex. 89 and 329.

Thus, the last act in furtherance of this conspiracy occurred on November

28, 2011, when Mr. Schopp sent a color copy of a COFS to Mr. Watts.  Five years

from November 28, 2011, is November 28, 2016.  The first indictment in this case

---

[3] Exhibit 86 was not an e-mail exchange but just a copy of the COFS.

[4] While there are three e-mail exchanges containing COFS, it is the same one either modified, or in color rather than black and white.

[5] Mr. Wheat is not a party to this e-mail.

was returned June 28, 2017, more than five years after the commission of any

conduct in a wire fraud conspiracy related to a COFS. Thus, the government failed

to bring this prosecution within the statute of limitations and the Court should

direct a verdict on the COFS conspiracy contained in Count One.

> **2.    The Court Should Direct a Verdict on Count One Because the Sole Owner and CEO of a Corporation Cannot Conspire with Only the Corporation**

Mr. Wheat is the sole owner and CEO of Hi-Tech. He, and he alone,

controls the operation of Hi-Tech. The government's evidence related to GMP

certificates and audits centered around a series of emails between Jay Klein of

World Health Products ("World Health"), Winsome Kirlew and Mark McLeod of

VPX, and Gregg Watts of Dorian Yates, Bobby Vachon of Spartan Nutrition,[6] and

Paul Joyce of Bioscience Inc., wherein GMP certificates and audits were emailed

to those customers from either Jared Wheat or Brandon Schopp. The government

presented the testimony of Glenn Godfrey, the person who purportedly signed the

GMP certificates and audit report. Mr. Godfrey testified that: he did not sign the

certificates or audit report, he did not give anyone authority to sign his name to the

---

[6] There were no documents ultimately admitted indicating any bogus GMP's were transmitted to Ms. Vachon. While Gov. Exs. 2 & 100 were initially admitted into evidence, they were ultimately ruled out by this Court. Similarly, the Court struck he entirety of the testimony of Bradley Byrne, from Health Canada.

certificates or audit report, he had no knowledge of PharmaTech, he was not a

founding partner of the company, and he conducted no audits of Hi-Tech.  The

government also called Sergio Oliveria who testified that he knew Mr. Godfrey to

be a lawyer in Belize.  He testified that PharmaTech was a company in name only,

he knew the PharmaTech GMP certificate was bogus, and that he confronted Mr.

Wheat about it.[7]

Although Mr. Schopp may have transmitted the GMP certificates and/or

audits, the government presented no evidence that Mr. Schopp knew the

certificates and/or audits were false.  There is nothing to indicate that Mr. Schopp

knew that Glenn Godfrey had not signed the certificates or audit reports.  There is

no evidence that Mr. Schopp had any knowledge that Mr. Godfrey had not

conducted the audit.  In fact, there is no evidence Mr. Schopp knew who Mr.

---

[7] This Court heard the testimony of Mr. Oliveira and witnessed, first-hand, how he
perjured himself before the Court.  It was demonstrated beyond any doubt that he
doctored documents that were presented by the government.  The Court further heard
how Mr. Oliveira swore that he would spend his life preparing to "destroy" Mr.
Wheat.  The Defendants suggest Mr. Oliveira's testimony is wholly unreliable and
should be stricken, or at least not considered as credible by this Court in deciding
whether to direct a verdict on Counts One through Three of the Second Superseding
Indictment. Mr. Oliveira's testimony is "so inherently incredible, so contrary to the
teachings of basic human experience, so completely at odds with ordinary common
sense, … no reasonable person would believe it beyond a reasonable doubt."
*Chancey*, 715 F.2d  at 546-47.

Godfrey was. As such, there is no evidence to support an inference that Mr. Schopp had knowledge of any conspiracy regarding the GMP certificates and audit report. Similarly, the government presented no evidence that any other person knowingly aided or conspired with Mr. Wheat in transmitting the GMP certificates and audit report. An individual who "completely controls a corporation and is the sole actor in performance of corporate activities, cannot be guilty of a criminal conspiracy with that corporation in the absence of another human actor." *United States v. Stevens*, 909 F.2d 431 (11th Cir. 1990). Because Mr. Wheat "completely controls [High-Tech] and [he] is the sole actor in the performance of corporate activities," this Court should direct a verdict on the GMP conspiracy contained in Count One of the Second Superseding Indictment.

**3.    The Court Should Direct a Verdict on Count 1 as to the Certificates of Free Sale as any Fraud was not Perpetrated on Hi-Tech's Customers or Prospective Customers**

The evidence demonstrates that the COFS in question were to be provided to foreign governments through distributors who purchased products from Dorian Yates. Thus, the distributors were not customers or prospective customers of Hi-Tech. Further, the distributors, themselves, did not require the certificates, it was the foreign governments where they were trying to distribute who required them. Thus, the ultimate recipient of the COFS were the foreign governments who would

rely on the authenticity of the certificates to allow the importation of Dorian Yates

products.   The instant indictment alleges that the Defendants conspired to transmit

fraudulent COFS to customers or prospective customers of Hi-Tech.  As neither

the distributors who purchased Dorian Yates products nor the governments where

the distributors intended to sell the products, were "customers or prospective

customers" of Hi-Tech, the government has failed to prove beyond a reasonable

doubt a conspiracy pertaining to COFS.

At most, the government has shown that the scheme relating to COFS

defrauded foreign governments, rather than any customer or prospective customer

of Hi-Tech, and the Indictment should have charged a conspiracy to defraud the

United States government pursuant to 18 U.S.C. § 371, rather than a conspiracy to

defraud Hi-Tech customers pursuant to 18 U.S.C. § 1349.

The same circumstances were presented in *United States v. Starr*, 816 F.2d

94 (2d Cir. 1987), where the Second Circuit reversed convictions based on its

determination that a scheme that defrauded the United States Postal Service by

hiding first class mail in lower rate bulk mail failed because the evidence was

insufficient to prove that defendants intended to defraud their customers, the

named victims. 816 F.2d at 97-101. As the concurring judge explained, "The

government has simply indicted the defendants for defrauding the wrong party."
*Id*. at 102 (Newman, J., concurring).

4.    **The Court Should Direct a Verdict on the COFS Conspiracy Contained in Count One Because There Was No Fraud as Gregg Watts of Dorian Yates Sports Nutrition Was Aware that Mr. Schopp Was Creating the Certificates of Free Sale**

To defraud means the "intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right." Miriam Webster Dictionary, found at https://www.merriam-webster.com/dictionary/fraud. Here there was no fraud perpetrated on Gregg Watts, or his employer, as Mr. Watts was fully aware and even encouraged Mr. Schopp to create the COFS in question. Mr. Watts, a highly educated mechanical engineer, who has had extensive experience in not only engineering, but also IT, dietary supplements and business management, knew that Brandon Schopp, not the FDA, produced the COFS.

An examination of the e-mail exchanges between Mr. Watts and Mr. Schopp proves the point. In the very first communication, Mr. Watts asked if Mr. Schopp could "create" a Certificate of Free Sale. On August 2, 2011, Mr. Watts asked Mr. Schopp if he "could ... create a Certificate of Free Sale for all the other products." Gov. Ex 69. In response, Mr. Schopp related, "we can make a Certificate of Free Sale for you easy. If they require a USADA Health Certificate, we will have to file

13

for one."[8]  *Id*.  The next day, August 3, 2011, Mr. Schopp told Mr. Watts that he would "need the names of every DYSN product that you will be distributing … so that I can have all them listed onto on [sic] Certificate.  As for the USADA Health Cer., we will have to apply for those as needed for each country …"  Gov. Ex. 7.

Approximately one month later, Mr. Schopp told Mr. Watts that he is "working on the certificates of free sale and should have it done by lunch time tomorrow."  Ex 73.  On September 7, 2011, Mr. Schopp sent Mr. Watts a "Certificate of Free Sale containing all the products you listed."  Gov. Ex. 9.  Later that day, Mr. Watts forwarded e-mails he received from distributors noting problems with the Certificate of Free Sale Mr. Schopp had just produced.  ***Within an hour,*** Mr. Schopp sent a corrected COFS.  Ex. 11.  Finally, on November 26, 2011, Mr. Schopp told Mr. Watts that he can get him a color copy, because it "is on our designers' server."  Gov. Ex. 78.   Mr. Watts knew that he was getting a COFS not from the FDA, but from Brandon Schopp.  He was not deceived.

---

[8] It is important to note that Mr. Schopp indicated that, if he had to apply to a governmental agency (USADA), it would take time to procure the document in question, but that he could "make a Certificate of Free Sale for you easy."  The message: "If you want a document that actually comes from the U.S. government, it will take some time, but if you're okay with me giving you a bogus one, I can have it to you in no time." Gov. Ex. 69.

**5. Assuming, *Arguendo*, There was a Conspiracy to Commit Wire Fraud by Transmitting Bogus Certificates of Free Sale, this Court Should Grant a Judgment of Acquittal as to Mr. Wheat as he Never Joined the Conspiracy**

As noted above, there were a total of twelve e-mail exchanges between Mr. Watts and Brandon Schopp, whom Mr. Watts indicated was his main contact at Hi-Tech, that pertained to COFS. On every e-mail exchange, Brandon Schopp is either a sender or recipient as is Mr. Watts. On several of the exchanges Mr. Wheat is included by being cc'd and in others he is a direct recipient. Whether cc'd or a direct recipient, Mr. Wheat *never responded* to any inquiry about a COFS. Further, there is no evidence that Mr. Wheat ever read the e-mails on which he was included. Three of the exhibits had as an attachment, a Certificate of Free Sale (Gov. Ex. 9, 11 & 12). Mr. Wheat is only cc'd on 9 & 11 and is not part of the exchange in 12. In order to prove a wire fraud conspiracy, the government must prove: (1) a conspiracy to commit wire fraud; (2) knowledge of the conspiracy; and (3) that the defendant knowingly and voluntarily joined the conspiracy. *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019). "Mere presence, guilty knowledge, even sympathetic observation" and close association with a co-conspirator are insufficient, without more, to support a conviction for conspiracy." *United States v. Geter*, 274 Fed. Appx. 805, 809 (11th

Cir. 2009) (citing, *United States v. Lyons,* 53 F.3d 1198, 1201 (11th Cir. 1995).

*See, also*, *United States v. Smith,* 255 Fed. Appx. 391, 398 (11th Cir. 2007).

At best, the government has proven Mr. Wheat was, at times, listed as someone receiving e-mails in which others were discussing COFS.  The government has not proven that Mr. Wheat ever actively participated in any discussions between Hi-Tech and Mr. Watts pertaining to a COFS.  Mr. Wheat has engaged in no conduct that would support an inference that he was something other than merely present, perhaps had knowledge and a close association with Brandon Schopp.  This is insufficient to prove he knowingly and voluntarily joined any conspiracy Mr. Schopp may have been engaged in.  This Court should direct a verdict as to Mr. Wheat concerning the COFS conspiracy of Count One.

**B.  The Court Should Grant a Judgment of Acquittal on Counts One Through Three Because Any Misrepresentations or Omissions Were Not Material**

"[T]he materiality of a falsehood is an element of – and thus a limit on – the federal fraud statutes."  *Kousisis v. United States*, 605 U.S. 114, 132 (2025), quoting *Neder v. United States*, 571 U.S. 1, 25 (1999).  "A material fact is a fact that would be important to a reasonable person in deciding whether to engage in a particular transaction.  A fact is material if it has a natural tendency to influence the decision of the person or entity to whom or which it is addressed."  *United*

16

*States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc) (citing and quoting

*Eleventh Circuit Pattern Jury Instructions (Criminal Cases)* § 50.1, at 282 (West

2003)). Materiality looks to the effect on the likely or actual behavior of the

recipient of the alleged misrepresentation." *Universal Health Services Inc. v.

United States ex rel. Escobar*, 579 U.S. 176, 193 (2016). In *Kousisis*, the

government suggested that the appropriate materiality standard should be "an

essence-of-the-bargain test, under which a misrepresentation is material only if it

goes to the very essence of the parties' bargain." 605 U.S. at 131. The Court did

not reach the materiality issue there because the defendants had not "contested that

their misrepresentations were material." *Id*. at 132. Justice Thomas, in his

concurrence noted "the standard we articulated in *Universal Health Services* was a

familiar one that aligned with the authoritative treatises and the common law."

*Kousisis*, 605 U.S. at 138 (Thomas, J. concurring). In any event, "the materiality

standard is demanding" so as to prevent the arrest, or prosecution of "garden-

variety" misrepresentations. *Universal Health Services*, 579 U.S. at 194.

### 1.    Dorian Yates' COFS Were Not Material

Mr. Watts, on behalf of Dorian Yates Sports Nutrition Ltd, entered into a

bargain with Hi-Tech Pharmaceuticals, Inc., for the sale of dietary supplements.

They did not enter into an agreement to provide COFS. Hi-Tech provided dietary

17

supplements to Dorian Yates and Dorian Yates paid Hi-Tech for the supplements they received. The supplements are "the very essence of the bargain" *Universal Health Services*, 579 U.S. at 194, n. 5, and the certificates were irrelevant to the bargain's "fundamental purpose" – dietary supplements. As such the certificates were "minor or insubstantial … that cannot be considered material." *Id*. at 194.

Another aspect to the materiality analysis focuses on what Mr. Watts knew. If he knew that the COFS were bogus, he, and by extension, Dorian Yates, could not have been defrauded. As noted above, there were a series of communications between Mr. Watts and Mr. Schopp that clearly indicate Mr. Watts knew he was receiving a COFS issued not from the FDA, but one created by Ms. Schopp.

Given these communications, Mr. Watts knew the COFS was bogus, but went on with the main deal anyway. He and Dorian Yates purchased, again and again, dietary supplements from Hi-Tech. Mr. Watts was not defrauded, and if there is fraud, he initiated it, and actively participated in it. Where a party decides to fulfill its end of the bargain "despite actual knowledge that certain requirements were violated "is very" strong evidence that those requirements are not material." *Universal Health Systems*, 579 U.S. at 195.[9]

---

[9] At best, Mr. Watts chose to be willfully ignorant of the fact that the COFS was bogus. *See* Eleventh Circuit Pattern Jury Instruction Special Instruction 8 which instructs that willful ignorance is proof of knowledge.

### 2.    GMP Certificates Were Not Material

The government presented evidence that World Health, VPX and Dorian Yates contracted with Hi-Tech, as a third-party manufacturer.  The contract called for Hi-Tech to either supply them with raw materials and/or dietary supplements. The customers would, in turn, sell the supplements for a profit.  Each of the customers conducted business with Hi-Tech over several years.  Hi-Tech lived up to its end of the bargain.  It provided quality products to the customers.  As Mark McLeod, the operations manager for VPX testified, the products VPX received from Hi-Tech were always of good quality and always met VPX's standards.  Ms. Winsome Kirlew of VPX testified that, before VPX would sell products received from Hi-Tech, they would be tested to ensure that the products were what Hi-Tech represented them to be, in the correct quantities, and that they were safe for consumption.  She could not recall an instance where a Hi-Tech product was not found to be satisfactory.  Similarly, World Health obtained products from Hi-Tech for approximately five years without any complaint concerning the quality of the

products.  Lastly, Dorian Yates, with one exception,[10] received quality dietary supplements from Hi-Tech for approximately four years.[11]

The purchase of supplements and products was the core of the agreement between Hi-Tech and its customers, VPX, World Health, Dorian Yates, and Bioscience Inc.[12]  The GMP certificates and audits were ancillary.  Indeed, the customers only wanted the GMP certificate in order  to show that Hi-Tech was manufacturing in compliance with the FDA's GMP requirements.  Neither NSF nor PharmaTech could say that they were.  The only entity that can confirm GMP compliance is the FDA.  Hi-Tech was GMP compliant as evidenced by the lack of 483's.  The GMP certificates and audit reports were *not* germane to "the essence of the parties' bargain."  *Kousisis*, 605 U.S. at 131.

Proof lies in the testimony of the relevant witnesses.  Not one of the witnesses who testified said that if the GMP certificate or audit[13] had not been

---

[10] Mr. Watts testified that on a couple of occasions, over the years Dorian Yates dealt with Hi-Tech, they received lumpy product that was unusable.

[11] Paul Joyce of Biotech Inc., was not questioned about the quality of products supplied by Hi-Tech.

[12] There was no testimony from Bobby Vachon that Spartan Nutrition ever received product from Hi-Tech.

[13] Jay Klein, of World Health Products said the audit report was not important to him at all.

provided, the companies would not have done business with Hi-Tech. At most they said the GMP certificate was "important" and even Jay Klein said if a contractor provided false documents all he would do is "not look kindly" on him. Jay Klein testified that the GMP certificates were important to have in their files in case a customer of World Health asked for it. All Winslow Kirlew could say is that VPX relied on the GMP certificates. Paul Joyce testified he did not even know what a third-party audit was. Mark McLeod testified that quality assessment was very important and he would not expect anyone to provide a fraudulent certificate. The GMP certificates and audit were not material and this Court should grant a directed verdict as to Counts One through Three.

> **3.    This Court Should Grant a Directed Verdict on Counts One Through Three Because There Was No Duty to Disclose that PharmaTech was Owned by Mr. Wheat**

As part of its case on the wire fraud counts, the government alleged that the Defendants transmitted "email communication[s] to customer M.M. contained a material omission in that it failed to disclose that PharmaTech was not an independent third-party auditor of HI-TECH, but was actually operated and controlled by WHEAT himself." Doc. 514 at 4. Initially, there is no duty to report that PharmaTech was controlled by Mr. Wheat. 21 C.F.R. § 111, which deals with Good Manufacturing Practices for dietary supplement companies, has

21

no requirement that a "third-party audit" even be conducted. In fact, there is

nothing mentioned within 21 C.F.R. § 111 that mentions audits. There is no

requirement of a third-party audit or prohibition against having an in-house audit.

In fact, Bill Kracht testified that he conducted in-house audits for DuPont for years.

(Testimony of Bill Kracht, October 24, 2025). Similarly, Mollie Kober testified

that she conducted multiple in-house audits for Dow Chemicals for GMP

compliance. (Testimony of Mollie Kober, October 28, 2025). Second, the

Defendants never represented that PharmaTech was not controlled by Mr. Wheat.[14]

In fact, the PharmaTech web site lists Mr. Wheat as a partner of a company that

was founded in 2010. Moreover, the omission, if there was one, was not material.

Jay Klein testified not that a third-party audit was required, but that they usually

were third parties who conducted the audits.

    The failure to disclose the relationship between Hi-Tech and PharmaTech is

an omission, not a misrepresentation. And:

> [A] mere "failure to disclose" information is typically insufficient
> to satisfy even the misrepresentation element of fraud. For
> nondisclosure to be equivalent to a misrepresentation, it must be
> coupled with special circumstances, such as a confidential
> relationship between the parties or a course of affirmative

---

[14] Witness Winsome Kirlew testified about an e-mail she sent to Hi-Tech inquiring whether the PharmaTech audit was conducted by a third party. She testified that she never got a response to that inquiry. Proof that Hi-Tech never represented the PharmaTech audit and GMP certificates were from an independent third party.

> representations making the omission misleading, that justify the
> imposition of a duty to disclose.

*Feldman*, 931 F.3d at 1267 (Pryor, J. concurring) (citations omitted). *See, also,*

*Langford v. Rite Aid of Alabama, Inc.,* 231 F.3d 1308, 1313 (11th Cir. 2000)

(finding no duty to disclose in civil RICO case based on wire fraud because

"[d]eterminations as to whether a duty to disclose information exists must be made

on a case by case basis, with appropriate attention given to the nature of the

transaction and the relationship between the parties.").

Here, the government's evidence fails to establish the necessary special

relationship or circumstances between Defendants and the customers or potential

customers who received GMP certificates and/or GMP audits.  Accordingly,

failing to disclose Hi-Tech's or Mr. Wheat's relationship with PharmaTech cannot

establish the offenses alleged in Counts One through Three.

The most glaring deficiency in the government's case is the absence of any

evidence that Hi-Tech was ***not*** GMP compliant.  As discussed with several

witnesses in the course of the trial, FDA does not have legislative authority to

regulate GMP certificates.  Such "certificates" are a product of private dietary

supplement industry and are designed to help companies get to GMP compliance.

It can also be used for marketing – as Hi-Tech has done in this case - without

running afoul of any regulation or statute.  The government is trying to impose

government regulation by way of prosecution over a part of the dietary supplement industry that they have no legislative authority to regulate. The fraud in this case must be the use of a certificate IF/when in fact Hi-Tech was *not* GMP compliant. Without proof of Hi-Tech *not* being GMP compliant, the government's case fails and this Court should direct a verdict on Counts one, two and three.

**II. This Court Should Grant a Judgment of Acquittal as to Counts Four through Nine (Conspiracy to Commit Money Laundering and Money Laundering) Because No Reasonable Jury Could Find Defendants Guilty on the Evidence Presented by the Government.**

The Government has failed to present sufficient evidence to allow a reasonable jury to find Defendants Jared Wheat and Hi-Tech guilty beyond a reasonable doubt of conspiracy to commit money laundering and money laundering.

Defendants Jared Wheat and Hi-Tech are charged in Count Four under 18 U.S.C. § 1956(h), with conspiring to launder money by engaging in transactions in violation of 18 U.S.C. § 1957. Doc. 514 at 6-7. Title 18, United States Code, Section 1956(h) provides:

> (h) Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

To support a conviction of conspiracy:

> [T]he government must prove [1] that an agreement existed between two or more persons to commit a crime and [2] that the defendants knowingly and voluntarily joined or participated in the conspiracy.

*United States v. Silvestri*, 409 F.3d 1311 (11th Cir. 2005) (citing *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983)). *See also Eleventh Circuit Pattern Jury Instructions (2025)*, Instruction O74.5 (same).

Defendants Jared Wheat and Hi-Tech are charged with substantive money laundering in violation of 18 U.S.C. § 1957 in Counts Five through Nine of the indictment, which allege that they:

> [D]id knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate commerce, as described below, each such transaction knowingly involving criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, …

Doc. 514 at 7.

Thereafter, the Indictment sets out five transactions, each consisting of the issuance of a check or a transfer from Chase Bank Account *0562 in the name of Affiliated Distribution. Count Five charges Check #2080 in the amount of $600,000 on 6/28/2012; Count Six charges check #2112 in the amount of $350,000 on July 6, 2012; Count Seven charges a transfer of $39,080.86 on July 12, 2012; Count Eight

25

charges a transfer of $42,065.87 on July 19, 2012; and Count Nine charges a transfer

of $44,000 on July 25, 2012. *Id.* at 8.

Title 18, United States Code, Section 1957, provides in relevant part:

> (a) Whoever … knowingly engages in or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

*Silvestri*, 409 F.3d at 1332-33, sets out what the Government must show:

> Section 1957 sanctions anyone who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity [.]" 18 U.S.C. § 1957(a). The term "monetary transaction" is defined by the statute as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument … by, through or to a financial institution [.]" *Id.* at § 1957(f)(1). The term "monetary instruments" means "(i) coin or currency of the United States or any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery [.]" *Id.* at § 1956(c)(5). The term "criminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense …." *Id.* at § 1957(f).

*Id. See also Eleventh Circuit Pattern Jury Instructions (2022),* Instruction O74.6.

Viewing all the evidence as to Counts Four through Nine of the Indictment,

in the light most favorable to the Government, the following was established:

The Government presented the testimony of Adrienne Richardson, an auditor

employed by the United States Attorney's Office, along with bank statements and

signature cards for the accounts listed in the indictment. Ms. Richardson analyzed the deposits into the accounts from Dorian Yates Sports Nutrition, Vital Pharmaceuticals, and World Health Products.  These companies are the alleged victims in the wire fraud counts. Here testimony can be boiled down to two demonstrative exhibits

| February 2012 - July 2012 | | |
|---|---|---|
| **BANK & ACCT#** | **MONTH/YEAR** | **DEPOSIT TOTAL** |
| Chase Bank x0562 | Feb 2012 | $2,865,064.61 |
| Chase Bank x0562 | March 2012 | $3,409,580.68 |
| Chase Bank x0562 | April 2012 | $3,899,257.56 |
| Chase Bank x0562 | May 2012 | $4,271,947.25 |
| Chase Bank x0562 | June 2012 | $3,951,078.77 |
| Chase Bank x0562 | July 2012 | $3,792,062.17 |
| **Chase Bank Deposit Totals** | | **$22,188,991.04** |

| February 3, 2012 - July 25, 2012 | |
|---|---|
| **DEPOSITED INTO CHASE BANK X0562** | **AMOUNT** |
| Dorian Yates Sports Ntrtn Ltd. | $543,208.37 |
| Vital Pharmaceuticals Inc. VPX/Redline | $46,465.00 |
| World Health Products | $1,041,167.59 |
| **Deposit Totals** | **$1,630,840.96** |

The testimony shows that, during the time charged in the substantive counts, Hi-Tech deposited $22,188,991.04 into its accounts.  Of that, only $1,630,840.94 are proceeds from the alleged wire fraud.  In other words, the "clean" money and "dirty" money are commingled and the dirty money represents just 7.3% of the deposits made into the accounts.

She also testified that some of the transfers out of the account were done close in time to deposits from one of the three alleged victim companies.  The bank records show that there was substantial activity in the accounts and that there were many deposits and withdrawals happening on a daily basis.  The bank records also demonstrate that the amount of "clean" money in the Chase account far exceeded any check or transfer, or aggregate of them, listed in Counts 5 through 9.

## A.  Argument

While the Indictment alleges that Defendants Jared Wheat and Hi-Tech conspired "with each other and with others, both known and unknown," Doc. 514 at 6, the government's proof in its case in chief failed to show that any *person* other than Jared Wheat conspired to commit financial transaction money laundering. As a result, this Court should enter a judgment of acquittal as to Count Four as to both Defendants.  In *United States v. Stevens*, 909 F.2d 431 (11th Cir. 1990), the Eleventh Circuit held that a stockholder who completely controls a corporation and is the sole

actor in performance of corporate activities cannot be guilty of a criminal conspiracy with that corporation in the absence of another human actor. The rationale for this rule is clear:

> The threat posed to society by these combinations arises from the creative interaction of two autonomous minds. It is for this reason that the essence of a conspiracy is an *agreement*. The societal threat is of a different quality when one human simply uses the corporate mechanism to carry out his crime. The danger from agreement does not arise.

*Id.* at 433 (emphasis in original). *Accord United States v. Panhandle Trading, Inc.,* 2006 WL 1883436 (N.D. Fla. July 7, 2006).  This Court should enter a judgment of acquittal of both Defendants as to Count Four.

The Government's proof as to Counts Five through Nine fails to demonstrate that there were *any* proceeds from a specified unlawful activity in the Affiliated Distribution Chase Bank Account *0562 at the time of the monetary transactions alleged in the Indictment.  As shown in the discussion regarding Counts One through Three, Defendants did not commit wire fraud as alleged in the indictment.  As such, no funds in the Chase account were derived from a specified unlawful activity.

If the Court believes that the Government has presented sufficient evidence that funds from wire fraud counts were deposited into the Chase account and that Mr. Wheat and Hi-Tech conducted transactions of more than $10,000, the Government's proof still falls short. The evidence in this case presents a situation

where alleged "dirty" funds are commingled with demonstrable "clean" funds. Unlike most commingling cases, the amount of clean money in the Chase account dwarfed the amount of alleged dirty money.

A recent case in the Sixth Circuit framed the issue posed by a commingled funds situation using a hypothetical drug dealer: if a "drug dealer put $100,000.00 from his legitimate day job in his bank account, deposited $15,000.00 of drug money, and then withdrew $11,000.00, it's hard to say whether his withdrawal consisted of clean money, dirty money, or both." *United States v. Erker*, 129 F.4th 966, 970-71 (6th Cir. 2025). Because this is a tricky question, the circuit courts have taken different approaches and the Eleventh Circuit has not ruled on the issue.[15] *Compare United States v. Rutgard*, 116 F.3d 1270, 1291-1292 (9th Cir. 1997)(Government must trace funds from transfer to dirty money) with *United States v. Moore*, 27 F.3d 969, 976-77 (4th Cir. 1994)(transfer presumed illegitimate up to the amount of criminally derived funds, i.e. presumption that dirty money is spent first); *United States v. Sokolow*, 91 F.3d 396, 409 (3rd Cir. 1996)(same) with

---

[15] During Ms. Richardson's testimony, the Government cited *United States v. Green*, 818 F.3d 1258 (11th Cir. 2016), for the proposition that the Court use pro rata percentages to deal with commingled funds. As will be explained in more detail below, *Green* does not hinge on the commingling issue or state a particular rule of law. However, even were the Court to follow the Government's suggestion, it would require the dismissal of Counts 7, 8, and 9.

*United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001)(where an account contains clean funds sufficient to cover a withdrawal, the Government cannot prove beyond a reasonable doubt that the withdrawal contained dirty money); see also, *Erker*, 129 F.4th at 977 (acknowledging the merit of the different approaches, but refusing to pick one).[16] Defendants assert that the correct analysis of commingled funds comes from the Fifth Circuit's decision in *United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001). The Court in *Loe* stated the following rule:

> As this Court has noted, money is fungible. The commingling of assets has placed courts in the difficult position of separating "clean" from "dirty" funds. Although any accounting method employed to this end inevitably exhibits certain "arbitrary" characteristics, a rule of decision is necessary. In *United States v. Davis*, we stated the following rule for section 1957 cases involving commingled accounts: "When the aggregate amount withdrawn from an account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account." *Davis* also implies the converse--that **where an account contains clean funds sufficient to**

---

[16] The Seventh and Tenth Circuits have upheld § 1957 convictions where the "vast majority" of commingled funds were criminally derived and there were insufficient clean funds to cover the charged transactions at the time they occurred (reaching same result as Fifth Circuit without announcing a bright line rule). *See United States v. Battles*, 745 F.3d 436, 456 (10th Cir. 2014); *United States v. Haddad*, 462 F.3d 783, 792 (7th Cir. 2006)("government proved aggregate withdrawals of far more than $10,000 above the amount of clean funds available"). The Eighth Circuit has held that tracing is not required, but its holdings on the issue have involved transactions from accounts in which there were no or minimal amounts of clean funds. *United States v. Pennington*, 168 F.3d 1060, 1066 (8th Cir. 1999); *United States v. Pizano*, 421 F.3d 707, 722-23 (8th Cir. 1999).

> **cover a withdrawal, the Government cannot prove beyond a reasonable doubt that the withdrawal contained dirty money**.

*United States v. Loe*, 248 F.3d 449, 466-67 (5th Cir. 2001) (emphasis added), *accord United States v. Evans*, 892 F.3d 692, 708 (5th Cir. 2018) (Rule for commingled funds is clean-funds-out-first).

The bank records and Ms. Richardson's charts demonstrate that on the date of every transaction listed in Counts 5 through 9, there was far more clean money in the accounts than dirty money. As such, under *Loe* and *Evans,* the Government has failed to prove beyond a reasonable doubt that the withdrawals contained dirty money. Therefore, all five of those charges must be dismissed.

In response to *Loe*, the Government has suggested two equally incorrect approaches for dealing with commingled funds in a § 1957 case. The first approach it suggests is that the Court should follow a some sort of pro rata percentage comparison approach which it says that the Eleventh Circuit adopted in *United States v. Green*, 818 F.3d 1258 (11th Cir. 2016). In *Green*, a pill mill defendant claimed that the government failed to prove that dirty money was withdrawn from a commingled account. That case involved a pharmacy that received 90% of its income from illegal opioid sales. The funds were put into the pharmacy account where a token amount could have come from legitimate sales of the pharmacy. In resolving a sufficiency of the evidence claim, the court said the following:

And only defendants Green and Hebble had signing authority over another bank account into which a significant portion of that money was transferred before being spent on various items. The indictment included money laundering counts for six transactions in 2011 totaling $402,599.18. Only $60,000 of that money or 14.9% needed to be proceeds of illegal drug distribution to sustain the money laundering counts and the money laundering conspiracy count predicated on these six transactions.

The jury heard one of Gulf Coast's pharmacists admit that approximately 90% of the prescriptions Gulf Coast filled were for oxycodone. The jury could reasonably have inferred that 90% of the $402,599.18 covered by the indictment was due to oxycodone sales, a percentage far greater than 14.9%. And on that basis, in combination with the overwhelming evidence of underground market oxycodone activity presented at trial and the defendants' participation in that underground market activity, the jury could reasonably find that the defendants money laundered proceeds of illegal drug distribution for the statutory dollar amount minimum on the six occasions covered by the indictment and conspired with each other to do so.

*Green*, 818 F.3d at 1279-80.

Notably, *Green* never uses the word commingle and does not set out a rule of decision for how to apply § 1957 in a commingled funds case. There is no holding here and it is a mistake to treat *Green* as setting a rule or a framework for decision. The *Green* Court simply looked at the account, found that 90% of the money in the account was dirty and noted that the jury could easily have assumed that 90% of the money withdrawn was dirty and that this amount was sufficient to sustain the § 1957 charge. The Court did note that $60,000.00 ($10,000 x 6 counts) was 14.9% of the total amount laundered. However, that was just an illustration to show that this case

involved an overwhelming amount of dirty money and no real possibility that there was clean money involved in the transactions. Because *Green* is merely a sufficiency of the evidence case in a situation where the overwhelming majority of the money in a commingled account is dirty, it fails to state a rule of law to be applied by lower courts and it similarly does not serve any precedential value.

The passage quoted above is the entirety of the treatment of the issue in *Green*. It does not say that it is setting out a holding or establishing a rule of decision. In fact, the Sixth Circuit's recent detailed and comprehensive review of the law on commingling in § 1957 cases does not recognize *Green* as any sort of controlling authority. *Erker*, 129 F.4th at 975-76; *accord* Audrey Spensley, *Untangling Laundered Funds: The Tracing Requirement Under 18 U.S.C. § 1957*, 75 Stan.L.Rev. 1157 (May 2023)(citing no controlling Eleventh Circuit § 1957 case). There is a reason these sources take this position – *Green* is nothing more than a sufficiency of the evidence case involving a throw away line illustrating the vast amount of dirty money and the relatively low amount of money needed to prove the money laundering counts.

Also, to use the percentage comparator method suggested by the Government would create a nonsensical rule that is unhinged from any accounting principle or any commingling theory used by any other court in the country. Again, the

discussion in *Erker* spells out the different approaches to commingled funds used in various contexts in the law and used by other Courts considering the issue. *Erker*, 129 F.4th at 970-974. None use the unmoored approach suggested by the Government. In addition, the approach is subject to manipulation by the Government. Using the *Green* amounts of $402,000.00, if the Government had charged 10 counts alleging this same total amount of money, there would be a $100,000.00 comparator for the money laundering counts ($10,000 x 10 counts). The comparison percentage is now 25% instead of 14.

In the end, *Green* is a case that involves an account that is made up of at least 90% dirty money. The Court of Appeals mentioned the 14.9%, but did not rely on that alone to make its sufficiency determination. It looked at that in conjunction with the vast and expansive nature of the illegal activities of the defendants in that case. The two factors together allowed it to rule that "the jury could reasonably find that the defendants money laundered proceeds of illegal drug distribution for the statutory dollar amount minimum on the six occasions covered by the indictment and conspired with each other to do so." *Green* at 1280. It did not say that the percentages standing alone satisfied the Government's burden.

However, if the Court were to adopt some sort of pro rata rule as urged by the Government, the Court must dismiss Counts 7, 8 and 9. Ms. Richardson's charts

show that at most, only 7.3% of the money in the commingled accounts is dirty. In Count 7, the transfer amount is $39,080.86. If the dirty money is 7.3%, the amount of dirty money in the transaction is $2,852.90. As this is less than $10,000.00, the Government has failed to prove the greater than $10,000.00 element. Doing the same calculation for Counts 8 and 9 produces dirty money amounts of $3,070.80 for Count 8 and $3,212 for Count 9. Again, both of these amounts are less than the $10,000.00 threshold. As a result, even using the Government's theory for the handling of commingled monies, Counts 7, 8, and 9 must be dismissed.

Despite the Government's insistence that Green's throw away dicta controls this case, it also cited the court to three cases to support a theory that no tracing of funds is required at all: *United States v. Ward*, 197 F.3d 1076 (11th Cir. 1999); *United States v. Concelliere*, 69 F.3d 1116 (11th Cir. 1995) and *United States v. Lawson*, 2025 WL 173235 (11th Cir. 2025)(unpublished). The first two cases are inapplicable because they deal with 18 U.S.C. § 1956 and interpret different statutory language while the non-binding opinion in *Lawson* appears to have confused the elements of § 1956 with those of § 1957 case.

In *Ward* and *Concelliere*, the Eleventh Circuit has held that a defendant can be convicted of money laundering under § 1956 "where the funds involved in the transaction are derived from a commingled account of which only a part comes from

specified unlawful activities." *United States v. Cancelliere*, 69 F.3d 1116, 1120 (11th Cir. 1995) (quotations omitted). This is so because of the unique language of § 1956 which only requires that "property involved in a financial transaction represents the proceeds of some form of unlawful activity" and that the transaction was "designed in whole or in part" to launder money. 18 U.S.C. § 1956. The key terms here are "involved" and "in part." These terms relieve the government of the requirement to trace money because any use of deposit or withdrawal of illegal money is involved and in part.

Notably, § 1957 does not contain these phrases. Instead, it requires that the funds in the amount at least $10,000.00 be "derived" from a specified unlawful activity. This means that unlike § 1956, the Government must show more than some part of the funds are dirty. *See Rutgard*, 116 F.3d at 1291;   .

The unpublished decision in *Lawson* does take up the issue of commingled funds in § 1957 cases. It did find that the Government was not required to trace funds. However, that holding appears to be based on *Ward*'s interpretation of § 1956. However, it made this statement as well:

> Lawson argues, as she did to the jury, that she could have used legitimate funds to purchase the Mercedes. Our job, however, is to review the sufficiency of the evidence, not choose between competing interpretations of that evidence. The jury was free to choose between reasonable constructions of the evidence, and Lawson has failed to

> show that the jury could not have found her guilty of money laundering
> based on the evidence  presented.

*Lawson*, 2025 U.S. App. LEXIS 15391, at *47-48.

This language is important for two reasons.  First, it does not apply the illogical percentage comparison methodology that the Government has derived from *Green*.  Second, it does not say that just because there is commingled dirty money that the entire transaction is dirty as a matter of law. In fact, *Lawson* suggests that if there was clean money in the account to cover the withdrawal, that this could defeat the § 1957 charge.[17]  In *Lawson*, the forensic accounting witness testified that the only money in the account at the time of the transaction was dirty money.

In the end, none of the cases cited by the Government provide controlling Eleventh Circuit rule.  There certainly is not a controlling § 1957 case that says any dirty money in an account makes a transaction over $10,000.00 violative of the statute. Defendants urge the Court to apply the Fifth Circuit's rule from *Loe* and dismiss substantive money laundering counts.  In the alternative, should the court adopt a pro rata method, it should dismiss Counts 7, 8, and 9.

---

[17] "Specifically, Downing testified that a $35,000 JPMorgan Chase cashier's check used to pay in part for the Mercedes had been funded entirely by the fees Lawson received from EIDL and PPP applications. *She explained that there were no other sources of funds to Lawson's account during the relevant time period, and that the account did not otherwise have enough money to cover the check*." Lawson,  2025 U.S. App. LEXIS 15391, at *46.

**III. This Court Should Grant a Judgment of Acquittal as to Counts Ten and Eleven (Conspiracy to Introduce Misbranded Drugs into Interstate Commerce and Introduction into Interstate Commerce of a Misbranded Drug) Because No Reasonable Jury Could Find Defendants Guilty on the Evidence Presented by the Government.**

The Government has failed to present sufficient evidence to allow a reasonable jury to find Defendants Jared Wheat and Hi-Tech guilty beyond a reasonable doubt to Count Ten of conspiracy to introduce misbranded drugs into interstate commerce or to Count Eleven the introduction into interstate commerce of a misbranded drug.

Count 10 alleges that Jared Wheat and Hi-Tech conspired to distribute a misbranded drug product called Choledrene.  The allegation is that the Choledrene contained the prescription drug, Lovastatin, and that the prescription Lovastatin drug was not listed on the label. The indictment identifies shipments to customers in other states between September 2009 and June 2014.

Count 11 is a substantive misbranding offense related to Choledrene.  This count alleges that, on August 22, 2013, Jared Wheat and Hi-Tech Pharmaceuticals, with the intent to defraud and mislead, sent misbranded Choledrene from Georgia to Louisiana, thereby, introducing a misbranded drug into interstate commerce.  The misbranding is alleged to be the failure to list prescription Lovastatin on the label. This shipment is one of the overt acts listed in the conspiracy count.

### A.  Evidence Presented in the Government's Case

The first witness to testify about Choledrene was retired FDA Special Agent Michael Niemiec.  (Testimony on October 28, 2025).  Agent Niemiec testified that in August 2013, he went onto the Hi-Tech website and ordered a bottle of Choledrene.  He paid $49.99 for the product and the bottle was shipped to him in Louisiana.  (Gov. Ex. 800).  Once he received the bottle, he photographed, marked, and bagged the exhibit. (Gov. Ex. 801).  Subsequently, the bag was sent to the FDA lab.

At some point in 2013, F.D.A. chemist, Lorrie Lin, created a composite sample by emptying the powder from ten capsules of the Choledrene into a glass vial.  (Hi-Tech Ex. 8). The glass vial was capped and placed into a sample room with the rest of the capsules in the bottle.  The composite sample was not refrigerated or stored in any special way.  Initial testing, in late 2013, purported to find Lovastatin in the composite. As shown during the government's case, the testing method employed in 2013, could not distinguish between Lovastatin and Monacolin K. Moreover, the 2013 testing erroneously compared the composite to Monacolin K, not Lovastatin. The composite thereafter remained in the sample room for the next four and a half years until Agent Kriplean asked for it to be tested again. (Testimony of Lisa Lorenz, October 29, 2025).

By the time of the testing in 2018, the sample had been expired for more than four years.  FDA Chemist Lisa Lorenz removed the sample for High Performance Liquid Chromatography with Ultraviolet Detection (HPLC-UV) testing.  She was asked to obtain samples of Monacolin K and Lovastatin from reference standards as well as a sample from the Choledrene composite.  Monacolin K is a naturally occurring substance that is found in red yeast rice. The prescription drug Lovastatin is made by purifying and synthesizing Monacolin K.  Ms. Lorenz testified that chemically, Monacolin K and prescription Lovastatin are "exactly the same"/identical and that HPLC-UV analysis cannot distinguish one from the other.

She testified that she used the HPLC-UV machine to compare the composite sample with Monacolin K and prescription Lovastatin.  Since they are the same chemically, the HPLC-UV machine found that the composite sample matched both the Monacolin K and bio-synthetic prescription Lovastatin standards.  This is so because the Monacolin K and prescription Lovastatin will look the same in HPLC-UV analysis.  Based on this, Ms. Lorenz testified that she could not say that the Choledrene was adulterated with prescription Lovastatin.

After Lorenz completed her work, the samples were sent to Kevin Kubachka for carbon isotope testing.  A method for using carbon isotope testing to distinguish between Monacolin K and prescription Lovastatin did not exist prior to 2017.  The

first time such a method was suggested was in a 2017 article by Matteo Perini. (Def. Hi-Tech Ex. 8 - M. Perini et. al, *Stable isotope ratio analysis for red yeast rice*, Talanta, May 23, 2017). While this was the first attempt at distinguishing the two compounds, it was not perfect. A subsequent article in 2023 suggested additional steps to take to isolate the compounds for testing. (Def. Hi-Tech Ex. 12 - K. Hannon et. al, *Using stable carbon isotope ratio analysis to detect adulteration in red yeast rice dietary supplement*s, Talanta, August 23, 2023). Since Lorenz isolated the compounds in the Choledrene five years before the publication of the 2023 article, she did not follow the protocols described in the 2023 article.

Kevin Kubachka testified that, after receiving the samples from Ms. Lorenz, he performed carbon isotope ratio testing (IRMS) in 2018 to attempt to determine whether the Choledrene contained Monakolin K or prescription Lovastatin. (Testimony on November 3, 2025). This was the first time that he had done such a test. He used the method described in the 2017 Perini article. The Perini method represented the first attempt to use IRMS to attempt to distinguish between Monakolin K and prescription Lovastatin.

Dr. Kubachka testified that Monacolin K and prescription Lovastatin have the same chemical structure and the same chemical formula. He also explained that an IRMS machine is an expensive piece of equipment, which required specialized

training, and would not be available to a dietary supplement manufacturer. He also testified that the carbon isotope ratio testing (IRMS) testing he performed would not have been available at the time of the conduct charged in the indictment because the method did not exist.[18]

Dr. Kubachka interpreted the Perini article as indicating that Monacolin K has a carbon isotope value in the range of -28 to -31 and that prescription Lovastatin has a range of -14 to -22. The test he ran on Choledrene resulted in a value of -17.96. Since this fell in the prescription Lovastatin range, he concluded that the Choledrene contained prescription Lovastatin. Despite this finding, he was unable to determine how much Lovastatin was in the product, only that some was in it.

Dr. Kubachka acknowledged that the sample he tested was over 8 years old and that it was unusual to test samples of that age. He also indicated that age could cause the sample to degrade and that could result in the loss of a carbon which would change the final value. Dr. Kubachka also agreed that problems with the preparation of the samples prior to his analysis could affect the results of his analysis. He further

---

[18] The lack of a test to distinguish between prescription Lovistatin and Monacolin K at the time of the indictment in 2017 proves that the Government presented false testimony to the grand jury in order to secure the indictment. There is no way that anyone could have truthfully testified that there was prescription Lovastatin in Choledrene because a test to distinguish it from Monacolin K did not exist at the time.

testified that factors in the manufacture of Monacolin K, such as the addition of nutrients during the fermentation process, could also effect the carbon isotope values. In addition to the age of the samples, there was evidence that a prior analyst, Lorrie Lin, confused or mislabeled the standards that were provided.  In addition, the Monacolin K standard was a sample that came from mushrooms rather than red yeast rice.

### B.  The Statutes Alleged to Have Been Violated

There are several interrelated statutes at play with these charges.  First we have the conspiracy statute which states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18, U.S.C. § 371. Then we have the misbranding statutes which state:

> The following acts and the causing thereof are hereby prohibited:
>
> (a)  The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

21 U.S.C. § 331(a) and that if any person "commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000 or both." 21 U.S.C. § 333(a)(2). " The term "drug"

means . . . articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1)(c). A drug or device is deemed to be misbranded "if its labeling is false or misleading in any particular." 21 U.S.C. § 352(a)(1).

A conspiracy requires proof of three elements: "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendant[s'] knowing and voluntary participation in the conspiracy; and (3) an overt act in furtherance of the conspiracy." *United States v. McQueen*, 727 F.3d 1144, 1153 (11th Cir. 2013) (alteration in original) (citation and internal quotation marks omitted). In order for the Government to prove the conspiracy, it must show that "two or more persons in some way agreed to try to accomplish a shared and unlawful plan" and that "the Defendant knew the unlawful purpose of the plan and willfully joined in it." 11th Circuit Pattern Criminal Jury Instructions, Offense Instruction 13.1.  Finally, a corporation and its individual owner cannot alone be the two co-conspirators. *United States v. Stevens*, 909 F.2d 431 (11th Cir. 1990).  There must be two actual people. The Government has failed to show both of these elements of conspiracy.

## C. Argument

The key issue here revolves around Monacolin K.  Monacolin K is the active ingredient in Choledrene and is a naturally occurring compound found in red yeast

rice. Monacolin K is not a prescription drug. The prescription drug Lovastatin is bio-synthetic and purified Monacolin K. On a molecular level, Monacolin K and prescription Lovastatin are identical. During the time period charged in the indictment, there was no test to differentiate naturally occurring Monacolin K from purified, bio-synthetic, prescription Lovastatin. HPLC-UV testing was the only testing available to the supplement industry during the dates alleged in the indictment and it could not distinguish between Monacolin K and prescription Lovastatin.

Both of the government's witnesses testified that the ingredient listed on the Choledrene label is red yeast rice. This is an accurate reflection of what was contained in the product. The Government has presented no evidence that Mr. Wheat or Hi-Tech spiked the Choledrene with purified, bio-synthetic, prescription Lovastatin. No witness testified that Mr. Wheat or Hi-Tech adulterated the Choledrene. It has also presented no evidence that Hi-Tech possessed prescription Lovastatin during the time frame alleged in the indictment. There are no orders, receipts, invoices, or inventory sheets in evidence showing that Hi-Tech purchased or manufactured purified, bio-synthetic, prescription Lovastatin or that it was ever in Hi-Tech's Choledrene manufacturing facility. Neither was any evidence presented regarding Hi-Tech's supplier of red yeast rice.

Defendants, therefore, cannot be convicted on any of the charges because the Government has failed to show that Choledrene contained a prescription drug. To do so, it would have to present evidence that the substance contained in the Choledrene was in fact bio-synthetic, purified, prescription Lovastatin and not the naturally occurring Monacolin K. Ms. Lorenz's HPLC-UV testing did not show this and she testified that she could not say that prescription Lovastatin was in the product.

The IRMS testing falls short of demonstrating that there was prescription Lovastatin in the Choledrene. The problem here is with the Perini study. While this is a published paper, it presented a novel method of analysis that had not been validated. Indeed, the research conducted in this area by the government's own expert, Dr. Kubachka, and published in 2023, demonstrates that the method needed to be revised and refined. The best the government can do is say that the Choledrene tests fall within the range suggested by the earlier paper. However, it has failed to demonstrate that the paper is in fact correct.

The Supreme Court articulated factors to consider when determining if an expert's testimony is admissible under Rule 702. Trial courts undertaking a *Daubert* analysis must determine: (1) whether the theory, technique, and background knowledge the expert applies is generally accepted in the relevant scientific

community; (2) whether the research supporting the expert's conclusion has been subjected to peer review and publication; (3) whether the expert's theory can be and has been tested; (4) whether standards exist to control the operations of the expert's methods; and (5) whether the known or potential rate of error is acceptable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993).

The problem with the 2017 Perini method used in this case is that the method was new and untested. It had not been replicated and had not been accepted in the scientific community. It was simply the first experiment put out to the scientific community for consideration. To this day, it has still not gone through the kind of analysis by the scientific community to allow anyone to conclude that Perini was right.

In fact, a subsequent paper authored by Kubachka and Lorenz, did not validate the Perini paper. (Def. Hi-Tech Ex. 12). Their 2023 paper found ranges that were entirely different than those found in the Perini study. The 2017 study set the range for Lovastatin at -14 to -22 while the 2023 study had it at -19.35 to -24.50. This is notable because the Choledrene sample was -17.96 and would have been outside the Lovastatin range listed in the 2023 study. What this says is that the standards are not reliable as they still have not been validated. In short, the science is not there yet to allow for the conclusions that the Government wishes to make. The IRMS testing

does not prove that the Choledrene contained prescription Lovastatin. With no proof of this key element both the substantive and the conspiracy counts must be dismissed.

Even if there is sufficient evidence to support a finding that there is purified, synthetic, prescription Lovastatin in the tested sample of Choledrene, without evidence of spiking, the Government has failed to present any evidence to show that Mr. Wheat and/or Hi-Tech knew that Choledrene contained prescription Lovastatin or that the product was mislabeled. This is especially so since the testing available prior to 2017 could not make the distinction between the Monacolin K and purified, synthetic Lovastatin.[19]

The knowledge of the presence of prescription Lovastatin goes to the Defendants' intent. "The presence or absence of intent is important since willful

---

[19] The Government may point to Government Exhibit 808 to argue that Mr. Wheat wanted to put prescription Lovastatin in his products. This would be an incorrect inference to draw from this exhibit. Government's Exhibit 808 is an email exchange between Mr. Wheat and a raw materials supplier in which the two are discussing price and specifications for red yeast powder. In the email, Mr. Wheat asks if the product contains .4% lovastatin. The supplier responds that it contains "Total Monacolin K NL TO .40%." to which Mr. Wheat responds "Yes, this is the correct material." (Gov. Ex. 808). Plainly, this shows that Mr. Wheat is using the terms lovastatin and Monacolin K interchangeably and demonstrates an intent to produce a product containing Monacolin K not prescription Lovastatin. Moreover, Dr. Kubachka testified that the terms were synonyms.

misbranding is only a misdemeanor unless there is 'the intent to defraud or mislead.' Then it is a felony." *United States v. Goldberg*, 538 F.3d 280, 289 (3d Cir. 2008) quoting 21 U.S.C. § 333(a). As the Tenth Circuit cogently explained:

> We believe that the specific intent requirement in § 333(a)(2) requires not only proof of misbranding under § 331, but also proof of an intent to mislead or defraud *which is connected to the misbranding violation under § 331. See Industrial Laboratories*, 456 F.2d at 910-11; *United States v. Hiland*, 909 F.2d 1114, 1128 (8th Cir. 1990). *See also United States v. Agnew*, 931 F.2d 1397, 1408-09 (10th Cir. 1991) (felony conviction under Federal Meat Inspection Act, 21 U.S.C. § 676(a) for transporting adulterated meat). Because "knowledge of the essential nature of the alleged fraud is a component of the intent to defraud," a defendant cannot act with intent to mislead or defraud under § 333(a)(2) without some knowledge of the misbranding. *Hiland*, 909 F.2d at 1128; *Industrial Laboratories*, 456 F.2d at 910 (jury should have been instructed that "defendant *knew* that several tests had not been made").

*United States v. Mitcheltree*, 940 F.2d 1329, 1349 (10th Cir. 1991)(emphasis in original); *accord United States v. Fishman*, 2025 LX 434878, at *6 (2d Cir. Sep. 22, 2025)("the essential requirement of the statute is that the intent to mislead relate to the underlying 21 U.S.C. § 331 violation."); *United States v. Geborde*, 278 F.3d 926, 928 (9th Cir. 2002)("Because Geborde was charged with failure to register, his intent to defraud or mislead must relate to his failure to register, and not to some other possible wrongdoing."). Here, there simply was no intent to mislead or defraud. Defendants believed that they were producing a product containing Monacolin K and testing was consistent with that.

Similarly, with no available testing method to show that Choledrene contained prescription Lovastatin, Mr. Wheat and Hi-Tech could not have knowingly joined a conspiracy to distribute a misbranded drug.[20]  They purchased red yeast rice as a raw material and testing indicated that it contained Monacolin K.

As to the conspiracy, the Government has failed to show that a second person was involved in the alleged conspiracy. Instead, it has alleged a conspiracy between Mr. Wheat and the Hi-Tech corporation.  The law is well settled in this circuit that a person who is the sole owner of a corporation, acting on his own and on behalf of the corporation, does not conspire with the corporation. *United States v. Stevens*, 909 F.2d 431 (11th Cir. 1990). With no other human person besides Mr. Wheat knowingly involved in the alleged conspiracy, there is no conspiracy.

---

[20] The Government lists 10 shipments of Choledrene as overt acts in paragraphs 24 to 33 of the second superseding indictment.  Yet, it only tested the shipment of Choledrene in the August 22, 2013, shipment listed in Paragraph 29.  Since there was no evidence that samples from any of the other shipments were tested, the Government has not proven that the Choledrene contained in those shipments contained prescription Lovastatin.  In fact, with no testing, there is no evidence as to any substance contained in those shipments, let alone prescription Lovastatin. As there is no evidence of prescription Lovastatin in those samples, there is no evidence that they were mislabeled or within the scope of any conspiracy.  Thus, even if the Court finds sufficient evidence to send the conspiracy count to the jury, because the Government has failed to prove these overt acts, they should be stricken from the second superseding indictment.

The Government has failed to identify another person who knew both that there was prescription Lovastatin in the Choledrene and that the prescription Lovastatin was not going to be identified on the label. Since, by definition, there cannot be a conspiracy with only one person, the Government has failed to provide sufficient evidence of a conspiracy. Second, even if the Government is able to show a second person with the requisite knowledge was involved, the Government has failed to show that Mr. Wheat knew the unlawful purpose of the plan and joined it. For this, the Government has to show that Mr. Wheat knew that Choledrene contained Lovastatin and not Monacolin K. Without that showing, Mr. Wheat could not have known that the product was misbranded and would not know that he was involved with a misbranded product.

The indictment clearly alleges that Choledrene was misbranded because it did not identify prescription Lovastatin on the label. Count 11 specifically states that the Choledrene "was misbranded within the meaning of Title 21, United States Code, Section 352(a), in that its labeling was false and misleading because it failed to list lovastatin as an ingredient." (Doc. 514 at 12). Similarly, in the manner and means section of the conspiracy listed in Count 10, the government alleges that "Defendant WHEAT caused Defendant HI-TECH to distribute and sell Choledrene with false

and misleading labeling that failed to declare lovastatin as an ingredient." (Doc. 514at 9, ¶ 23).

During the testimony of Sergio Oliveira, the Government introduced copies of the Hi-Tech magazine. In arguing for the admission of the magazines, the Government put forth a theory that the Choledrene was misbranded because the advertising materials in the magazine made statements indicating that Choledrene would affect the structure or function of the human body. It asserted that advertising was part of the label so that structure and function statements in the advertising were part of the labeling. Even if the Government's theory is legally sound, it is not part of this case.

As shown above, the indictment only alleges misbranding because prescription Lovastatin is not listed on the Choledrene label. The indictment makes no reference to misbranding because of any structure or function claims in the advertising materials. For the government to go forward on this theory would allow for a constructive amendment to the indictment. A constructive amendment to an indictment occurs "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Keller*, 916 F.2d 628, 634, 635-36 (11th Cir. 1990) (finding that there was a constructive amendment where the

indictment charged that the defendant conspired with a particular individual, but the jury instructions indicated that the defendant could be convicted by a showing that he conspired with anyone).

In addition, even if the magazine articles contained language that would cause Choledrene to be misbranded, the articles are outside the time window of this case. The magazines were published in August 2008 and April 2009. The conduct alleged in the conspiracy count started in July 2009 while the conduct alleged in Count 11, the substantive count, occurred in August 2013. Thus, the articles provide no evidence to support either the conspiracy count or the substantive count.

Finally, the Government has failed to present evidence on the element of the offense that "Choledrene was not a 'dietary supplement' under FDCA, and instead was a 'drug' because it was an article other than food intended to affect the structure and function of the human body." (Doc. 514 at 9). The Government has not presented a doctor or pharmacologist or any other expert to testify on this element. Without such testimony from such a witness, the Government has failed to present any evidence on this element. Therefore, both the felony and the misdemeanor offenses should be dismissed.

WHEREFORE, for the foregoing reasons, this Court should direct a verdict on all counts.

Dated, this the 5th day of November, 2025.

Respectfully submitted

.

**/s/ Brian Steel**
Brian Steel
Georgia Bar No. 677640
Colette Resnik Steel
Georgia Bar No. 601092
The Steel Law Firm, P.C.
1800 Peachtree Street, N.W., Ste. 300
Atlanta, Georgia 30309
404-605-0023
thesteellawfirm@msn.com
crsteel@msn.com
*Counsel for Defendant Jared Wheat*

**/s/ Arthur W. Leach**
Arthur W. Leach
Georgia Bar No. 442025
The Law Office of Arthur W. Leach
4080 McGinnis Ferry Road, Ste. 401
Alpharetta, Georgia 30005
404-786-6443
Art@ArthurWLeach.com
*Counsel for Defendant*
*Hi-Tech Pharmaceuticals, Inc.*

**/s/ Brian Mendelsohn**
Brian Mendelsohn
Georgia Bar No. 502031
Jeffrey L. Ertel
Georgia Bar No. 249966
The Mendelsohn Ertel Law Group LLC
101 Marietta Street, N.W., Suite 3325
Atlanta, Georgia 30303
(404) 885-8878
Brian@tmelg.com
Jeffrey@tmelg.com
*Counsel for Defendant Jared Wheat*

**/s/ Jack Wenik**
Jack Wenik
One Gateway Center, 13th Floor
Newark, New Jersey 07102
973-639-5221
jwenik@ebglaw.com
Admitted Pro Hac Vice
*Counsel for Defendant*
*Hi-Tech Pharmaceuticals, Inc.*

**/s/ Bruce H. Morris**
Bruce H. Morris
Georgia Bar No. 523575
Finestone Morris & White

**/s/ J. Stephen Salter**
J. Stephen Salter
8975 Pompano Way
Gulf Shores, Alabama 36542

3340 Peachtree Road NW
Atlanta, Georgia 30326
404-262-2500
BMorris@FMattorneys.com
*Counsel for Defendant Jared Wheat*

205-585-1776
umstakwit@aol.com
Admitted Pro Hac Vice
*Counsel for Defendant Jared Wheat*